**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

03   JUN -5  PH 4:39

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| SOLUTIA INC. and PHARMACIA CORPORATION, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) |
| vs. | ) CASE NUMBER: |
| | ) |
| MCWANE, INC. a/k/a Union Foundry and M&H Valve; | ) |
| | ) |
| WALTER INDUSTRIES, INC. f/k/a U.S. Pipe and Foundry and T.C. King Pipe and Fittings Co.; | ) |
| | ) CV-03-PWG-1345-E |
| | ) |
| UNITED STATES PIPE AND FOUNDRY COMPANY, INC.; | ) |
| | ) |
| U.S. CASTINGS; | ) |
| MEADWESTVACO CORPORATION f/k/a Mead Corporation, Woodward Iron, Alabama Pipe Company, Union Foundry, Lynchburg Foundry, and Standard Foundry; | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| FMC CORPORATION; | ) |
| UNITED DEFENSE, LP; | ) |
| AMCAST INDUSTRIAL CORPORATION f/k/a Lee Brass Company; | ) |
| | ) |
| PHELPS DODGE INDUSTRIES, INC. f/k/a Lee Brothers Company, Incorporated; | ) |
| | ) |
| HALLIBURTON COMPANY f/k/a Dresser Industries, M&H Valve Company; | ) |
| | ) |
| THE WALWORTH COMPANY f/k/a M&H Valve Company; | ) |
| | ) |
| KILBY STEEL COMPANY, INC.; | ) |
| SCIENTIFIC-ATLANTA, INC. f/k/a Southern Tool; | ) |
| | ) |
| HURON VALLEY STEEL CORPORATION; | ) |
| TULL CHEMICAL COMPANY, INC.; | ) |
| CARRIER RESEARCH INCORPORATED; | ) |
| DATRON, INC.; | ) |
| ANCHOR METALS, INC.; | ) |
| CHALK LINE MANUFACTURING, INC.; | ) |
| | ) |
| Defendants. | ) |

**COMPLAINT**

Plaintiffs, Solutia Inc. and Pharmacia Corporation, by and through their undersigned attorneys, file this Complaint and allege as follows:

**NATURE OF THE ACTION**

1.      This is a civil action pursuant to Section 107 and Section 113(f)(1) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607 and 42 U.S.C. § 9613(f)(1), as amended, for contribution and cost recovery with respect to any costs incurred, or to be incurred, by Pharmacia or Solutia in performing response activities at certain sites that make up what the United States Environmental Protection Agency ("U.S. EPA") identifies as the Anniston PCB Site and the Anniston Lead Site in Calhoun County, Alabama and Talladega County, Alabama (hereinafter collectively referred to as the "Anniston PCB and Lead Sites").

2.      Research has shown that many other sources of PCB contamination exist from parties using products containing PCBs.  The purpose of this Complaint is to hold other parties legally responsible for their contribution to the contamination found in the Anniston PCB and Lead Sites and, further, to compel such other parties to pay their fair share of the costs, which Solutia has expended, and will continue to expend, in addressing the environmental contamination in Calhoun County and Talladega County.

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction over this action and the parties thereto pursuant to CERCLA, 42 U.S.C. § 9613(b).

4.     Venue is proper in the Northern District of Alabama, pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b), because the U.S. EPA's allegations of releases of hazardous substances giving rise to the Plaintiffs' claims for contribution for response costs and cost recovery occurred in this district, and because the property that is the subject of this action is situated in this district.

## THE PLAINTIFFS

5.     Pharmacia was formed in 2000 by the merger of the former Monsanto Company ("Monsanto") and Pharmacia & Upjohn, Inc.  (A different corporate entity named "Monsanto Company" exists today).  Monsanto, now known as Pharmacia, owned and operated a plant in Anniston, Alabama, from the 1930's until 1997 (hereinafter, the "Anniston Plant").

6.     In December 1996, Monsanto's Board of Directors approved in principle a plan to spin-off certain, but not all, of its chemical businesses.  A new corporation was initially formed as a wholly-owned subsidiary of Monsanto.  Certain assets ultimately to become assets of Solutia were then transferred into the subsidiary.  Then, on September 1, 1997, with shareholder approval, Monsanto distributed the shares of the subsidiary to its shareholders, thus effecting the spin-off.  Solutia now owns and operates the Anniston Plant.

7.     As part of the 1997 spin-off of Solutia, Solutia agreed to indemnify Monsanto - now Pharmacia - for various liabilities.  Under its agreement with Pharmacia, Solutia is legally obligated to indemnify Pharmacia for certain liabilities associated with the Anniston PCB and Lead Sites.

## THE ANNISTON PCB AND LEAD SITES

8.     Anniston, Alabama is located in a mountainous region in northeastern Alabama. Anniston is in a valley with Coldwater Mountain to the southwest, Ft. McClellan Reserve and the Anniston Army Depot to the west, and the Choccolocco Mountain Range, including part of Ft. McClellan Reserve, to the east.

9.     Snow Creek originates in Ft. McClellan and runs south, through Anniston and Oxford, into Choccolocco Creek.  Choccolocco Creek originates east of its confluence with Snow Creek and runs west into Lake Logan Martin.

10.     The Anniston PCB and Lead Sites are defined in the October 27, 2000 Administrative Order on Consent between the U.S. EPA and Solutia Inc, docket no. 01-02-C; the October 5, 2001 Administrative Order on Consent between the U.S. EPA and Defendants, docket no. CER-0402002-3752; and/or the October 23, 2002 Administrative Order on Consent between the U.S. EPA and Pharmacia Corporation (p/k/a Monsanto Company) and Solutia Inc, docket no. CV-02-PT-0749-E.  The Anniston PCB and Lead Sites include, but are not limited to, parts of West Anniston, Oxford Lake Park, the Quintard Mall expansion area, the Highway 21 expansion area, Snow Creek, Choccolocco Creek, and Lake Logan Martin.

## SOLUTIA'S ANNISTON PLANT

11.     Swann Chemical manufactured polychlorinated biphenyls ("PCBs") at the Anniston, Alabama facility from 1929 until 1935, when Monsanto purchased the facility from Swann.  Monsanto continued to manufacture PCBs at the Anniston Plant from 1935 until 1971. In 1971, Monsanto voluntarily ceased production of PCBs at its Anniston Plant.

12.     PCBs were widely used in industry for more than five decades because they are resistant to fire and they are chemically inert, which means they do not readily react with other substances.  These attributes made PCBs especially useful in safety fluids used to insulate and cool heavy duty electrical equipment, including transformers and capacitors.  The use of PCB electrical fluids was required by building safety codes in many industrial operations where the risks of electrical fires or explosions were major concerns.

13.     In the late 1960s, Monsanto learned that the same trait that made PCBs so attractive to industry - the fact that they do not react readily with other substances - also resulted in their persistence in the environment.

14.     Starting in the late 1960s, Monsanto voluntarily began a company wide effort to minimize the risk that PCBs could have on the environment.  In Anniston, for example, Monsanto capped and constructed a storm water management system for the two plant landfills and removed the sediment in the 11th Street ditch.  In addition, Solutia purchased the residential property in the flood plain immediately surrounding the Anniston Plant.

## PHARMICIA AND SOLUTIA ARE ADDRESSING A REGIONAL PROBLEM

15.     On December 31, 1998, the U.S. EPA received a letter from the West Anniston Environmental Justice Task Force, now known as Citizens Against Pollution ("CAP"), in which CAP alleged contamination could be found throughout Anniston.

16.     In February of 2000, the U.S. EPA began a program of sampling properties in West Anniston.   Under this program, the U.S. EPA sampled approximately 800 residential, public, and commercial properties for PCBs, lead and cadmium.

17.     In October of 2000, Solutia entered into an Administrative Order on Consent ("AOC") with the U.S. EPA.  The 2000 AOC is known as the "October 27, 2000 Administrative Order on Consent between the U.S. EPA and Solutia Inc, docket no. 01-02-C".

18.     The 2000 AOC was revised by an amended AOC in October of 2001.   The October 2001 AOC is known as the "October 5, 2001 Administrative Order on Consent between the U.S. EPA and Solutia Inc, docket no. CER-0402002-3752."

19.     In October of 2002 Solutia and Pharmacia entered into a third AOC with the U.S. EPA.   The October 2002 AOC is known as the "October 23, 2002 Administrative Order on Consent between the U.S. EPA and Pharmacia Corporation (f/k/a Monsanto Company) and Solutia Inc, docket no. CV-02-PT-0749-E".

20.     The October 27, 2000 Administrative Order on Consent between the U.S. EPA and Solutia Inc, docket no. 01-02-C; the October 5, 2001 Administrative Order on Consent between the U.S. EPA and Defendants, docket no. CER-0402002-3752; and the October 23, 2002 Administrative Order on Consent between the U.S. EPA and Pharmacia Corporation (f/k/a

Monsanto Company) and Solutia Inc, docket no. CV-02-PT-0749-E are hereinafter collectively referred to as the "Orders" or the "Order".

21.     Pursuant to the above Orders, Solutia and Pharmacia, without admitting liability, agreed to take over the residential sampling for the U.S. EPA in areas covered by the Orders, and to clean up contaminated properties in Anniston by removing contaminated foundry sand, fluff, and other contaminated waste fill material, and replacing it with clean fill.  Further, Solutia agreed to investigate other sources of the contamination and reimburse the U.S. EPA.

22.     While performing its obligations under the Orders, Solutia discovered that PCBs, lead, cadmium, and other waste substances were sporadically deposited in the residential and commercial soil in West Anniston.  The U.S. EPA and Solutia detected lead, cadmium, PCBs, and other waste substances in residential properties that are hundreds of feet up gradient of the Solutia Anniston Plant and other industrial facilities.  Many of the contaminated residential and commercial properties are adjacent to uncontaminated properties. For example, 717 Zinn Parkway, which has elevated levels of PCBs, is adjacent to properties with significantly lower levels of PCBs.

23.     The residential and commercial properties in West Anniston contain spent foundry sand, fluff, and other waste fill material.  The spent foundry sand, fluff, and other waste fill material in West Anniston contains PCBs, lead, cadmium, and other hazardous substances. West Anniston is part of the Anniston PCB and Lead Sites.

24.     Oxford Lake Park is located near the confluence of Snow Creek and Choccolocco Creek.  Oxford Lake Park contains substantial amounts of spent foundry sand and other wastes.

The spent foundry sand at Oxford Lake Park contains PCBs, lead, cadmium, and other hazardous substances. Oxford Lake Park is part of the Anniston PCB and Lead Sites.

25.     The Quintard Mall expansion area is located at or near 700 Quintard Dr., in Oxford, Alabama. The Quintard Mall expansion area contains substantial amounts of spent foundry sand and other wastes. The spent foundry sand in the Quintard Mall expansion area contains PCBs, lead, cadmium, and other hazardous substances. The Quintard Mall expansion is part of the Anniston PCB and Lead Sites.

26.     The Highway 21 expansion area is located where Highway 21 crosses Choccolocco Creek in Talladega County. The Highway 21 expansion area contains substantial amounts of spent foundry sand and other wastes. The spent foundry sand in the Highway 21 expansion contains PCBs, lead, cadmium, and other hazardous substances. The Highway 21 expansion area is part of the Anniston PCB and Lead Sites.

27.     The only common element among the areas identified in paragraphs 22 - 26 is the presence of spent foundry sand and foundry waste.

**DEFENDANTS**

**THE FOUNDRIES**

28.     Anniston is or has been home to over 20 foundries. Many of the foundries produced soil pipe, fittings for soil pipes, and other related foundry products.

29.     Soil pipe production started in Anniston during the late 1800's. By the early 1920's, Anniston was the largest production center for cast iron soil pipe in the world. Cast iron soil pipe and fittings are used primarily in building construction for sanitary and storm drain,

waste, and vent piping applications.   The pipe and fittings are installed in residential construction, hospitals, schools, and commercial and industrial facilities.

**McWane, Inc.**

30.    McWane, Inc. ("McWane") is a Delaware corporation in good standing.

31.    McWane has owned and operated the Union Foundry Facility, located at 1501 West 17th Street, since 1976.

32.    McWane has owned and operated the M&H Valve facility, located at 605 West 23rd Street, since 1984.

**Walter Industries, Inc., U.S. Pipe and Foundry and U.S. Castings**

33.    Walter Industries, Inc. ("Walter Industries") is a Delaware corporation in good standing.

34.    In 1899, United States Cast Iron Pipe and Foundry Company was created through the consolidation of 12 companies located throughout eight states, including the Anniston Pipe & Foundry in Anniston, Alabama.  In 1929, the name of the company was changed to United States Pipe and Foundry ("U.S. Pipe").

35.    From the late 1890's to the late 1940's, Walter Industries owned and operated a facility in north Anniston that included the U.S. Pipe North Facility (f/k/a Anniston Pipe & Foundry Company) and the facility that later became the "FMC Forge" and the "FMC Foundry", located at 2101 West 10th Street, as U.S. Pipe and Foundry.

36.     Walter Industries sold the FMC Forge and FMC Foundry facilities to Kilby Steel in the late 1940's.

37.     In the late 1940's, Walter Industries began operations at its South Facility, located at 1831 Front Street, as T.C. King Pipe and Fittings Company.  In 1961, T.C. King Pipe and Fittings merged into U.S. Pipe and Foundry.

38.     In 1969, United States Pipe and Foundry merged into Jim Walter Corporation.  In 1988, the Jim Walter Corporation changed its name to Walter Industries.

39.     In 1987, Walter Industries created a Delaware corporation named United States Pipe and Foundry Company, Inc. ("U.S. Pipe") as a wholly-owned subsidiary.

40.     Prior to 2002, U.S. Pipe created a subsidiary called U.S. Castings.  U.S. Castings is the current owner of U.S. Pipe's south facility.

**MeadWestvaco Corporation**

41.     MeadWestvaco Corporation ("MeadWestvaco") is a Delaware corporation in good standing.

42.     MeadWestvaco owned and operated 5 foundries in Anniston, Alabama, from the early 1900's until the late 1970's.  These foundries are Union Foundry, Alabama Pipe Company, Ornamental Foundry, Standard Foundry, and the Water Pipe Plant.

43.     In 1917, MeadWestvaco began operating Union Foundry, located at 1501 West 17th Street, Anniston, Alabama, as the Union Foundry Company.  In 1924, Union Foundry merged into Alabama Pipe Company.

44.     Prior to 1920, MeadWestvaco began operating its Water Pipe Plant, also known as the Lynchburg Foundry, located at 2700 Dooley Avenue, Anniston, Alabama.  In 1924, the Water Pipe Plant merged into Alabama Pipe Company.

45.     Prior to 1920, MeadWestvaco began operating its Alabama Pipe facility, located at 20th Street and McCoy Ave., Anniston, Alabama, as the Alabama Pipe & Foundry Company. In 1924, Alabama Pipe & Foundry Company merged into the Alabama Pipe Company.

46.     Prior to 1920, MeadWestvaco began operating its Ornamental Foundry facility, located directly west of Snow Creek, near the corner of Front Street and Pine Street, Anniston, Alabama, as a division of Alabama Pipe & Foundry Company.

47.     Prior to 1920, MeadWestvaco began operating its Standard Foundry facility, located at 21st and Mulberry St., Anniston, Alabama, as the Standard Foundry Company.   The Standard Foundry Company merged into Alabama Pipe in 1924.

48.     Alabama Pipe merged into Woodward Iron Company in 1959.  Woodward Iron Company changed its name to Woodward Corporation. Woodward Corporation merged into the Mead Corporation in 1968.  Mead Corporation merged with Westvaco to form MeadWestvaco in 2002.

**FMC Corporation and United Defense, LP**

49.     FMC Corporation ("FMC") is a Delaware corporation in good standing.

50.     FMC owned and operated the "FMC Forge" facility and the "FMC Foundry", located at 2101 West 10th Street, West Anniston, Alabama from 1968 until 1994.

51.     FMC purchased the FMC Forge and the FMC Foundry from Kilby Steel in 1968.

52.     FMC, as the general and controlling partner in United Defense, L.P., owned and operated the FMC Forge and FMC Foundry from 1994 until 1997.

53.     United Defense, L.P. sold the FMC Forge and FMC Foundry to United Defense in 1997.

**Amcast Industrial Corporation and Lee Brass Company**

54.     Amcast Industrial Corporation ("Amcast") is an Ohio corporation in good standing.

55.     Amcast owned and operated the Lee Brothers Foundry facility, at 1800 Golden Springs Road, from 1983 until approximately 1998 as the Lee Brass Company.

56.     In 1998 the Lee Brass Company merged into Amcast.

57.     Amcast is the current owner of the Lee Brass facility and successor to the liabilities of the Lee Brass Company.

**Phelps Dodge Industries, Inc.**

58.     Phelps Dodge Industries, Inc. ("Phelps Dodge") is a Delaware corporation in good standing.

59.     Phelps Dodge owned and operated the Lee Brothers Foundry facility, at 1800 Golden Springs Road, from 1919 until approximately 1963 as the Lee Brothers Foundry Co.

60.     In 1963 the Lee Brothers Foundry Co. merged into Phelps Dodge.

61.     Phelps Dodge continued to operate the facility until 1982, when it sold the facility to Amcast.

**Halliburton Company**

62.     Halliburton Company ("Halliburton") is a Delaware corporation in good standing.

63.     Halliburton owned and operated the M&H Valve Facility, located at 605 West 23rd Street, from 1961 to 1984 as Dresser Industries ("Dresser'). In 1984, Dresser sold M&H Valve to McWane, Inc.

64.     In 1998, Dresser merged into Halliburton.

**The Walworth Company**

65.     The Walworth Company ("Walworth") is a Delaware Company in good standing.

66.     From the early 1920's to 1955, Walworth operated the M&H Valve Facility, located at 605 West 23rd Street, as the M&H Valve Fitting Company. M&H Valve Fitting

Company merged into Walworth in 1955. Walworth continued to own and operate the M&H Valve facility until 1961.  Walworth sold M&H Valve to Halliburton Company in 1961.

**Kilby Steel Company, Inc.**

67.    Kilby Steel Company, Inc. is an Alabama corporation in good standing.

68.    Kilby Steel owned and operated the "FMC Forge" facility and the "FMC Foundry", located at 2101 West 10th Street, from the late 1940's until 1968, when it sold the facilities to FMC Corporation.

69.    Kilby Steel started operating the Kilby Steel Foundry, located at 501 National Drive, Anniston, prior to 1970.  Kilby Steel is the current owner and operator of the facility.

**Scientific-Atlanta, Inc.**

70.    Scientific-Atlanta is a Georgia company in good standing.

71.    Scientific-Atlanta owned and operated the Southern Tool facility at 112 Highway 78 West in Oxford from 1953 until 1964 as Southern Tool.  In 1964 Southern Tool merged into Scientific-Atlanta.

72.    Scientific-Atlanta owned and operated the Southern Tool facility as Scientific-Atlanta, Southern Tool Division from 1964 until 1998.

73.    MeadWestvaco Corporation, Walter Industries, Inc., U.S. Pipe and Foundry, U.S. Castings, United Defense, LLP, FMC Corporation, McWane, Inc., The Walworth Company, Amcast Industrial Corporation, Phelps Dodge Industries, Inc., Kilby Steel Company, Inc.,

Halliburton Company, Scientific-Atlanta, Inc., (collectively referred to as the "Foundries") disposed of PCBs, lead, cadmium and other hazardous substances in the Anniston PCB and Lead Sites.

### Manufacturing Process of the Foundries

74.     The Foundries manufactured soil pipe and fittings out of cast iron. Cast iron is a generic term for a series of alloys primarily of iron, carbon and silicon. Cast iron also contains smaller amounts of other elements. The Foundries' primary source of cast iron is scrap metal. The Foundries used hundreds of tons of scrap a day.

75.     The Anniston Foundries also made a wide variety of other castings. These sand castings were made using sand or ceramic molds and cores.

76.     In their manufacturing process, the Foundries melted scrap and other metals in a cupola or an electric arc furnace. The molten metal was then poured into a mold made out of sand. Once the metal cooled, the sand mold was broken revealing the casting. The spent foundry sand was generally discarded. The Foundries arranged for the disposal of thousands of tons of foundry sand every month. For example, in 1988, Walter Industries disposed of 47.35 tons of foundry sand per day.

**The Foundries Disposed of PCBs in the Anniston PCB and Lead Sites**

77.    The Foundries have multiple sources of PCB contamination at each facility, including dielectric and hydraulic equipment, scrap and investment casting wax.

78.    The Foundries use a large amount of electricity, and as a result, the Foundries have all sizes of oil filled transformers, capacitors and switches on site.  This equipment is referred to as dielectric equipment.

79.    The Foundries' dielectric equipment was filled with PCB and PCB contaminated dielectric fluid.  Some of the Foundries' larger dielectric equipment contained over 1,500 gallons of PCB fluid.  For example, FMC had one transformer that contained 1,700 gallons of fluid.

80.    The Foundries primary raw material, scrap, was contaminated with PCBs.  For example, in a 1994 study titled "PCB, Lead, and Cadmium Levels in Shredder Waste Materials: a Pilot Study", the EPA found that all types of scrap contained PCBs.

81.    The Foundries used scrapped dielectric equipment as scrap metal in their casting process.  This discarded dielectric equipment contained large quantities of PCB-contaminated dielectric fluid.

82.    In addition to dielectric equipment, the Foundries' hydraulic systems contained large quantities of hydraulic oils.  For example, at the FMC Foundry, an Environmental Site Assessment found eight hydraulic fluid reservoirs leaking in an unpaved scrap yard.  Hydraulic fluid can be a source of PCBs.

83.   Some of the Foundries used casting wax.   There is EPA published literature which indicates that PCBs from Italy and France were blended with the casting wax, at percentages as high as 30%.

**The Foundries' housekeeping practices regularly contaminated their spent foundry sand with PCBs.**

84.   The Foundries' dielectric equipment and hydraulic systems often leaked oil. When such equipment leaked, the Foundries used spent foundry sand as oil absorbent.   This practice continues today.   For example, in 2000, McWane's Union Foundry facility reported to the Alabama Department of Environmental Management ("ADEM") that it used sand as an absorbent to clean up an oil spill.   Further, an employee of FMC Corporation told the Alabama Department of Public Health that periodically, sometimes due to ruptured hydraulic systems, oil would contaminate the foundry's molding sand.

85.   The Foundries swept up PCB oil-contaminated sand and deposited it back into the spent foundry sand pile.   This was one manner by which the Foundries' spent foundry sand became sporadically contaminated with PCBs from the dielectric and hydraulic fluids.

86.   Using spent foundry sand for oil dry is a standard industrial practice.   For example, Dr. Scrudato, proffered as an expert by the plaintiffs in Abernathy vs. Monsanto and Tolbert vs. Monsanto, co-authored an article about PCB contamination in foundry waste. In this article, Dr. Scrudato stated that the sporadic distribution of PCBs was consistent with the deposit of PCB-contaminated floor sweepings in the foundry waste.

87.     PCB-contaminated dielectric equipment was found in the Foundries' scrap piles. PCB fluid leaked out of the scrapped dielectric equipment and contaminated the scrap pile with PCBs. The PCB fluid draining off the scrap pile contaminated the spent foundry sand.

88.     The Foundries swept this contaminated sand back into the spent foundry sand pile.

89.      The Foundries arranged for the disposal of PCB-contaminated foundry sand at the Anniston PCB and Lead Sites.

90.     Disposing of foundry sand was a major cost for the Foundries. One of the cheapest ways for the foundries to dispose of their spent foundry sand was for the Foundries to "give" the foundry sand away as clean fill material for commercial and residential properties. Residents either picked up spent foundry sand or the foundries delivered spent foundry sand to residential, commercial, and public properties.

91.     The spent foundry sand was used as fill or mixed with topsoil.  Remnants of this practice exist today. For example, in the 1980's and 1990's, Phelps Dodge and Amcast gave or sold "reclaimed" foundry sand to various individuals and entities.  Further, these foundries sold spent foundry sand to another entity who in turn sold spent foundry sand and mixtures of foundry sand and soil to commercial and residential property owners throughout Anniston.  In 2002, the U.S. EPA ordered Amcast to remove the spent foundry sand from the residential and commercial property because it was allegedly hazardous for lead.  However, Amcast only investigated sites that received foundry sand after 1995.

92.     Spent foundry sand, fluff, and other waste material can be found in contaminated residential and commercial properties in and around Anniston.  This includes West Anniston, Oxford Lake Park, Quintard Mall, and the Highway 21 Expansion Area, which are each within the Anniston PCB and Lead Sites.

93.     The Foundries often had to repair or maintain dielectric equipment at their facilities.  When this was needed, the Foundries partially or completely drained the PCB-contaminated equipment.  Some Foundries apparently drained the PCB-contaminated fluids into Snow Creek or one of its tributaries, which is within the Anniston PCB and Lead Sites.

94.     The Foundries routinely discharged wastewater directly into Snow Creek or its tributaries.  For example, documents show that MeadWestvaco's Mead Pipe facility discharged directly to Snow Creek, which is within the Anniston PCB and Lead Sites.

95.     The Foundries arranged for the disposal of the contaminated soil, spent foundry sand, fluff, and other wastes by allowing rainwater to wash these wastes into Snow Creek and its tributaries.

96.     The Foundries disposed of PCB fluids at the Anniston PCB and Lead Sites by directly dumping PCB oil and PCB-contaminated fluids, as well as spent PCB fluid from the PCB equipment, in Snow Creek and its tributaries, or into sewer systems that discharged directly to Snow Creek.

97.     Solutia, U.S. EPA, and ADEM found PCBs in the drainage areas outside of the FMC Forge, the FMC Foundry, the M&H Valve facility, and the Union Foundry facility, all of which are upstream of Solutia's Anniston Plant.

98.     Samples show that the PCB contamination level of Snow Creek downstream from U.S. Pipe and Foundry is substantially higher than the level upstream from the facility.

**The Foundries disposed of lead, cadmium, chromium, arsenic and other contaminants in the Anniston PCB and Lead Sites.**

99.     The Foundries arranged for the disposal of lead, cadmium, zinc, and other hazardous material at the Anniston PCB and Lead Sites.

100.    The Foundries are a major source of heavy metal contamination.

101.    Scrap metal contains a significant amount of impurities. When a foundry melts scrap in its cupola or electric arc furnace lead, cadmium and other heavy metals are separated from the iron. The separated metals are captured in a baghouse, resulting in waste referred to as baghouse dust.

102.    In order to reduce disposal costs, the Foundries mixed the contaminated baghouse dust with spent foundry sand. For example, McWane's M&H Valve facility and Walter Industry's U.S. Pipe and Foundry recently admitted to mixing their foundry sand, core butts and baghouse dust together for disposal. McWane further admitted to improperly disposing of the mixture as a non-hazardous waste.

103.    In addition, the Foundries periodically swept the metal dust from the foundry floors and disposed of the dust in the spent foundry sand piles.

104.    A common practice in Anniston was to use spent foundry sand as clean fill material in commercial and residential properties. Residents either picked up spent foundry sand or the foundries delivered spent foundry sand to the residential and commercial properties.

105.   The disposal by the Foundries of spent foundry sand throughout the Anniston PCB and Lead Sites is evident in that spent foundry sand, fluff, and other waste material have been found in contaminated residential and commercial properties in and around Anniston.

106.   The Foundries' practices caused the PCB, lead, cadmium and other hazardous wastes to be deposited with spent foundry sand in commercial and residential properties throughout Anniston.

107.   The Foundries considered the foundry sand, which was contaminated with baghouse dust, coal tar, and other hazardous substances, to be suitable fill material for residential and commercial properties.

108.   The Foundries arranged for the disposal of the contaminated foundry sand at local residential, business, and community properties as a method for reducing their disposal costs and to increase the life expectancy of their landfills.

109.   The Foundries arranged for the disposal of the contaminated soil, spent foundry sand, fluff, and other wastes by allowing rainwater to wash these wastes into Snow Creek and its tributaries.

110.   The Foundries discharged contaminated storm water and wastewater into the Anniston PCB and Lead Sites.

111.   The Foundries, as owners and operators of the above named facilities, disposed of or arranged for the disposal of wastes, including dielectric fluid, hydraulic fluid, fluff, shredder residue, spent foundry sand, cupola baghouse dust, cupola slag, and core butts, that contained

"hazardous substances," as that term is defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), in the Anniston PCB and Lead Sites.

**Huron Valley Steel Corporation**

112.    Huron Valley Steel Corporation ("Huron Valley") is a Michigan corporation in good standing.

113.    Huron Valley began operating its scrap processing facility, located at 820 Ware Street, Anniston, Alabama, in the early 1980s.  From 1981 until 1991 Huron Valley subleased the facility from U.S. Reduction.  In 1991 Huron Valley bought the property from the Anniston Industrial Redevelopment Board.  Huron Valley is the current owner and operator of the facility.

114.    Huron Valley disposed of PCBs and other hazardous waste at the Anniston PCB and Lead Sites.

115.    Huron Valley processes large quantities of scrap at its facility. This scrap contains PCB dielectric equipment and other PCB-contaminated material.  PCB-contaminated dielectric fluid leaked out of the spent dielectric equipment in the scrap piles.   Huron Valley's housekeeping practices failed to prevent the release of PCBs into Snow Creek and its tributaries.

116.    Huron Valley also shredded scrap at its facility.  A byproduct of shredding scrap is a non-metallic byproduct often called "fluff". This fluff byproduct is contaminated with PCBs from PCB-contaminated scrap and lead, cadmium and other heavy metals.  Samples of shredder fluff generated by Huron Valley Steel Corporation were found to contain significant levels of PCBs.

117.   Fluff often looks like dirt and landfill operators used it as cheap cover.   For example, in an application for a waste disposal permit, Huron Valley stated that its waste stream could be used as daily cover for the landfill.  In addition, fluff's similarity to topsoil makes it a cheap source of topsoil or an inexpensive way to dilute commercially available topsoil.

118.   Huron Valley used large quantities of solvents, hydraulic fluid, and other hazardous substances. These solvents, fluids and other hazardous substances dripped and/or leaked throughout the facilities.

119.   Huron Valley arranged for the disposal of the contaminated sand, soil, and spent foundry sand by allowing rainwater to wash the contaminated soil, sand, and fluff into Snow Creek and its tributaries.

120.   Huron Valley, as the owner and operator of the above named facility, disposed of or arranged for the disposal of wastes, including dielectric fluid, hydraulic fluid and spent foundry sand that contained "hazardous substances," as that term is defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), in the Anniston PCB and Lead Sites.

**Tull Chemical**

121.   Tull Chemical is an Alabama corporation in good standing.

122.   Tull Chemical began operating its chemical manufacturing facility, located at 130 Burton Street, prior to 1970.  Tull Chemical used PCB equipment at its facility, including at least one heat transfer unit.   Tull's PCB equipment periodically leaked.   For example, ADEM investigated and found a major leak and spill of PCB fluid from Tull Chemical in 1984. The State of Alabama reported that the PCB concentration in Snow Creek was 50 times higher

downstream of Tull Chemical's wastewater discharge point than the PCB concentration at the State's sample locations upstream of Tull Chemical.

123.    Tull Chemical, as owner and operator of the above-named facility, disposed of or arranged for the disposal of wastes that contained "hazardous substances," as that term is defined in Section 101(14) of CERCLA , 42 U.S.C. §9601(14), in the Anniston PCB and Lead sites.

**Carrier Research Incorporated**

124.    Carrier Research Incorporated ("Carrier") is a Delaware corporation in good standing.

125.    In 1971 Carrier purchased and began operating the Carrier facility, located at 1205 Front Street, Anniston, Alabama, as Engineering Research, Inc.  This facility was both a forge and a foundry.

126.    Carrier owned and operated this facility until 1988.

127.    Carrier disposed of PCBs in the Anniston PCB and Lead Sites.

128.    Carrier used PCBs at its Anniston facility.  Carrier had PCB equipment, including large, oil filled transformers and capacitors at its Anniston Facilities.  The Carrier facility had seven transformers and some pole-top transformers at the facility.  In 1988, all seven transformers were PCB-contaminated up to a level of 190 ppm.  Some of Carrier's larger transformers contained thousands of pounds of PCB fluid.  A Carrier employee has stated that he heard of transformers being buried at the facility.

129.   Carrier used scrap metal as its primary raw material. The scrap contained discarded dielectric equipment. The discarded dielectric equipment each likely contained large quantities of PCB-contaminated dielectric fluid.

130.   Carrier disposed of the PCB fluids in its equipment at the Anniston PCB and Lead Sites by directly dumping its spent PCB fluid at its facility adjacent to Snow Creek, in Snow Creek and/or its tributaries.

131.   Carrier arranged for the disposal of the contaminated sand, soil, and spent foundry sand by allowing rainwater to wash the contaminated soil, sand, and fluff into Snow Creek and its tributaries.

132.   Carrier disposed of lead, cadmium, and other hazardous substances at the Anniston PCB and Lead Sites. Carrier used scrap metal as its primary raw material. The scrap metal contained impurities, including, but not limited to lead, cadmium, and chromium.

133.   Carrier melted large quantities of scrap and other material daily.  In the cupola, the lead, cadmium, chromium and other hazardous substances separated from the iron and captured in its baghouse.

134.   Carrier removed large quantities of dust from the baghouses and dumped it into a disposal pit located adjacent to Snow Creek.

135.   Carrier used large quantities of asphalt based paint, solvents and other hazardous substances.   Paint, solvents, and other hazardous substances dripped and/or leaked throughout the facility.

136.    Carrier disposed of the waste paint, solvents and other hazardous substances into a disposal pit located adjacent to Snow Creek.

137.    As late as 1988, Carrier transported hazardous substances from its Florida facility to its Anniston facility. Former employees testified that Carrier disposed of the material at its Anniston facility because it could not obtain a disposal permit from the State of Florida.

138.    Once these hazardous substances arrived at Carrier's Anniston facility, employees claim that Carrier dumped them into Snow Creek or on its property near Snow Creek.

139.    Carrier, as owner and operator of the above named facility, disposed of or arranged for the disposal of wastes, including dielectric fluid, hydraulic fluid, spent foundry sand, cupola baghouse dust, cupola slag and core butts, that contained "hazardous substances," as that term is defined in Section 101(14) of CERCLA (42 U.S.C. § 9601(14)) in the Anniston PCB and Lead Sites.

**Datron, Inc. and Anchor Metals Inc.**

140.    Datron, Inc. ("Datron") is a Delaware corporation in good standing.

141.    Anchor Metals Inc. is a Texas corporation in good standing.

142.    In 1959 Anchor Metals Company leased the Anchor Metals facility from the city of Anniston.

143.    Datron purchased Anchor Metals Company and owned and operated the facility until 1999 when the property was purchased by FL Industries.

**Disposal of PCBs, Lead and Other Hazardous Wastes**

144.    Datron and Anchor Metals disposed of hazardous materials in the Anniston PCB and Lead Sites.

145.    Datron and Anchor Metals had PCB equipment, including large, oil-filled transformers and capacitors at its Anniston facility.  For example, in a 1994 investigation ADEM found a leaking PCB switch and 24 PCB-contaminated capacitors at the facility.

146.    Datron and Anchor Metals used large quantities of paint, solvents and other hazardous substances. The paint, solvents, and other hazardous substances dripped and/or leaked throughout the facility.

147.    Datron and Anchor Metals arranged for the disposal of the contaminated sand, soil, and spent foundry sand by allowing rainwater to wash the contaminated soil, sand, and fluff into Snow Creek and its tributaries.

148.    Datron and Anchor Metals, through the above-named facility, disposed of or arranged for the disposal of wastes, including spent foundry sand, baghouse dust and other waste that contained "hazardous substances," as that term is defined in Section 101(14) of CERCLA, 42 U.S.C. §9601(14), in the Anniston PCB and Lead Sites.

## Chalk Line Manufacturing, Inc.

149.    Chalk Line Manufacturing, Inc. ("Chalk Line") began operating its clothing manufacturing facility at 215 W. 11th Street, Anniston Alabama prior to 1982.

150.    Chalk Line used PCB equipment at its facility. The PCB equipment periodically leaked.

151.    Chalk Line, as owners and operators of the above-named facilities, disposed of or arranged for the disposal of wastes that contained "hazardous substances," as that term is defined in Section 101(14) of CERCLA , 42 U.S.C. §9601(14), in the Anniston PCB and Lead sites.

152.    As set forth above McWane, Walter Industries, U.S. Pipe and Foundry, U.S. Castings, MeadWestvaco, FMC, , Amcast, Phelps Dodge, Halliburton, Walworth, Kilby Steel, Scientific-Atlanta., United Defense, L.P., Tull Chemical, Carrier Research, Datron, Anchor Metals, Chalk Line, and Huron Valley (collectively referred to as "Defendants"), disposed of or arranged for the disposal of wastes that contained "hazardous substances," as that term is defined in Section 101(14) of CERCLA , 42 U.S.C. §9601(14), in the Anniston PCB and Lead sites.

## COUNT I

## CONTRIBUTION

153.    Plaintiffs reallege and incorporate paragraphs 1 through 152 as if fully set forth herein.

154.    The Anniston PCB Site and the Anniston Lead Site each constitute a "facility" within the meaning of section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

155.    MeadWestvaco Corporation, Walter Industries, Inc., U.S. Pipe and Foundry Company, Inc., U.S. Castings, FMC Corporation, McWane, Inc., Amcast Industrial Corporation, Phelps Dodge Industries, Inc., Halliburton Corporation, The Walworth Corporation, Kilby Steel Company, Inc., Scientific-Atlanta, Inc., United Defense, L.P., Tull Chemical Company, Inc., Carrier Research Incorporated, Datron, Inc., Anchor Metals, Inc., Chalk Line Manufacturing, Inc., and Huron Valley Steel Corporation, (collectively "Defendants"), at all times relevant to this action, have caused "releases" and "threatened releases" of "hazardous substances" into the environment at, from and into the Anniston PCB and Lead Sites, within the meaning of CERCLA Sections 101(14), 101(20), 101(22), and 107(a), 42 U.S.C. § 9601(14), 9601(20), 9601(22), and 9607(a).

156.    Defendants' "releases" and "threatened releases" of hazardous substances at the Anniston PCB and Lead Sites have resulted in Pharmacia and Solutia incurring, and will continue to cause Pharmacia and Solutia to incur, "response costs" within the meaning of Sections 101(25) and 107(a) of CERCLA, 42 U.S.C. § 9601(25) and 9607(a).

157.    Solutia, on its own behalf and on behalf of Pharmacia, has incurred response costs in connection with work performed under various state and federal orders.

158.    The response costs incurred by Pharmacia and Solutia for work performed at the Anniston PCB and Lead Sites are consistent, and will continue to be consistent with, the federal and state orders.

159.    The response costs incurred by Pharmacia and Solutia under the federal and state orders are consistent, and will continue to be consistent, with the National Contingency Plan, which was promulgated under Section 105(a) of CERCLA, 42 U.S.C. § 9605(a), and codified at 40 C.F.R. Part 300.

160.    Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

161.    Defendants are liable parties under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), therefore Pharmacia and Solutia, pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), are entitled to contribution from each of the Defendants with respect to all response costs incurred by Pharmacia and Solutia, or to be incurred by Solutia or Pharmacia, including interest, in performing response activities pursuant to the federal and state orders at the Anniston PCB and Lead Sites.

162.    To date, Defendants have failed to reimburse Pharmacia or Solutia for any of the above-referenced response costs incurred in connection with the Anniston PCB and Lead Sites.

## COUNT II

## COST RECOVERY

163.    Plaintiffs reallege and incorporate paragraphs 1 through 152 as if fully set forth herein.

164.    The Anniston Lead Site constitutes a "facility" within the meaning of section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

165.    McWane, Inc., Walter Industries, Inc., U.S. Pipe and Foundry Company, Inc., U.S. Castings, MeadWestvaco Corporation, FMC Corporation, United Defense, L.P., Amcast Industrial Corporation, Phelps Dodge Industries, Inc., Halliburton Corporation, The Walworth Corporation, Kilby Steel Company, Inc., Scientific-Atlanta, Inc., Tull Chemical Company, Inc., Carrier Research Incorporated, Datron, Inc., Anchor Metals, Inc., Chalk Line Manufacturing, Inc., and Huron Valley Steel Corporation, (collectively "Defendants"), at all times relevant to this action, have caused "releases" and "threatened releases" of "hazardous substances" into the environment at, from and into the Anniston Lead Site within the meaning of CERCLA Sections 101(14), 101(20), 101(22), and 107(a) , 42 U.S.C. § 9601(14), 9601(20), 9601(22), and 9607(a).

166.    Defendants' "releases" and "threatened releases" of hazardous substances at the Anniston Lead Site have resulted in Pharmacia and Solutia incurring, and will continue to cause Pharmacia and Solutia to incur, "response costs" within the meaning of Sections 101(25) and 107(a) of CERCLA, 42 U.S.C. § 9601(25) and 9607(a).

167.    Solutia, on its own behalf and on behalf of Pharmacia, has incurred response costs in connection with work performed under various state and federal orders.

168.    Pharmacia and Solutia did not contribute hazardous material to the Anniston Lead Site.

169.    The response costs incurred by Pharmacia and Solutia for work performed at the Anniston Lead Site is consistent, and will continue to be consistent with, the federal and state orders.

170.    The response costs incurred by Pharmacia and Solutia under the federal and state orders are consistent, and will continue to be consistent, with the National Contingency Plan, which was promulgated under Section 105(a) of CERCLA, 42 U.S.C. § 9605(a), and codified at 40 C.F.R. Part 300.

171.    Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).   Defendants are liable parties under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), therefore Pharmacia and Solutia, pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607, are entitled to recover its costs from each of the Defendants with respect to all response costs incurred by Pharmacia and Solutia, or to be incurred by Solutia or Pharmacia, including interest, in performing response activities pursuant to the federal and state orders at the Anniston Lead Site.

172.    To date, Defendants have failed to reimburse Pharmacia or Solutia for any of the above-referenced response costs incurred in connection with the Anniston Lead Site.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Pharmacia and Solutia, respectfully request that this Court:

(a)     Enter a judgment of contribution against the Defendants, pursuant to section 107 and 113(f) of CERCLA, 42 U.S.C. §9607 and 42 U.S.C. § 9613(f), for any and all response costs, including investigatory costs and legal fees, incurred by Pharmacia and Solutia to date, including interest, in performing response activities with respect to the Anniston PCB and Lead Sites;

(b)     Enter a judgment for cost recovery against the Defendants, pursuant to section 107 of CERCLA, 42 U.S.C. §9607, for any and all response costs, including investigatory costs and legal fees, incurred by Pharmacia and Solutia to date, including interest, in performing response activities at the Anniston Lead Site;

(c)     Enter a declaratory judgment that the Defendants are liable for their equitable share of response costs, including investigatory costs and legal fees, that will be incurred by Solutia and Pharmacia in the future in performing response activities at the Anniston PCB and Lead Sites;

(d)     Enter a declaratory judgment that the Defendants are jointly and severally liable for all response costs, including investigatory costs and legal fees, that will be incurred by Solutia and Pharmacia in the future in performing response activities at the Anniston Lead Site; and

(e)     Order such other and further relief as this Court may deem just and proper.

Respectfully submitted,

**HUSCH & EPPENBERGER, LLC**

By:
Michael K. Alston, ALS004
736 Georgia Avenue, Suite 300
Chattanooga, TN 37402
Phone: 423.266.5500
Fax: 423.266.5499

OF COUNSEL:                         Joseph G. Nassif
Husch & Eppenberger, LLC            Michael H. Wetmore
                                    William J. Curtis
                                    190 Carondelet Plaza, Suite 600
                                    St. Louis, MO 63105-3441
                                    Phone: (314) 480-1500
                                    Fax: (314) 480-1505

                                    Ryan W. Mitchem
                                    736 Georgia Avenue, Suite 300
                                    Chattanooga, TN 37402
                                    Phone: 423.266.5500
                                    Fax: 423.266.5499

**ATTORNEYS FOR PLAINTIFFS
SOLUTIA INC. AND PHARMACIA
CORPORATION**