FILED

2008 Jun-10  PM 03:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| SOLUTIA INC.; PHARMACIA CORPORATION, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) CV 03-PWG-1345-E |
| | ) |
| McWANE, INC., a/k/a Union Foundry, M&H Valve; WALTER INDUSTRIES, INC., f/k/a US Pipe and Foundry Company, TC King Pipe and Fittings Co.; UNITED STATES PIPE AND FOUNDRY CO., INC.; US CASTINGS; MEADWESTVACO CORP., f/k/a Mead Corp., Union Foundry, Woodward Iron, Alabama Pipe Company, Lynchburg Foundry, Standard Foundry, Anniston Foundry; FMC CORP., f/k/a Kilby Steel; UNITED DEFENSE, LP; AMCAST INDUSTRIAL CORP., a/k/a Lee Brass Co.; PHELPS DODGE INDUSTRIES, INC., f/k/a Lee Brothers Co., Inc.; HALLIBURTON CO., f/k/a Dresser Industries, M&H Valve Co.; THE WALWORTH CO., f/k/a M&H Valve Co.; KILBY STEEL CO. INC.; SCIENTIFIC-ATLANTA, INC., f/k/a Southern Tool; HURON VALLEY STEEL CORP.; TULL CHEMICAL CO., INC.; CARRIER RESEARCH INC.; LEE BRASS CO., a unit of Amcast; DII INDUSTRIES, LLC; SOUTHERN TOOL CORP.; RANSOM INDUSTRIES . | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on Motions for Summary Judgment filed by the Settling Defendants:[1] FMC Corp., DII industries, Huron Valley Steel Corp., McWane, Inc.,[2] Mead -Westvaco Corp., Phelps Dodge Industries, Inc., United Defense, United States Pipe and Foundry Co., and Walter Industries.  (Doc. 295.)  Defendants Scientific Atlanta and Southern Tool have filed Motions for Partial Summary Judgment. (Docs. 355, 356.)  Plaintiffs, Solutia, Inc., and Pharmacia Corp., have sued defendants seeking to recover costs of clean-up and recovery activity in the Anniston area and for contribution pursuant to sections 107(a) and 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act ["CERCLA"].  Defendants contend that

---

[1]The term Settling Defendants is capitalized to identify these defendants as a discrete subgroup of defendants seeking summary judgment not on the merits of the action, but upon a claim of preemption with respect to the complaint because of agreements reached with the Environmental Protection Agency.  The effect of these agreements is discussed below. Moreover, because each member of the subgroup has consented to the jurisdiction of the magistrate judge for consideration of these motions as have the plaintiffs, this disposition is entered as final.  See 28 U.S.C. § 636(c)(1) & (3).  "(1) ([Magistrate Judges] may conduct any or all proceedings in a ... civil matter and enter judgment in the case.)" "(3) (... an aggrieved party may directly appeal to the appropriate U.S. Court of Appeals.)"  This order finally resolves the motions for summary judgment between affected parties.  Other claims in this action between plaintiffs and the non-Settling Defendants remain.  The plaintiffs and the Settling Defendants would appear to benefit from a Rule 54(b) order in this action.  The parties are entitled to an immediate review of the conclusions reached here in light of the unique legal issues.  There appears to be no just reason to delay appellate consideration. Given the extensive costs to be incurred by all parties in this action the ruling should be reviewed expeditiously to resolve the questions of law.  The court will entertain a motion to enter judgment in accordance with Rule 54(b) should the parties request such an order.

[2]McWane Inc. brings this summary judgment on behalf of itself and as the successor of defendant Ransom Industries.  (Doc. 295 at 1.)

plaintiffs' § 107(a) claim, Count II of plaintiffs' First Amended Complaint, is due to be dismissed because plaintiffs are not innocent parties and because any cost of cleanup were not incurred voluntarily.  The Settling Defendants contend that plaintiffs' § 113(f) claim, Count I of plaintiffs' First Amended Complaint, is due to be dismissed based upon § 113(f)(2) contribution bar.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the Settling Defendants' Motion for Summary Judgment, (doc. 295), is due to be granted in part and denied in part; the Motions for Partial Summary Judgment filed by Scientific Atlanta and Southern Tool, (docs. 355, 356), are due to be denied.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that he is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in its favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  STATEMENT OF FACTS

From 1929 to 1971, Monsanto and its predecessors, produced PCBs[3] at a plant approximately a mile west of downtown Anniston, Alabama. *See* Revised Partial Consent

---

[3]PCBs or polychlorinated biphenyls have been found –

to cause cancer, decreased fertility, still births, and birth defects in test animals. *Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1267, 1270 (D.C. Cir. 1980). . . . The EPA has noted the "well-documented human health and environmental hazard of PCB exposure" and the "potential hazard of PCB exposure posed by the transportation of PCBs." 40 C.F.R. § 761.20. Indeed, PCBs pose such health and environmental dangers that the Toxic Substances Control Act bans the manufacturing of PCBs in this country without a special exemption from the EPA. 15 U.S.C.A. §§ 2605(e)(3)(A) & (B).

*Dickerson, Inc. v. United States*, 875 F.2d 1577, 1583 (11th Cir. 1989).

4

Decree, *United States v. Pharmacia Corp.*, CV 02-C-0749-E, doc. 72, Ex. A at 8 (N.D. Ala. Aug. 4, 2003) [hereinafter "RPCD"].  In 1997, Monsanto formed Solutia, Inc.  Solutia currently produces para-nitrophenol and polyphenyl compounds at the Anniston plant.  *Id.* at 8-9.  In 2000, Monsanto merged with Pharmacia and Upjohn to form Pharmacia Corp..  *Id.* at 9.

In 2002, EPA sued the plaintiffs, Solutia, Inc., and Pharmacia Corp., pursuant to §§ 104, 106, 107, and 113(g)(2) of CERCLA seeking "injunctive relief as well as the recovery of response costs incurred on or after January 4, 2001 in connection with the [Anniston PCB Hazardous Waste Site]."  *United States v. Pharmacia Corp.*, CV 02-C-0749-E, doc. 1 ¶ 1 (N.D. Ala. Mar. 25, 2002).  That litigation resulted in the Revised Partial Consent Decree between the government and the plaintiffs, which was entered on August 4, 2003.  RPCD at 1.

According to the Revised Partial Consent Decree –

10.  During its operational history, the [plaintiffs' Anniston] plant disposed of hazardous and nonhazardous waste at various areas, including the west end landfill and the south landfill, which are located adjacent to the plant. The west end landfill encompasses six acres of land, located on the southwestern side of the plant.  The west end landfill was used for disposal of the plant's wastes from the mid-1930s until approximately 1960.  In 1960, Monsanto Company began disposing of wastes at the south landfill.  Disposal of wastes at the south landfill ceased in approximately 1988.  During the time that the west end landfill and the south landfill were used to dispose of wastes, there was a potential for hazardous substances, including PCBs, to be released from the landfills via soils and sediments being transported in surface water leaving [plaintiffs'] Property.  In addition, during the time that PCBs were manufactured by Monsanto Company at its Anniston plant, an aqueous stream flowing to a discharge point . . . on Monsanto Company's Anniston plant Site

contained PCBs, and discharge from that discharge point flowed to a ditch, the waters of which flowed toward Snow Creek. Sampling by EPA, Solutia Inc., ADEM,[4] and other parties has indicated that sediments in drainage ditches leading away from the plant, Snow Creek, and Choccolocco Creek, as well as sedimentary material in the floodplains of these waterways, contain varying levels of PCBs and other contaminants.

11. Solutia Inc. has a RCRA[5] permit for [plaintiffs'] Property, which was issued by ADEM. Pursuant to its RCRA permit, Solutia Inc. performed extensive "Interim Measures" on the west end landfill, the south landfill, and areas east and north of the plant during the mid to late 1990s to attempt to eliminate the potential for release of hazardous substances, including PCBs, associated with soils and sediments. Solutia Inc. is also engaged in an extensive program under the RCRA permit to investigate and address PCBs in sediments and floodplain soils in the waterways leading away from the plant. EPA has provided oversight of the RCRA permit.

12. PCBs are listed . . . as hazardous substances . . . .

RPCD, Ex. A at 8-10 (footnotes added).

The Revised Partial Consent Decree identifies two superfund sites located in and around the City of Anniston, Alabama; the Anniston PCB Site ["the PCB Site"] and the Anniston Lead Site ["the Lead Site"]. RPCD at 7, 10. Despite the names given to these "sites," they are defined in the Revised Partial Consent Decree by the ***source*** of the contaminants therein, rather than geographic location or the type of contaminant. In fact, the PCB Site and the Lead Site overlap geographically and contain the same contaminants:

---

[4]ADEM is the Alabama Department of Environmental Management. RPCD at 6.

[5]"'RCRA' shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901 et seq. (also known as the Resource Conservation and Recovery Act). RPCD at 9.

"polychlorinated buphenyls ["PCBs"], lead, cadmium, and other commingled hazardous substances."  (*See* doc. 86 ¶ 24.)

The PCB Site is defined as "the area where hazardous substances, including PCBs[,] associated with releases or discharges as a result of the operations, including waste disposal, of the Anniston plant ***by Solutia Inc., Monsanto Company, and their predecessors*** have come to be located."  RPCD at 10.  The Lead Site is defined as "the area where lead and other commingled hazardous substances, including PCBs, associated with the ***historical and ongoing industrial operations in and around Anniston, Alabama*** have come to be located." *Id*. at 7.  The Revised Partial Consent Decree covers only the PCB Site.  *See id*. at 4, 10.

The Revised Partial Consent Decree requires plaintiffs to "finance and perform RI/FS[6] Work, Removal Order Work, and NTC[7] Removal Work in accordance with [the] Consent Decree" and its Exhibits.  *Id*. at 11.  It also requires plaintiffs to "reimburse the United States for Future Response Costs . . . and for AOC[8] Oversight Costs."  *Id*.  "Future Response Costs do not include costs that the United States incurs at the Anniston Lead Site."  *Id*. at 8.  The purpose of the RI/FS is "to determine the nature and extent of contamination at the Anniston PCB Site and develop and evaluate potential remedial alternatives."  *Id*.  The RI/FS Work

---

[6]"RI/FS" stands for "remedial investigation/feasibility study."  RCPD at 8.

[7]"NTC" stands for "non-time critical."  *Id*. at 7.

[8]"AOC" is the Administrative Agreement and Order on Consent for Removal Action. *See id*., Ex. C; *see, e.g., ITT Industries, Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 455 (6th Cir. 2007).

"does not include activities or work EPA determines to be necessary at any other Site (including the Anniston Lead Site)." *Id*. at 10.

The Revised Partial Consent Decree requires plaintiffs to sample the soil on certain properties. *See id*., Ex. C at 11. In addition, plaintiffs are required to "conduct a removal response" for property found to have PCBs in surface soil at a concentration of 10 mg/kg or greater. *Id*. The Non-time Critical ["NTC"] Removal Agreement, Exhibit G to the Revised Partial Consent Decree, requires plaintiffs to undertake removal actions for properties with PCBs in surface soil of 1 ppm and in deep soil, "below a depth of 12 inches," of 10 ppm or greater. *Id*., Ex. G at 2. Plaintiffs have cleaned up properties in which sample results have shown the presence of both PCBS and lead. They contend that the manner and extent to which PBCs and lead are found in some residential properties show that the source of these contaminants is the deposit of foundry fill material. Therefore, they contend that most if not all of these contaminants are part of the Lead Site. (Doc. 329 at 8 [citing, *inter* alia, doc. 331, Ex. 4; *id*., Ex. 5 §§ 2.1-2.3].)

Plaintiffs contend that "the specific language of the [Revised Partial Consent Decree] clearly state[s] that Plaintiffs are entitled to pursue their rights to seek contribution." (Doc. 334 at 15 [citing Ex. 1B ¶¶ 38, 42 and App. B at 3; Ex. 1G, App. G at 3].) The Revised Partial Consent Decree states:

> 38. Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree. The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this decree may have under applicable

law. ***Each of the Parties expressly reserves any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site and/or the Anniston Lead Site against any person not a Party heret**o.

. . .

    42. [Solutia and Pharmacia] signing of this Consent Decree and taking action under it shall not be considered an admission of liability and is not admissible in evidence against [them] in any judicial or administrative proceeding other than a proceeding by the United States, including EPA, to enforce this Consent Decree or a judgment relating to it. ***[Solutia and Pharmacia] retain their rights to assert claims against other potentially responsible parties at the PCB Site**. However, the Defendants agree not to contest the validity or terms of this Consent Decree, or the procedures underlying or relating to it in any action brought by the United States, including EPA, to enforce its terms.

RPCD at 19, 20 (emphasis added). The NTC Removal Agreement provides, "If [Solutia and Pharmacia] remove soil from any property having lead in excess of 400 ppm from a residential property pursuant to this Agreement, EPA acknowledges that [they] may seek contribution for the costs of such removal from the PRPs at the Anniston Lead Site and any other parties who may be liable." *Id*., Ex. G at 3.

Defendants in this action are current and former operators of industrial operations in the Anniston area. (*See* doc. 86 ¶ 122, 283.) Plaintiffs allege that some or all of the defendants gave away contaminated waste to residents of Anniston to use as fill and that this practice led to sporadic deposits of PCBs, lead, cadmium and other waste substances in residential and commercial soils throughout the geographic areas covered by the PCB Site and the Lead Site. (Doc. 329 at 3 [citing doc. 331, Ex. 4 at 18-41].) Plaintiffs deny that

contaminants from their Anniston plant were deposited sporadically throughout Anniston to any great extent; "instead, Plaintiffs' investigation shows that the pattern of contamination from Plaintiffs' Anniston Plant is fairly uniform." (*Id*. [citing doc. 331, Ex. 2 at 7; *id*., Ex. 3 at 1].)

On January 17, 2006, the Settling Defendants entered into an administrative settlement with EPA, which was embodied in an Administrative Agreement and Order on Consent for Removal Action between the government and the Settling Defendants ["the Foundries' AOC"].  (Doc. 332, Ex. 8.)

The Foundries' AOC contains the following "Findings of Fact by EPA":

a.  EPA became aware of soil lead concentration greater than or equal to 400 ppm in some locations within the Anniston, Alabama area during EPA's investigation of the Anniston PCB Site during 1999-2000.  EPA has established 400 ppm as the Cleanup standard for lead in residential soils at the [Anniston Lead] Site.  Sampling results show that some properties contain lead concentrations greater than or equal to 400 ppm, and some properties contain PCB concentrations greater than or equal to 1ppm PCBS, and some Commingled Residential Properties contain both.  The Commingled Residential Properties are part of both the Anniston Lead Site and the Anniston PCB Site.

b.  EPA entered into a Consent Decree with Solutia, Inc. and Pharmacia Corporation . . . for the Anniston PCB Site, which was entered by the District Court for the Northern District of Alabama . . . .  Under the Consent Decree, [Solutia and Pharmacia] are conducting time critical and non-time critical removal activities, and a remedial investigation and feasibility study at the Anniston PCB Site.

c.  Corporate predecessors or Pharmacia Corporation and Solutia, Inc. owned and/or operated a PCB manufacturing plant in Anniston from which PCBs and lead were released into the environment.  Millions of pounds of PCBs were released from the plant through the disposal of

PCB liquids, sludges, and other wastes into unlined and uncapped landfills and other areas outside of the plant site; PCBs to sewer lines and surface and groundwater; and PCBs through air and fugitive emissions.

d.      Respondents and other persons operated foundries and/or other industrial facilities in the Anniston area from which lead was released into the environment.   PCBs were not manufactured by the Respondents, nor were PCBs a raw material in the products manufactured by the Respondents.   While Respondents' operations utilized transformers, capacitors, and hydraulic equipment which may have contained PCBs, and from which there may have been periodic leaks and spills which may have been released into the environment, Respondents' potential PCB contribution is minimal in comparison to the millions of pounds of PCBs contributed by Pharmacia Corporation and Solutia, Inc. to the Anniston PCB Site.

e.      . . . Commingled Residential Properties are part of both the Anniston Lead Site and the Anniston PCB Site.   Under this Agreement, Respondents will be conducting substantial Sampling for PCBs at Residential properties as well as Cleanup at Commingled Residential Properties.   Respondents, therefore, will be performing substantial response activities at the Anniston PCB Site.

f.      EPA has been addressing the presence of lead at the Anniston Lead Site through a time critical removal action.   EPA sampled approximately 2,000 Residential Properties for lead.   Soil lead concentrations greater than or equal to 400 ppm were detected at over 300 of the Residential Properties sampled.  As of the Effective Date, EPA has cleaned up approximately 132 of these Residential Properties. Additional Residential Properties remain in need of Sampling and potential Cleanup.

(*Id*. at 9-10.)  Under the Foundries' AOC, Settling Defendants' clean up obligations were

based on the presence of soil containing lead greater than or equal to 400 ppm.  (*Id*. at 5.)

The Foundries' AOC purports to resolve the liability of the Settling Defendants under

CERCLA with regard to "the Anniston Lead Site" and "the Anniston PCB Site" – as these

11

terms are defined in the Foundries' AOC.  (*See id*. at 3.)  The Foundries' AOC defines the
"Anniston PCB Site" as "the areas where ***PCBs*** associated with the releases from the
***Anniston Industrial Operations*** have come to be located."  (*Id*. at 5 [emphasis added].)  The
Foundries' AOC defines the "Anniston Lead Site" as "the areas where ***lead*** associated with
releases from the ***Anniston Industrial Operations*** have come to be located."  (*Id*. at 7
[emphasis added].)  "Anniston Industrial Operations" are "current and former industrial
operations listed" in the Foundries' AOC and includes the Settling Defendants.  (*Id*. at 5 and
app. 1.)  "Anniston Industrial Operations" also includes plaintiffs.  (*Id*. app. 1 at  3.)

Paragraph 74 of the Foundries' AOC states:

[The Settling Defendants] are entitled . . . to protection, to the extent allowed
by law, from contribution actions or claims as provided by [§§] 113(f)(2),
122(g)(5), and 122(h)(4) of CERCLA, . . .  for "matters addressed" in this
Agreement.  Pursuant to the terms of this Agreement, respondents are
resolving their liability to the United States under CERCLA for the Anniston
Lead Site and the Anniston PCB Site.

(*Id*. at 50.)  The "matters addressed" by the Foundries' AOC are the Settling Defendants
"liability . . . for the Anniston Lead Site and . . .  for the Anniston PCB Site, and includes all
response actions taken or to be taken, and response costs incurred or to be incurred, by any
person, with regard to any hazardous substance at the Anniston Lead Site and/or the Anniston
PCB Site."  (*Id*.)

With regard to the Anniston PCB Site, as defined in the Foundries' AOC, the EPA
additionally found that Settling Defendants had, at most, *de minimus* liability with regard to
the Site.  (Doc. 332, Ex. 8 at 11.)  The Foundries' AOC states:

> . . . EPA has determined that the quantity and/or toxic effects of the hazardous substances contributed by [the Settling Defendants] to the Anniston PCB Site is minimal in comparison to the other hazardous substances at the Anniston PCB Site, particularly, PCBs contributed by Solutia and/or Pharmacia or their predecessors.  In accordance with Section 122(g)(10) of CERCLA, . . . EPA has determined that [the Settling Defendants] are eligible for an expedited settlement under Section 122(g)(1) of CERCLA, . . . for the Anniston PCB Site.  This Agreement constitutes the settlement of an administrative action within the meaning of Section 122(g) of CERCLA . . . .

(*Id.*)

During discussions between the Settling Defendants and the EPA, but before the Foundries' AOC became effective, plaintiffs sought protection of their contribution rights in the court in *United States v. Pharmacia.*  On June 30, 2005, the court entered an Order, which stated:

> The present dispute involves whether [Pharmacia and Solutia] may pursue contribution claims against other potentially responsible parties ("PRPs") for PCB contamination in the Anniston, Alabama area.  Pursuant to the Revised Partial Consent Decree ("Consent Decree") approved by this Court on August 4, 2003, [Pharmacia and Solutia] are entitled to pursue said PCB contribution rights.  [They] would not have agreed to the Consent Decree in the absence of a clause preserving their right to seek contribution from the PRPs for PCB contamination.  Indeed, such an agreement is consistent with this Court's finding that the Consent Decree was fair and reasonable.

> However, the USA is prepared to enter into an Administrative Agreement and Order on Consent for Removal Action ("AOC") with these same PRPs over lead-site contamination and clean-up.  Once finalized, this <u>Lead</u>-Site AOC would prevent [Pharmacia and Solutia] from pursuing their <u>PCB</u> contribution claims against the PRPs.  ***The Government's effort to foreclose [Pharmacia and Solutia's] contribution rights is in effect a repudiation of the Consent Decree approved by this Court.***  Moreover, in the most recent pleading, the USA has indicated that "any further dispute

resolution, mediation, arbitration, or the like, [over the contribution issue] is moot at this point."

Given the repudiation efforts by the United States and the impasse at which the parties find themselves, upon Motion by [Pharmacia and Solutia], this Court will suspend [their] obligations under the Consent Decree.

*United States v. Pharmacia Corp.*, CV 02-C-0749-E, doc. 152 (N.D. Ala. June 30, 2005)(emphasis added).

To date, plaintiffs have not asked the court to suspend their obligations under the Revised Partial Consent Decree.

## III. DISCUSSION

"CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994). "CERCLA imposes the costs of the cleanup on those responsible for the contamination. The remedy that Congress felt it needed in CERCLA is sweeping: everyone who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup." *United States v. Bestfoods*, 524 U.S. 51, 56 n.1 (1998)(quoting *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 7, 21 (1980))(internal quotations omitted). "Two provisions of [CERCLA] – §§ 107(a) and 113(f) – allow private parties to recover expenses associated with cleaning up contaminated sites." *United States v. Atlantic Research Corp.*, 127 S. Ct. 2331, 2333 (2007).

Section 107(a) defines four categories of PRPs [potentially responsible parties], . . . 42 U.S.C. §§ 9607(a)(1)-(4), and makes them liable for, among other things:

> "(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; [and]
>
> "(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan." § 9607(a)(4)(A)-(B).

Enacted as part of the Superfund Amendments and Reauthorization Act of 1986 (SARA), . . . § 113(f) authorizes one PRP to sue another for contribution in certain circumstances.  42 U.S.C. § 9613(f).  [NOTE]

[NOTE] Section 113(f)(1) permits private parties to seek contribution during or following a civil action under § 106 or § 107(a).  42 U.S.C. § 9613(f)(1).  Section 113(f)(3)(B) permits private parties to seek contribution after they have settled their liability with the Government.  § 9613(f)(3)(B).

*Id*. at 2334.

Plaintiffs have sued defendants seeking to recover their costs incurred as a result of cleaning up the Lead Site and for contribution for money paid as a result of the EPA litigation, *United States  v. Pharmacia Corp*, CV 02-C-0749-E.

## A.  SECTION 107(A)

Plaintiffs seek to recover their costs incurred in the clean-up of the Lead Site.  (Doc. 86 ¶¶ 341-49.)[9]  Defendants contend that plaintiffs' may not maintain an action under

---

[9]Plaintiffs have filed a Motion for Leave to Amend Count II of their First Amended Complaint, (doc. 314), asking the court for permission to amend their Complaint to add a § 107 claim for costs incurred in the cleanup of the PCB Site.  By separate Order, this Motion will be denied.  Defendants are not potentially responsible parties with regard to the PCB Site.

§107(a) because (1) plaintiffs are not innocent parties, and (2) their remedy is limited to a

§113(f) contribution claim because plaintiffs did not voluntarily incur the recovery costs.

### 1. Innocent Parties

The Eleventh Circuit has held that a PRP may not bring a § 107 action against another

PRP because, "as a matter of law," only "an innocent party to the contamination" can "bring

a cost recovery action based solely on § 107(a)."  *Redwing Carriers, Inc. v. Saraland

Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996).  In *Redwing Carriers*, the court held that

a PRP's "claims against other allegedly responsible parties are claims for contribution."  (*Id*.)

"Parties who are not themselves liable or potentially liable for response costs under § 107(a)

of CERCLA can bring a cost recovery action directly under § 107(a) against potentially

responsible parties."  (*Id*. at 1513.)

Plaintiffs contend that they are not PRPs with regard to the Lead Site.  According to

the Revised Partial Consent Decree, plaintiffs are not responsible for contamination at the

Lead Site.  Although CERCLA appears to have been drafted assuming "sites" would be

defined geographically, the Lead Site and the PCB Site are defined by whether plaintiffs

were responsible for the contamination.  RPCD at 7, 10.  Therefore, plaintiffs appear to be

innocent parties as to the Lead Site, even though some of the Lead Site property overlaps the

PCB Site property.

Assuming plaintiffs are "responsible parties" with regard to the Lead Site, *Redwing

Carriers* would prohibit their § 107(a) cost-recovery claim.  However, the decision in

*Redwing Carriers* was effectively overruled by the Supreme Court's decision in *United States v. Atlantic Research*, 127 S. Ct. 2331 (2007).

The Supreme Court in *Atlantic Research* held that the term "other persons" that may sue for cost recovery under § 107(a)(4)(B) includes PRPs.  *Atlantic Research*, 127 S. Ct. at 2335-36.  This holding cannot be reconciled with the holding in *Redwing Carriers* that PRPs may not sue under § 107(a).  This court must follow the Supreme Court's holding in *Atlantic Research*.  *See In re Employment Discrimination Litigation Against State of Ala.*, 198 F.3d 1305, 1319 (11th Cir. 1999); *see also McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004)("A circuit court's decision binds the district courts sitting within its jurisdiction while a decision by the Supreme Court binds all circuit and district courts.").

Therefore, the court finds that plaintiffs' § 107(a) cost-recovery claim is not barred based on their status as PRPs.

**2.  "Voluntary" vs. "Compelled" Costs**

Defendants contend that plaintiffs cannot recover under § 107(a) because they were compelled to incur the cleanup costs at issue based on the Revised Partial Consent Decree.  The court notes that there are factual issues regarding whether the costs incurred by plaintiff in cleaning up are divisible between the Lead Site and the PCB Site.  However, for purposes of summary judgment, the court assumes that plaintiffs can distinguish recovery costs expended cleaning up the Lead Site and recovery costs expending cleaning up the PCB Site.

The Revised Partial Consent Decree does not compel plaintiffs to undertake any recovery effort as to the Lead Site.   Also, the court in *United States v. Pharmacia* specifically found that the United States had repudiated the parties' agreement and that the court would suspend plaintiffs' obligations under the Revised Partial Consent Decree upon plaintiffs' Motion.  *United States v. Pharmacia Corp*, CV 02-C-0749-E, doc. 152 at 2. Under these circumstances, the court finds, for purposes of summary judgment, that any costs incurred by plaintiffs with regard to cleaning up the Lead Site were voluntarily incurred.

However, assuming the cleanup costs were not voluntarily incurred, the court finds that plaintiffs nevertheless may maintain a § 107(a) action under the plain language of the statute.

The defendants and the United States, as amicus curiae, argue:

> [T]he viability of Plaintiffs' proposed § 107(a) claim necessarily turns on whether the expenses they sustain by virtue of performing work under compulsion of the government are akin to expenses reimbursed to the government for government-conducted remedial work, or akin to costs voluntarily incurred by a private party without any government compulsion. A careful reading of *Atlantic Research* and the CERCLA statutory framework confirms that claims for such expenses, like claims for reimbursement costs, are relegated to § 113.  The Supreme Court limited its recognition of § 107 rights to parties who voluntarily undertake work precisely because a party who performs work under the compulsion of the government, like Plaintiffs here, are necessarily limited to a § 113(f) contribution claim.
>
> *Atlantic Research*'s clarification of CERCLA's remedy structure explains why parties who have been "compelled" to perform cleanup work by the government under a consent decree or other enforcement mechanism are limited to a CERCLA § 113(f) contribution claim.  The Court explained that when a party enters into such a consent decree with the government, "the PRP does not incur costs voluntarily but does not reimburse the costs of another

18

party."  [*Atlantic Research*, 127 S. Ct. at 2238 n.6]  In other words, the PRP does not incur its own costs of response because it is being compelled by the government to perform the cleanup.  Instead, these are response costs the government has *avoided* by compelling performance from the PRP, thus, making these costs functionally equivalent to and legally indistinguishably from response costs reimbursed to the government by a PRP for work performed by the government.

(Doc. 375 at 7-8 [emphasis in original].)

It must be observed that in *Atlantic Research* the Supreme Court did not decide whether a PRP could recover costs incurred as a result of a consent decree under § 113(f) or § 107(a) or both.  *Atlantic* Research, 127 S. Ct. at 2338 n.6.  The Court however clearly stated:

We do not suggest that §§ 107(a)(4)(B) and 113(f) have no overlap at all.  *Key Tronic Corp. v. United States*, 511 U.S. 809, 816, 114 S. Ct. 1960, 128 L. Ed. 2d 797 (1994)(stating the statutes provide "similar and somewhat overlapping remed[ies]").  For instance, we recognize that a PRP may sustain expenses pursuant to a consent decree following a suit under § 106 or § 107(a).  *See, e.g., United Technologies Corp. v. Browning-Ferris Industries, Inc.*, 33 F.3d 96, 97 (C.A.1 1994).  In such a case, the PRP does not incur costs voluntarily but does not reimburse the costs of another party.  We do not decide whether these compelled costs of response are recoverable under § 113(f), § 107(a), or both.  For our purposes, it suffices to demonstrate that costs incurred voluntarily are recoverable only by way of § 107(a)(4)(B), and costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f).  Thus, at a minimum, neither remedy swallows the other, contrary to the Government's argument.

*Id*.

The Court concluded that a PRP had a remedy under § 107 *only* when it had incurred costs voluntarily because a PRP in this position, as a matter of law, was *not* seeking contribution of money paid to satisfy a judgment in an action brought pursuant to § 106 or

19

§ 107.  The court also stated that a PRP had a remedy under § 113 **only** when it had paid

money to **reimburse** another that had incurred cleanup costs because a PRP in that position

had **not** itself incurred any costs of cleanup.  The Court did not, contrary to the argument of

the defendants and the government, suggest or otherwise intimate that any cleanup costs

incurred by one PRP during or as a result of a settlement or a consent judgment in a § 106

or § 107 action could be recovered from another PRP **only** in a § 113 action.

The Supreme Court held "the plain terms of § 107(a)(4)(B) allow a PRP to recover

costs from other PRPs." *Atlantic Research*, 127 S. Ct. at 2239.  The court is of the opinion

that the "plain terms of § 107(a)(4)(B)" do not limit cost recovery to cost incurred voluntarily

as opposed to those costs incurred as a result of recovery work done pursuant to a judgment

in favor of the United States or settlement agreement with the United States.

Section 107(a) states that a PRP, defined in (a)(1)-(4), is "liable for . . . (B) any other

necessary costs of response incurred by **any other person** consistent with the national

contingency plan."  42 U.S.C. § 9607(a)(4)(B).  The Court in *Atlantic Research* held that

"any other person" was "anyone except the United States, a State, or an Indian tribe – the

persons listed in subparagraph (A) [of § 107(a)]."  *Atlantic Research*, 127 S. Ct. at 2336.

"Consequently, the plain language of subparagraph (B) authorizes cost-recovery actions by

any private party, including PRPs."  *Id*.  Thus, section 107(a)(4)(B), by its plain terms,

requires the party suing to recover "necessary costs of response" to prove only that its costs

were "incurred . . . consistent with the national contingency plan."   42 U.S.C. §

9607(a)(4)(B).  The plain text of the statute does not explicitly or implicitly require proof that the "necessary costs of response" be voluntarily incurred.

A general principle of statutory construction is that a court may not graft additional terms to an unambiguous statute.  *See Aronsen v. Crown Zellerbach*, 662 F.2d 584, 590 (9th Cir. 1981)(citing 2A J. Sutherland, STATUTORY CONSTRUCTION § 47.36 at 164 (Sands ed. 1973).  This court must "construe what Congress has written.  After all, Congress expresses its purpose by words.  It is for [the court] to ascertain – neither to add nor to subtract, neither to delete nor to distort."  *62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951).  "[A] suggested implication cannot be allowed to prevail against the express words of a statute."  *Schattman v. Texas Employment Commission*, 459 F.2d 32, 38 (5th Cir. 1972)(citing *Wright v. Blakeslee*, 101 U.S. 174 (1879)).[10]  Moreover, "'[I]t is generally presumed that Congress acts intentionally and purposely' when it 'includes particular language in one section of a statute but omits it in another.'"  *City of Chicago v. Environmental Defense Fund*, 511 U.S. 328, 338 (1994)(quoting *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993)).

Congress defined the right of contribution as limited to "[a]ny person" who is involved in "any civil action under section 9606 of this title or under section 9607(a) of this title."  *See* 42 U.S.C.A. § 9613(f)(1).  If Congress  had intended to limit § 107(a)(4)(B)

---

[10]Decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

claims to only those parties with costs *not* subject to a civil action under § 106 or 107(a), it was capable of saying so.  As the statute makes no demand that costs be voluntary – that is, not the result of a § 106 or § 107(a) civil action – such proof is not required.

Even assuming their costs incurred cleaning up the Lead Site were compelled by the Revised Partial Consent Decree in *United States v. Pharmacia*, plaintiffs may sue other PRPs to their recover necessary costs of response incurred in the cleanup and recovery of the Lead Site.[11]

## B. CONTRIBUTION CLAIMS

Plaintiffs contend that they are entitled to contribution pursuant to § 113(f) for costs incurred or to be incurred as a result of "performing response activities pursuant to the federal and state orders at the Anniston PCB and Lead Sites." (Doc. 86 ¶ 338.)  The Settling Defendants argue that such claims are expressly barred by the Foundries' AOC in accord with §113(f) and § 122(g).

Section 113(f) provides:

(1)  Contribution

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title.  Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In

---

[11]Such recovery costs would not include any money paid the United States to reimburse it for its costs incurred.  Recovery under such conditions is contribution, and, therefore, actionable only under § 113(f).

resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

(2)     Settlement

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

(3)  Persons not party to settlement

. . .

(B)  A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).

. . .

42 U.S.C. § 9613(f)(1)-(2), (3)(B).  Section 122(g)(1) provides for de minimus settlements,

42 U.S.C. § 9622(g)(1), and § 122(g)(5) states, "A party who has resolved its liability to the

United States under this subsection shall not be liable for claims for contribution regarding

matters addressed in the settlement," *id*. § 9622(g)(5).   The liability of the Settling

Defendants as to the Anniston PCB Site, as defined in the Foundries' AOC, was found to be de minimus.[12]

"A right of 'contribution' allows a defendant to demand that another who is jointly responsible for a third party's injury supply part of what is required to compensate the third party." *BUC Intern. Corp. v. International Yacht Council Ltd.*, 517 F.3d 1271, 1277 (11th Cir. 2008)(quoting BLACK'S LAW DICTIONARY 352-53 (8th ed. 2004))(internal quotations omitted). "It reflects the view that when two or more persons share responsibility for a wrong, it is inequitable to require one to pay the entire cost of reparation." *Id.* (quoting *Nw. Airlines v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 88 (1981))(internal quotations omitted). The Supreme Court in *Atlantic Research* stated:

> Contribution is defined as the "tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault." Black's Law Dictionary 353 (8th ed. 1999). Nothing in § 113(f) suggests that Congress used the term "contribution" in anything other than this traditional sense. The statute authorizes a PRP to seek contribution "during or following" a suit under § 106 or § 107(a). 42 U.S.C. § 9613(f)(1). Thus, § 113(f)(1) permits suit before or after the establishment of common liability. In either case, a PRP's right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties.

*United States v. Atlantic Research Corp.*, 127 S. Ct. 2331, 2337-38 (2007).

The Foundries' AOC was administratively approved and addresses the subject matter of plaintiffs' contribution claim, the cleanup of hazardous materials in the Anniston area.

---

[12]As addressed in earlier orders by this court, the EPA's decision is not reviewable here.

Therefore, plaintiffs' contribution claims against the Settling Defendants are clearly barred by the plain language of § 113 (f)(2) and § 122(g)(5).

Plaintiffs contend that the Foundries' AOC does not bar their contribution claim because the Foundries' AOC violates the contribution protection provision of the Revised Partial Consent Decree and, therefore, is unenforceable.  (*See* doc. 334 at 10-17, 20-25.) They also contend that the Settling Defendants were in privity with the United States and, therefore, they are collaterally estopped from denying plaintiffs the right to pursue contribution in accordance with the Revised Partial Consent Decree. (*Id*. at 17-20.)  Finally plaintiffs contend that this court should not allow the Foundries' AOC to bar their contribution claim because the Foundries' AOC represents a taking by the United States of plaintiffs' right to seek contribution, in violation of the fifth amendment.  (*Id*. at 25-29.) These arguments are without merit.

## 2.  Revised Partial Consent Decree Contribution Provisions

Plaintiffs argue that this court should not recognize the Settling Defendants' right to contribution protection pursuant the Foundries' AOC because the court in *United States v. Pharmacia* found that the contribution protection provision of the Foundries' AOC violated the Revised Partial Consent Decree's provision preserving plaintiffs' right to contribution from the Settling Defendants.  There is no legal support for plaintiffs' argument that plaintiffs may ignore the fact that the Settling Defendants have resolved their liability with the government and are entitled by law to protection from plaintiffs' contribution claims.

Plaintiffs' remedy for the government's repudiation of the terms of the Revised Partial Consent Decree is properly limited to the enforcement (or non-enforcement) of the terms of the Revised Partial Consent Decree against plaintiffs. *See United States v. Pharmacia Corp*, doc. 152 at 2.

The law allows the Settling Defendants to settle with the government and, in return, to receive protection from § 113(f) contribution claims. Plaintiffs do not dispute that the Foundries' AOC resolves the liability of the Settling Defendants to the government for contamination in the Anniston area. "The language in § 113(f)(2) is unequivocal in its grant of contribution protection to PRPs who settle with . . . the federal government." *General Time Corp. v. Bulk Materials, Inc.*, 826 F. Supp. 471, 475 (M.D. Ga. 1993). Therefore, the Settling Defendants are "not be liable for [plaintiffs'] claims for contribution regarding [Anniston area clean-up]," despite language in the Revised Partial Consent Decree protecting plaintiffs' right to seek contribution. *See* 42 U.S.C. § 9613(f)(2).

**3. Collateral Estoppel**

Plaintiffs assert, "Settling Defendants are estopped from arguing that the contribution protection provisions of the [Foundries'] AOC do not violate Plaintiffs' rights to seek contribution pursuant to the [Revised Partial Consent Decree]." (Doc. 334 at 17.)

The Eleventh Circuit has held –

res judicata can be applied only if . . . four factors are shown: (1) the prior decision must have been rendered by a court of competent jurisdiction; (2) there must have been a final judgment on the merits; (3) both cases must involve the same parties or their privies; and (4) both cases must involve the

26

same causes of action.  Likewise, in this Circuit, collateral estoppel can apply only when the parties are the same (or in privity) and if the party against whom the issue was decided had a full and fair opportunity to litigate the issue in the earlier proceeding.  If identity or privity of parties cannot be established, then there is no need to examine the other factors in determining whether res judicata or collateral estoppel applies.

*E.E.O.C. v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1285 (11th Cir. 2004)(internal quotations, emphasis, and citations omitted).

Plaintiffs argue that the Settling Defendants were in privity with the government premised upon the government's alleged "virtual representation" of the Settling Defendants. (Doc. 334 at 19.)  "'Virtual representation' is a term of art that [the Eleventh Circuit has] defined as applying when the respective interests are closely aligned and the party to the prior litigation adequately represented those interests."  *Pemco Aeroplex*, 383 F.3d at 1287 (internal quotations, emphasis, and citations omitted).  "Whether a party is a virtual representative of another is a question of fact."  (*Id*.)  However:

> "[T]he doctrine of virtual representation require[s] an express or implied legal relationship in which parties to the first suit are ***accountable to non-parties*** who file a suit raising identical issues."  Thus, if the party to the prior litigation was not legally accountable to the party in the latter, then virtual representation cannot be present, regardless of any other factor.

*Id*. at 1289 (quoting *Dills v. City of Marietta, Ga.*, 674 F.2d 1377, 1379 (11th Cir. 1982))(emphasis in *Pemco Aeroplex*).

Nothing in the record indicates that the government, in pursuing cost recovery against plaintiffs in *United States v. Pharmacia Corp.*, was ***legally accountable*** to the Settling Defendants.  The government was not under the control of the Settling Defendants and, of

27

equal importance, the Settling Defendants had no power to require the government to act according to their wishes.  *See Pemco Aeroplex*, 383 F.3d at 1289.  There is no privity between the government and the Settling Defendants.

Because the government and the Settling Defendants were not in privity, the Settling Defendants are not estopped to deny plaintiffs' right to seek contribution.

### 4.  Takings Clause

Citing 42 U.S.C. § 9657, plaintiffs contend that the Foundries' AOC  constitutes a "taking" of their right to contribution in violation of the fifth amendment.   Section 9657 provides:

> If an administrative settlement under section 9622 of this title[13] has the effect of limiting any person's right to obtain contribution from any party to such settlement, and if the effect of such limitation would constitute a taking without just compensation in violation of the fifth amendment of the Constitution of the United States, such person shall not be entitled, under other laws of the United States, to recover compensation from the United States for such taking, but in any such case, such limitation on the right to obtain contribution shall be treated as having no force and effect.

42 U.S.C. § 9657 (footnote added).

In order for the Foundries' AOC to constitute a  "taking" in violation of the fifth amendment, plaintiffs must show that their right to contribution was a ***vested*** property right. "The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of ***vested property rights*** except for a 'public use' and upon payment of 'just compensation.'" *Landgraf v. USI Film Products*, 511 U.S. 244, 266 (1994)(emphasis added).  However, "a legal claim affords no definite or enforceable property right until reduced to final judgment." *Sowell v. American Cyanamid Co.*, 888 F.2d 802, 805 (11th Cir. 1989)(citing *Atmospheric Testing Litigation*, 820 F.2d 982 (9th Cir. 1987), *cert. denied*, 485 U.S. 905 (1988); *Hammond v. United States*, 786 F.2d 8 (1st Cir. 1986)).

---

[13]Only the Settling Defendants' liability as to the Anniston PCB Site, as defined in the Foundries' AOC, was resolved by a de minimus settlement pursuant to 42 U.S.C. § 9622.

"[E]very circuit court to have addressed the issue has likewise concluded that no vested property right exists in a cause of action unless the plaintiff has obtained a final, unreviewable judgment." *Ileto v. Glock, Inc.*, 421 F. Supp. 2d 1274, 1299 (C.D. Cal. 2006)(citing *Arbour v. Jenkins*, 903 F.2d 416, 420 (6th Cir. 1990); *Sowell*, 888 F.2d at 805; *Eddings v. Volkswagenwerk, A.G.*, 835 F.2d 1369, 1373 (11th Cir. 1988); *Hammond*, 786 F.2d at 12; *Ducharme v. Merrill-Nat'l Laboratories*, 574 F.2d 1307, 1309 (5th Cir.1978)).

Plaintiffs right to *seek* contribution is not a vested property right. Accordingly, section 9657 does not abrogate the Settling Defendants' protection from plaintiffs' contribution claims. *See United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1017 n.5 (8th Cir. 2002).

Based on the foregoing, plaintiffs' contribution claim against the Settling Defendants is barred by the Foundries' AOC. Therefore, such claim is due to be dismissed.

## CONCLUSION

There are no material facts in dispute and the Settling Defendants are entitled to judgment as a matter of law as to Count I of plaintiffs' First Amended Complaint. However, defendants are not entitled to judgment as a matter of law as to Count II of plaintiffs' First Amended Complaint. An Order granting the Settling Defendants' Motion for Summary Judgment, (doc. 295), as to Count I and denying defendants's Motions for Summary Judgment, (docs. 295, 355, 356) as to Count II of plaintiffs' First Amended Complaint will be entered contemporaneously with this Memorandum Opinion.

As to the foregoing it is SO ORDERED this the 10th day of June, 2008.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE