**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| SOLUTIA, INC. and PHARMACIA CORPORATION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.:** |
| | ) | **1:03-cv-1345-PWG** |
| McWANE, INC., a/k/a Union Foundry, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Before the court are motions to reconsider filed by defendants Huron Valley Steel Corporation; Walter Energy, Inc.; United States Pipe and Foundry Company, Inc.; McWane, Inc.; FMC Corporation; BEA Systems & Armaments, LP; DII Industries, LLC; MeadWestvaco Corporation; Phelps Dodge Industries, Inc.; Southern Tool LLC; and Scientific-Atlanta, Inc. (hereinafter the "Defendants"). (Docs. 542, 544, 546, 547, 548, 549, 550, 554, 558, & 581). The Defendants have moved for reconsideration of that portion of the court's memorandum opinion and order of June 10, 2008 (Docs. 397 & 398) that denied the defendants' motions for summary judgment on claims asserted by the plaintiffs, Solutia Inc. ("Solutia") and Pharmacia Corporation ("Pharmacia") (collectively "S/P"), to recover response costs under § 107(a)(4)(B)[1] of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a). The court held a hearing on the motions to reconsider on May 25, 2010. Upon consideration, the court concludes that the Defendants' respective motions to reconsider are due to be granted.

---

[1] Except where otherwise noted, section references are to the provisions of CERCLA.

## I.     BACKGROUND

### A.     PCB Contamination in Anniston

This case is complex, in terms of its underlying facts, its litigation history, and the legal

issues it presents.  From 1929 to 1971, Monsanto Company ("Monsanto") and its predecessors

produced polychlorinated biphenyls ("PCBs") at a plant approximately one mile west of downtown

Anniston, Alabama.  (the "Anniston Plant").

> PCBs were widely used in industry for more than five decades because they are
> resistant to fire and are chemically inert, which means they do not readily react with
> other substances.  These attributes made PCBs especially useful in safety fluids used
> to insulate and cool heavy duty electrical equipment, including transformers and
> capacitors.  In the late 1960s, Monsanto learned that the same trait that made PCBs
> so attractive to industry - the fact that they do not react readily with other substances -
> also resulted in their persistence in the environment.

(Amended Complaint (hereinafter "Complaint" or "Compl."), Doc. 86, ¶¶ 12, 13).  Further, as noted

in the court's prior summary judgment memorandum opinion, PCBs have been found

> to cause cancer, decreased fertility, still births, and birth defects in test animals.
> *Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1267,
> 1270 (D.C. Cir. 1980). ... The EPA has noted the "well-documented human health
> and environmental hazard of PCB exposure" and the "potential hazard of PCB
> exposure posed by the transportation of PCBs." 40 C.F.R. § 761.20.  Indeed, PCBs
> pose such health and environmental dangers that the Toxic Substances Control Act
> bans the manufacturing of PCBs in this country without a special exemption from the
> EPA. 15 U.S.C. §§ 2605(e)(3)(A) & (B).

*Dickerson, Inc. v. United States*, 875 F.2d 1577, 1583 (11th Cir. 1989).  In 1997, Monsanto created

Solutia in a spin-off transaction which now owns and operates the Anniston Plant.  (Compl. ¶ 6).

In 2000, Pharmacia was formed by the merger of Monsanto and Pharmacia & Upjohn, Inc.  (*Id*. ¶

5).

2

### B.        The Removal Order

In June 1999, the United States Environmental Protection Agency ("EPA") began sampling activities to assess PCB contamination related to prior operations at the Anniston Plant.  Pursuant to its authority under CERCLA, EPA entered into an Administrative Order on Consent with Solutia, docket no. 01-02-C, effective October 27, 2000, (the "2000 Solutia AOC"), under which Solutia agreed to perform additional sampling and PCB cleanup activities in Anniston.  The 2000 Solutia AOC was superceded by a second Administrative Order on Consent between EPA and Solutia, docket no. CER-04-2002-3752, which was effective on October 5, 2001. That second AOC, referred to hereinafter as the "Removal Order" (Doc. 330-4, Exhibit 1C to Plaintiff's Response in Opposition to Settling Defendants' Motion for Summary Judgment), generally provides for the performance of a "removal action" by Solutia and the reimbursement of oversight costs incurred by the United States in connection with contamination located on an area known as the "Anniston PCB Site"  (Removal Order, § I), which is defined in the Removal Order as "consist[ing] of residential, commercial, and public properties located in and around Anniston, Calhoun County, Alabama that contain or may contain hazardous substances, including [PCB] impacted soil."  (Removal Order, § III, definition of "Site").  In outlining the work Solutia was to perform, the Removal Order acknowledged that the purposes of the "time critical removal order" it requires "are to determine the extent of PCBs, lead, and other hazardous substances" and "to conduct appropriate removal activities" in specific geographical areas designated as "Zones 1, 2, 3, 6 and 'F'," identified in an attached "Figure 1," and as the "Oxford Lake Neighborhood ('OLN')," identified in an attached "Figure 2."  (collectively the "Removal Order Zones").  (Removal Order, § VI, ¶ 2.0).  Under the Removal Order, Solutia was obligated to conduct surface soil sampling, as directed by EPA, at residential properties in the

Removal Order Zones that had either not previously been sampled by EPA for PCBs or had undergone only limited data sampling. (*Id.*, § VI, ¶¶ 2.0(a)). Under the Removal Order's sampling regimen, Solutia was generally required to test for both PCBs and lead, notwithstanding that EPA had not determined that Solutia was a source of lead contamination in the Anniston area and that Solutia had expressly denied liability on that score. (*Id.*, § VI, ¶ 2.0(h)). Regardless of the scope of Solutia's sampling duties, however, the Removal Order required Solutia to take soil abatement measures based upon sampling results as they pertained only to the level of PCBs, not lead. More particularly, one of Solutia's primary abatement duties was to "conduct a removal response" at properties within the Removal Order Zones that prior or subsequent sampling either by EPA or by Solutia under the Removal Order indicated PCBs in surface soils at a concentration of 10 milligrams per kilogram ("mg/kg") or greater. (*Id.*, § VI, ¶¶ 2.0(b), (c), & (d)). EPA generally covenanted in the Removal Order that, upon issuance of a notice acknowledging that Solutia had fulfilled its obligations thereunder, EPA would not sue Solutia for damages or civil penalties or take administrative action for any failure to perform. (*Id.*, § XIV). In addition, the parties acknowledged that Solutia was entitled to protection from contribution actions or claims to the extent provided by §§ 113(f)(2) and 122(h)(4).

### C.     The Enforcement Case

On March 25, 2002, the United States filed a CERCLA enforcement action in this court against both Solutia and Pharmacia for their activities and liability associated with the "Anniston PCB Site," alleged in the complaint to "consist[] of [S/P]'s plant site, [and] residential and commercial properties located in and around Anniston, Alabama, that are suspected of containing PCB-contaminated soil and sediments." (*United States v. Pharmacia Corp. et al.*, 1:02-cv-749-PWG

(N.D. Ala.) (hereinafter the "Enforcement Case" or "Enf. Case"), Doc. 1 ("Enforcement Case Complaint" or "Enf. Case Compl.") ¶¶ 1, 9).   Invoking CERCLA §§ 104, 106, 107, 113 and 122, the government sought three types of relief.  First, the government asked for an injunction requiring S/P to perform certain recovery actions, including a Remedial Investigation and Feasibility Study ("RI/FS").[2]  (Enf. Case Compl., "First Claim for Relief" ¶¶ 21-24).  Second, the government claimed entitlement to reimbursement for its own costs of response under § 107(a)(4)(A).  (*Id.*, "Second Claim for Relief" ¶¶ 25-29).  Finally, the government sought a declaratory judgment on S/P's liability for response costs that would be binding on any subsequent action or actions to recover further response costs or damages, as authorized under § 113(g)(2), 42 U.S.C. § 9613(g)(2).  (Enf. Case Compl. "Prayer for Relief" ¶ 1).

Contemporaneously with the filing of the Enforcement Case Complaint, the United States submitted a proposed Partial Consent Decree entered into by the parties that would, if approved, settle certain claims identified in the Enforcement Case Complaint.  (Enf. Case, Doc. 2); *see also* §

---

[2]      40 C.F.R. § 300.5 defines "remedial investigation" as follows:

> Remedial investigation (RI) is a process undertaken by the lead agency to determine the nature and extent of the problem presented by the release. The RI emphasizes data collection and site characterization, and is generally performed concurrently and in an interactive fashion with the feasibility study. The RI includes sampling and monitoring, as necessary, and includes the gathering of sufficient information to determine the necessity for remedial action and to support the evaluation of remedial alternatives.

The regulation likewise defines "feasibility study":

> Feasibility study (FS) means a study undertaken by the lead agency to develop and evaluate options for remedial action. The FS emphasizes data analysis and is generally performed concurrently and in an interactive fashion with the remedial investigation (RI), using data gathered during the RI. The RI data are used to define the objectives of the response action, to develop remedial action alternatives, and to undertake an initial screening and detailed analysis of the alternatives. The term also refers to a report that describes the results of the study.

122(d)(1), 42 U.S.C. § 9622(d)(1).  On October 23, 2002, after a notice and comment period on the proposed Partial Consent Decree, *see* § 122(d)(2), 42 U.S.C. § 9622(d)(2), the parties filed a proposed Revised Partial Consent Decree with appendices (hereinafter the "PCD," Enf. Case Doc. 72) and an accompanying motion for its entry.  (Enf. Case Docs. 13 & 14).  Ultimately, the court, acting through then-Chief Judge U.W. Clemon, approved and entered the PCD on August 4, 2003. (Enf. Case Docs. 71 & 72).

In setting out S/P's cleanup "commitments," the PCD incorporated and memorialized joint and several obligations of S/P to finance and perform three categories of "Work" set forth in other documents attached as appendices to the PCD itself.  (*See* PCD, § VI, ¶ 6).  One category of such "Work" was the "Removal Order Work," which arose from the Removal Order, discussed above. (PCD, § V, ¶¶ 6, 8; *see also id.*, § IV, ¶¶ AA, BB).  The other two categories were designated as "NTC [Non-time Critical] Removal Work" and "RI/FS Work."  (*Id.*, § V, ¶ 6).  They respectively arose from documents captioned, naturally enough, a "NTC [Non-time Critical] Removal Agreement" (Doc. 330-8, Exhibit 1G to Plaintiffs' Response in Opposition to Settling Defendants' Motion for Summary Judgment, hereinafter "NTC Removal Agreement" or "NTC Rem. Agmt."; PCD, § V, ¶ 6, 9; id., § IV, ¶¶ P, Q), and an "RI/FS Agreement" (Doc. 330-2, Exhibit 1A to Plaintiffs' Response in Opposition to Settling Defendants' Motion for Summary Judgment, hereinafter "RI/FS Agreement" or "RI/FS Agmt.") and its implementing "Statement of Work" (Doc. 330-3, Exhibit 1B to Plaintiffs' Response in Opposition to Settling Defendants' Motion for Summary Judgment hereinafter "RI/FS SOW").  (*See* PCD, § V, ¶¶ 6, 9; *id.*, § IV, ¶¶ CC, DD, HH).  The NTC Removal Agreement and the RI/FS Agreement were administrative settlement agreements between EPA and S/P that were signed in October 2002, at or about the same time that the parties signed the

6

PCD. (*See* NTC Rem. Agmt. at pp. 31-32; RI/FS Agmt. at pp. 36-38; PCD at pp. 26-29). Both of those agreements were effective upon the court's entry of the PCD. (NTC Rem. Agmt. at § XXI; RI/FS Agmt. at § XXIII).

The area of contamination that was the principal subject of the PCD, the NTC Removal Agreement, and the RI/FS Agreement was stated, as in the Removal Order, to be the "Anniston PCB Site." However, while the PCD, the NTC Removal Agreement, and the RI/FS Agreement all contain the same definition of the "Anniston PCB Site," that definition is different from that which appears in the Removal Order, which is, in turn, also somewhat different from the term as used in the Enforcement Case Complaint, which are set forth above. Specifically, the PCD, the NTC Removal Agreement, and the RI/FS Agreement define the "Anniston PCB Site" as

> consist[ing] of the area where hazardous substances, including PCBs associated with releases or discharges as a result of the operations, including waste disposal, of the Anniston plant by Solutia, Inc., Monsanto Company, and their predecessors have come to be located. The [Anniston PCB] Site includes, but is not limited to, the area covered by the RCRA[3] Permit [associated with the Anniston Plant].

(PCD, § IV, ¶ FF; NTC Rem. Agmt, § III, definition of "Site"; RI/FS Agmt, § IV, FF (footnote added)). Further, while the Removal Order references only a single, broadly defined "Anniston PCB Site," the PCD, the NTC Removal Agreement, and the RI/FS Agreement acknowledge a second area of contamination known as the "Anniston Lead Site." The PCD, the NTC Removal Agreement, and the RI/FS Agreement each define the Anniston Lead Site as "consist[ing] of the area where lead and other commingled hazardous substances, including PCBs, associated with the historical and ongoing industrial operations in and around Anniston, Alabama have come to be located." (PCD, § IV, ¶ B;

---

[3]/     "RCRA" refers to the Resource Conservation and Recovery Act, which amended the Solid Waste Disposal Act, 42 U.S.C. § 6901 et seq.; *see also* PCD, § IV, ¶¶ V, W, X; RI/FS Agreement, § IV, ¶¶ V, W, X; NTC Removal Agreement, § III, definition of "RCRA").

NTC Rem. Agmt, § III, definition of "Anniston Lead Site"; RI/FS Agmt, § IV, B).  The United States covenanted in the PCD not to sue S/P or take any administrative action against them for performance of the Removal Work, RI/FS Work, or NTC Removal Order Work or for recovery of certain response costs, with such covenant taking effect upon EPA's approval of a certification of completion pursuant to the RI/FS Agreement.  (PCD, § X, ¶ 30).  Likewise, the PCD makes clear the parties' contemplation that the PCD extended protection to S/P from CERCLA contribution liability "for matters addressed in [the PCD]," pursuant to § 113(f)(2).  (PCD, § XII, ¶ 39).  By contrast, the government reserved all rights against S/P with regard to liability for the Anniston Lead Site (id., ¶ 30(j)), and both the government and S/P "expressly reserve[d] any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the [Anniston PCB Site] and/or the Anniston Lead Site against any person not a Party hereto."  (PCD, § XII, ¶ 38).

Under the NTC Removal Agreement, S/P assumed a number of additional sampling and removal duties beyond those contained in the Removal Order.  These included submission of a "Supplemental Sampling Plan" that would require S/P to conduct composite surface soil sampling, "as directed by EPA, at residential properties that have not previously had composite sampling." (NTC Rem. Agmt., § VI, ¶ 2.0(c)).  Further, while Solutia's soil removal obligations under the Removal Order were linked to a surface soil PCB concentration level of 10 mg/kg or greater, the NTC Removal Agreement indicated that it would likely implement a substantially lower threshold that would require S/P to conduct soil removal "for any property (including properties that are not within the Zones covered by the Removal Order)" (NTC Rem. Agmt., § VI, ¶ 2.0(e)), with a surface

8

soil PCB concentration at or above 1 part per million ("ppm")[4] and at or above 10 ppm for soils below a depth of 12 inches, as disclosed by composite sampling done pursuant to the 2000 Solutia AOC, the Removal Order, the NTC Removal Order, or by EPA. (*Id.*, § I at p. 2; *id.* § VI, ¶¶ 2.0(a), (e), (f), (h); Streamlined Risk Evaluation for Residential Areas, Doc. 330-9, Exhibit 1H to Plaintiffffs' Response in Opposition to Settling Defendants' Motion for Summary Judgment, at 7). It is undisputed at this time that the 1 ppm PCB standard was adopted as the trigger for S/P's soil removal obligations under the NTC Removal Agreement.[5]

The NTC Removal Agreement expressly recognized that there might be properties requiring a removal action by S/P because sampling showed they met the 1 ppm threshold for PCBs but also had lead contamination greater than 400 ppm. (NTC Rem. Agmt., § VI, ¶ 2.0(h)(4)). Such properties, the parties acknowledged, would "also [be] part of the Anniston Lead Site." (*Id.*, § I at p.3). As in the Removal Order, S/P denied responsibility for lead contamination in Anniston, and EPA acknowledged that it had not made a determination as to whether S/P was a source of such contamination. (*Id.*; *id.* § V, ¶ 8). Nonetheless, as to those dual contamination properties, S/P agreed to conduct depth sampling to determine the vertical extent of lead contamination, and if there was lead contamination greater than 400 ppm below a depth of 12 inches that would not be removed by the PCB removal action, S/P was required to notify EPA and "coordinate the PCB removal pursuant

---

[4]    As a measure of mass, a measure of 1 milligram per kilogram, or .001 gram / 1000 grams, is, by definition, equal to 1 gram per million grams or 1 part per million.

[5]    Technically speaking, the NTC Removal Agreement provided that the applicable soil removal standard would be formally established by an NTC Removal Action Memorandum, to be issued by EPA subsequent to the parties' signing of the NTC Removal Agreement. (NTC Rem. Agmt., § VI, ¶¶ 2.0(g) & (h)). That NTC Removal Action Memorandum itself does not appear to be included in the record. Nonetheless, S/P has unambiguously asserted that its soil removal obligations under the NTC Removal Agreement were tied to a 1 ppm PCB concentration standard. (Doc. 329, Plaintiffs' Responses to Settling Defendants' Statement of Undisputed Facts in Support of Motion for Summary Judgment, ¶ 30).

9

to [the] NTC Removal Agreement with any lead removal EPA determines is necessary." (NTC Rem. Agmt., § VI, ¶ 2.0(h)(4)).  EPA recognized, however, that if S/P were to "remove soil from any property having lead in excess of 400 ppm from a residential property pursuant to [the NTC Removal Agreement], ... [S/P] may seek contribution for the costs of such removal from PRPs at the Anniston Lead Site and any other parties who may be liable."  (*Id.*, § I at 3).

### D.    The Instant Action for Cost Recovery and Contribution

On June 5, 2003, S/P filed this action.  (Doc. 1).  In its now-governing first amended complaint, S/P brought claims against a number of parties, including the remaining Defendants, alleging that these parties are liable under CERCLA.  (*Id.*; Compl., Doc. 86).  In Count I, S/P asserted claims for contribution under § 113(f) with respect to cleanup activities they financed and performed at both the Anniston Lead Site and the Anniston PCB Site.  (Compl., Count I, ¶¶ 330-339).  In connection with these claims, S/P alleged that "Solutia, on its own behalf and on behalf of Pharmacia," incurred response costs within the meaning of § 107(a) and § 101(25), 42 U.S.C. §§ 9601(25), "in connection with work performed under various state and federal orders" at the Anniston PCB Site and the Anniston Lead Site.  (*Id.* ¶ 334; *see also id.*, ¶ 22 ("Pursuant to the [2000 Solutia AOC, the Removal Order, and the PCD], Solutia and Pharmacia, without admitting liability, agreed to take over sampling for ... EPA in areas covered by the Orders, and to clean up contaminated properties in Anniston by removing contaminated foundry sand, fluff, and other contaminated waste fill material, and replacing it with clean fill.")  S/P further maintained that each of the Defendants was a PRP under § 107(a) because they had released hazardous substances at both the Anniston PCB and Lead Sites.  (Compl. ¶¶ 332, 338).  As a result, S/P contended that they "are entitled to contribution from each the Defendants with respect to all response costs incurred by [S/P],

or to be incurred by [S/P], including interest, in performing response activities pursuant to the federal and state orders at the Anniston PCB and Lead Sites." (Compl. ¶ 338). In Count II, S/P sought to assert claims for "cost recovery" pursuant to § 107(a) with respect to the Anniston Lead Site only. (*Id.*, Count Two, ¶¶ 340-349. Such claims were based upon the same allegations underlying the contribution claims asserted in Count I (see *id.*), plus an assertion by S/P that they did not contribute hazardous material to the Anniston Lead Site. (*Id.* ¶ 345). In the prayer for relief, S/P demanded a judgment allowing them to recoup from the Defendants S/P's response costs incurred to date, including investigatory costs, legal fees, and interest. (*Id.*, Prayer for Relief, ¶¶ (a)-(b)). Finally, S/P sought a declaratory judgment holding the Defendants liable, as an equitable share or jointly and severally, for response costs that will be incurred by S/P in the future. (*Id.*, ¶¶ (c)-(d)).

###    E.    The Foundry AOC

In early May 2005, as this litigation was underway, and 21 months after Judge U. W. Clemon approved the PCD in the Enforcement Case, EPA entered into an Administrative Agreement and Order on Consent with a number of parties identified collectively as the Foothills Community Partnership (the "Partnership"). (*See* Doc. 296, the "Foundry AOC", at § I, p. 3). Under that administrative agreement, hereinafter referred to as the "Foundry AOC," with the exception of Southern Tool LLC ("Southern Tool") and Scientific-Atlanta, Inc. ("Scientific-Atlanta"), all of the Defendants now remaining in this action and moving for reconsideration (the "Settling Defendants"[6]) were members of the Partnership. (*Id.*) The Partnership's primary undertakings pursuant to the Foundry AOC included reimbursement of $3.25 million to EPA for its past response costs; sampling

---

[6]    The "Settling Defendants" are: Huron Valley Steel Corporation; Walter Energy, Inc.; United States Pipe and Foundry Company, Inc.; McWane, Inc.; FMC Corporation; BEA Systems & Armaments, LP; DII Industries, LLC; MeadWestvaco Corporation; and Phelps Dodge Industries, Inc.

and soil removal at residential and certain other types of properties, mostly within three designated geographic areas in and around Anniston identified as Zones A, B, and C, where sampling revealed soil lead concentration of at least 400 ppm; and reimbursing EPA for future costs it would incur overseeing the Partnership's work.  (Foundry AOC, § I, ¶ 1).  With respect to soil removal obligations, the Foundry AOC expressly contemplated that some covered properties would have "commingled" soil contamination, with lead concentration of at least 400 ppm *and* PCB concentration of at least 1 ppm.  (Foundry AOC, § III, ¶ 8(h)).  In such cases, the Partnership was generally required to conduct soil removal efforts on such properties when located in Zones A and B (*id.*, § VIII, ¶¶ 16(a), (b)(iii), (c)(iii)), but not when located in Zone C, except for certain specifically identified properties.  (*id.*, § VIII, ¶¶ 16(a)(I), (d)(ii)).  The Foundry AOC also recognized that the Partnership members might potentially be required later to assume certain sampling and removal obligations with respect to a fourth area designated as "Zone D." (*See id.*, § III, ¶ 8(*ll*)); *id.*, § VIII, ¶ 16(e); *id.*, § XX).

In exchange for agreeing to perform these and other specified obligations, the Foundry AOC provided that members of the Partnership, including the Settling Defendants, had resolved their CERCLA liability to the United States and were entitled to protection from contribution claims, in relation to two areas, identified as the "Anniston Lead Site" and the "Anniston PCB Site." (Foundry AOC, § XXIII, ¶ 74).  While those same two sites were also referenced in the PCD, the NTC Removal Agreement, and the RI/FS Agreement between the government and S/P, the terms were defined differently when they appeared later in the Foundry AOC.  Namely, the Foundry AOC defined the "Anniston PCB Site" as "the areas where PCBs associated with releases from the Anniston Industrial Operations, have come to be located" (*id.*, § III, ¶ e) and the "Anniston Lead

Site" as "the areas where lead associated with releases from the Anniston Industrial Operations has (sic) come to be located." (*Id.*, § III, ¶ bb). The term "Anniston Industrial Operations," in turn, encompassed a list identifying twenty-three industrial business locations throughout Anniston, including a host of current or former pipe, foundry, and machine works, including those operated by members of the Partnership or their predecessors, as well as the Anniston Plant of S/P. (*See id.*, § III, ¶ d; *id.*, "Appendix 1," Doc. 296-2 at p. 6-9). Further, based upon EPA's determination "that the quantity and/or toxic effects of the hazardous substances contributed by [the members of the Partnership] to the Anniston PCB Site is minimal in comparison to other hazardous substances at the Anniston PCB Site, particularly PCBs contributed by [S/P] or their predecessors," Foundry AOC expressly recites that it constitutes a de minimis settlement under § 122(g), 42 U.S.C. § 9622(g), with respect to the Anniston PCB Site. (Foundry AOC, § V, ¶ g).

Shortly after the parties to the Foundry AOC had signed it, the Settling Defendants filed motions in this case for protective orders and to stay discovery, contending that S/P's claims against them would be precluded by the contribution protection granted by the Foundry AOC, once it took effect. (See Docs. 193-196). Simultaneously, S/P filed a motion in the Enforcement Case seeking an order from Judge Clemon holding the United States in contempt for allegedly violating terms of the PCD and prior court orders by negotiating and executing the Foundry AOC. (Enf. Case Doc. 137). Judge Clemon entered an order in which he recognized that "[S/P] would not have agreed to the [PCD] in the absence of a clause preserving their right to contribution from other [PRPs] for contamination of the Anniston PCB Site" and that the court, in approving the PCD, had similarly understood it to preserve such rights. (Enf. Case Doc. 144 at 1-2). In Judge Clemon's view, however, the proposed Foundry AOC "apparently [would] have the likely effect of nullifying the

Defendants' rights of contribution against the named defendants in *Solutia v. McWane*." (Id. at 2). Based on Judge Clemon's determination that there is "indubitably a dispute concerning the meaning of the contribution provisions of the [PCD]," he ordered the United States and S/P to proceed with the dispute resolution procedures set forth in § VIII of the PCD and enjoined the United States from taking further action to approve or implement the proposed Foundry AOC for 30 days. (Id. at 2-3). After the United States filed a request for "clarification" of that order, Judge Clemon issued another, dated June 30, 2005. (Enf. Case Doc. 152). In that brief order, Judge Clemon denied the United States' motion for contempt sanctions. (*Id*. at 1). He added, however, that the "Government's effort to foreclose [S/P]'s contribution rights" through the proposed Foundry AOC was "in effect a repudiation of the [PCD]" and that the United States had indicated that "any further dispute resolution, mediation, arbitration, or the like [over the contribution issue] is moot at this point." (*Id*. at 2). The order then concluded: "Given the repudiation efforts by the United States and the impasse at which the parties find themselves, upon Motion by [S/P], this Court will suspend [S/P]'s obligations under the [PCD]." (*Id*.) At no point thereafter did S/P file a motion requesting such relief. Ultimately, the Foundry AOC went through public notice and comment and became effective on January 17, 2006.

### F.     The Stipulation "Clarifying" the PCD

By July 2006, S/P and EPA were engaged in a dispute over the nature and scope of certain of S/P's obligations under the PCD. At that time, S/P and the United States settled such disagreement by entering into a "Stipulation and Agreement," which by its terms "clarifies" S/P's obligations under the PCD. (Doc. 545-2; Enf. Case Doc. 157-1, (the "Stipulation" or "Stip.") at 1). Pursuant to the Stipulation, S/P agreed that it would be generally required to clean up all yards within

Zones A and B, as defined in the Foundry AOC, where sampling by the Partnership or EPA under the Foundry AOC or by S/P disclosed surface soil PCB concentration of at least 1 ppm but that did *not* have surface soil lead concentration of 400 ppm or greater. (Stip., ¶¶ 8, 11). The Stipulation further provided that EPA could require S/P to perform sampling at certain other properties within Zone B and to clean up yards on those properties where such sampling showed soil PCB concentrations greater than or equal to 1 ppm, regardless of the levels of lead found there. (*Id.* ¶¶ 15, 16). Under the Stipulation, S/P also agreed to conduct additional sampling in Zones C and D, as defined in the Foundry AOC. (*Id.*, ¶¶ 18, 19). In Zone C, S/P would also clean up any yards that had PCB concentration of 1 ppm or greater, regardless of the level of lead contamination (*id.*, ¶ 18), while in Zone D, S/P would "clean up all yards that contain surface soil PCB concentrations greater than or equal to 1 ppm and/or surface soil lead concentrations greater than or equal to 400 ppm." (*Id.*, ¶ 19). The parties further agreed that except for the RI/FS Agreement and its implementing SOW, the PCD, the Removal Order and the NTC Removal Order "do not extend to any properties located outside of Zones A, B, C, and D." (*Id.*, ¶ 20). Finally, S/P also expressly waived their right, afforded by Judge Clemon's order of June 30, 2005, to seek the suspension of their obligations under the PCD. (*Id.*, ¶ 27). On July 18, 2006, the Stipulation was filed as an exhibit to a special masters' status report in the Enforcement Case, which was still being overseen by Judge Clemon,(Enf. Case Doc. 157).

### G.   The Defendants' Motions for Summary Judgment

Meanwhile, after the Foundry AOC became effective in January 2006, the Settling Defendants moved for summary judgment on all claims S/P brought against them in this action, whether characterized as seeking cost recovery under or contribution under CERCLA. (Doc. 295).

Later, the other two Defendants, *i.e.*, Southern Tool and Scientific-Atlanta (the "Non-Settling Defendants"), also moved for summary judgment, but only as to the claims against them for cost recovery. (Docs. 355, 356). On June 10, 2008, the undersigned entered an order resolving the motions, granting in part and denying in part the Settling Defendants' motion, while denying those of the Non-Settling Defendants. (Doc. 398, "June 2008 Summary Judgment Order" or "June 2008 Summ. J. Order"). In an accompanying memorandum opinion, the court concluded that the Settling Defendants were entitled to summary judgment on the § 113(f) contribution claims because they were precluded under §§ 113(f)(2) and 122(g)(5) by the Foundry AOC. (Doc. 397, the "June 2008 Summary Judgment Memorandum" or "June 2008 Summ. J. Mem.," at 22-28). However, the court ruled that S/P were entitled to proceed against all Defendants on claims seeking cost recovery under § 107(a) relative to the Anniston Lead Site. (*Id*. at 15-22).

The court's reasons for denying summary judgment on the cost recovery claims were basically two-fold. The first was based upon its resolution of a legal issue of statutory interpretation, in which the court concluded that the cost recovery remedy embodied in § 107(a) is generally available to any party that has itself financed cleanup efforts and is thus not limited, as the Defendants had argued, only to non-PRPs, "innocent" parties, or to those that have performed a cleanup "voluntarily," *i.e.*, without having been compelled to do so by judicial or administrative governmental action. (June 2008 Summ. J. Mem. at 16-22). Because S/P had undisputedly incurred costs directly financing and performing cleanup work, the court explained, it could pursue cost recovery claims under § 107(a), even if their cleanup efforts were undertaken pursuant to, and were thus "compelled" by, the PCD. The second reason for the denial of summary judgment on the cost recovery claims was that, even assuming that a party cannot, as a matter of law, employ § 107(a) to

16

recoup compelled cleanup costs, the record supported that, as a factual matter, at least some of the costs that S/P had incurred on the Anniston Lead Site were not, in fact, compelled because, the court determined, the terms of the PCD did not impose obligations upon S/P vis-á-vis the Anniston Lead Site. (*Id*. at 17-18). In addition, the court further addressed the compulsion issue by noting that Judge Clemon's June 30, 2005 order in the Enforcement Case had at least ambiguously suggested that he might have suspended S/P's obligations under the PCD, which have effectively rendered voluntary any subsequent response expenditures by S/P. (*Id*. at 18).

At a hearing in September 2009 on another matter, an attorney for the United States, a non-party in this case, verbally asked the court to reconsider its June 2008 summary judgment order to the extent it had declined to dismiss the § 107(a) claims for cost recovery. (Doc. 541 at 59). In support, the United States asserted that a number of cases decided since the Supreme Court's decision in *United States v. Atlantic Research* Corp., 551 U.S. 128 (2007), were asserted to be contrary to this court's summary judgment ruling on the § 107 claims and also that the terms of the Stipulation, which had not been presented to the court when it ruled in June 2008, allegedly demonstrated that the PCD (1) had compelled the response costs for which S/P was seeking recovery under § 107 and (2) had not been suspended by Judge Clemon. (*Id*. at 56-60, 62-64). While the court declined to reconsider its summary judgment order at the time for a number of reasons, including that the United States had no standing to seek such reconsideration and no party in the case done so, the court intimated its belief that it was authorized to revisit its summary judgment ruling and that it was "not truly adverse" to doing so. (*Id*. at 66-67).

With that door left ajar, the Defendants obliged with motions to reconsider. (Docs. 542, 544, 546, 547, 548, 549, 550, 551, 554, 557, 558, & 581). In their motions, the Settling Defendants

17

contend that they are entitled to summary judgment on the § 107(a) claims as well as on the § 113(f)

claims, which would result in their dismissal as parties.  The Non-Settling Defendants, by contrast,

acknowledge that they are potentially subject to claims for contribution under § 113(f), but they

argue that such claims are S/P's exclusive remedy against them.

## II.   DISCUSSION

### A.   Timeliness of the Motions to Reconsider

As a threshold matter, S/P argues that the court cannot consider the motions to reconsider on

the theory that they are untimely.  (Doc. 604, Plaintiffs' Supplemental Brief and Memorandum in

Opposition to Defendants' Motions to Reconsider ("S/P Supp. Brief in Opp. to Reconsid."), at 3).

S/P points out that the defendants have invoked Rule 60(b) of the Federal Rules of Civil Procedure

as the basis for their motions to reconsider and that such motions must be filed within a "reasonable

time" under Rule 60(c), Fed. R. Civ. P.  Because there was a delay of approximately 18 months

between the court's June 2008 summary judgment decision and the filing of the first motion to

reconsider in December 2009, S/P claims that the motions come too late.  (S/P Supp. Brief in Opp.

to Reconsid. at 3).

The timing of the motions is not material.  Time limits applicable to Rule 60(b) motions do

not apply to the defendants' motions to reconsider.  Notwithstanding any reliance by the defendants

on Rule 60(b), that rule does not authorize or govern motions requesting a court to revisit non-final,

interlocutory orders, including rulings that deny summary judgment in whole or in part.  *See Bon Air*

*Hotel, Inc. v. Time, Inc.*, 426 F.2d 858, 862 (5th Cir. 1970)[7]; *Zimzores v. Veterans*

---

[7]     The decisions of the former Fifth Circuit handed down before October 1, 1981 are binding in the Eleventh
Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc)

*Admin.*, 778 F.2d 264, 266 (5th Cir. 1985); *Nicholson v. City of Daphne* [Civ. No. 95-W-1031-N], 2009 WL 2045152, *2 (S.D. Ala. July 7, 2009) (unpublished).  Rather, a district court retains discretionary authority to revisit such interlocutory orders at any time prior to final judgment.  *See Harper v. Lawrence County, Ala.*, 592 F.3d 1227, 1231 (11th Cir. 2010); *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 578 F.3d 1283, 1289 (11th Cir. 2009); *Hardin v. Hayes*, 52 F.3d 934, 938 (11th Cir. 1995).

### B.    Legal Standards Applicable to Motions to Reconsider

In a second procedural argument, S/P also assert that the court may not, or at least should not, revisit its summary judgment order because, S/P contends, the legal standards or prerequisites for a motion to reconsider have not been met.  (S/P Supp. Brief in Opp. to Reconsid. at 2-3).  S/P maintains that "[o]nly three grounds justify reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or manifest injustice." (*Id*. at 2, citing *Mitchell v. Crowell*, 975 F. Supp. 1440, 1442 (N.D. Ala. 1997)).  S/P urges that none of these circumstances are present.

S/P's arguments fail to establish that it is improper for the court to entertain the defendants' motions to revisit the June 2008 summary judgment order.  It is not disputed that in general a finding that there exists at least one of the circumstances cited by S/P from *Mitchell* before reconsidering an earlier order represents a sound prudential limitation on the propriety of revisiting interlocutory rulings.  Even so, there are at least two grounds why reconsideration of summary judgment is warranted.  The first is the availability of additional evidence, which is the second *Mitchell* circumstance.  The court's June 2008 summary judgment ruling was based in part on an ambiguity in Judge Clemon's June 30, 2005 order that potentially rendered it subject to the interpretation that

19

it operated to suspend S/P's obligations under the PCD, supporting that S/P's clean up efforts thereafter were voluntarily in the sense that they were no longer compelled by the PCD.  It is now crystal clear, however, from the Stipulation, S/P's briefing on the motions to reconsider, and from a declaration attached to the latter, none of which was before the undersigned in June 2008, that Judge Clemon's order did not itself suspend S/P's obligations under the PCD, that S/P never moved for such relief, and that S/P is not making any claim to the contrary.  (Stip. ¶ 27; S/P Supp. Brief in Opp. to Reconsid. at 32; Declaration of George Frampton, Jr., Exhibit B to S/P Supp. Brief in Opp. to Reconsid., ¶¶ 11-12).  In addition, the Stipulation, which by its terms "clarifies" the nature and scope of S/P's duties under the PCD and the administrative orders referenced therein, constitutes new evidence on the broader factual question of whether S/P's particular response activities in Anniston were compelled.[8]

The second reason justifying reconsideration is the existence of additional legal authority from a number of federal courts since this court issued its June 2008 decision.  It is true that there

---

[8] S/P have noted that the Stipulation provides that S/P's "signing of [the Stipulation] and taking actions consistent with it shall not be considered an admission of liability and is not admissible in evidence against [S/P] in any judicial or administrative proceeding, other than a proceeding by the United States, including EPA to enforce the [Stipulation] or a judgment relating to it."  (Stipulation at p. 3, ¶ 5; *see also id.* at p. 5, ¶ 12 ).  S/P have also moved in the Enforcement Case to strike a "Status Report" filed in that case by the United States, which includes arguments based upon the Stipulation that S/P regards as an improper attempt to undercut S/P's position in the instant case.  (Enf. Case Doc. 187).  However, S/P have not moved to strike or exclude the Stipulation itself, which, aside from being offered by the defendants in this case, is a public document filed in the Enforcement Case.  Nor do S/P make any argument that *the defendants*, who are not parties to the Stipulation, are precluded from now relying upon it.  It may be that, even without the inclusion of express provisions purporting to limit its use as evidence, the Stipulation would constitute evidence of a compromise that is not admissible to prove S/P's liability for lead contamination in Anniston.  *See* Rule 408(a), Fed. R. Evid.; *also see generally Lyondell Chem. Co. v. Occidental Chem. Corp.*, ___ F.3d ___, ___, 2010 WL 2266812, *5 (5th Cir. June 8, 2010) (interpreting Rule 408 in the CERCLA context).  That exclusionary principle is not implicated, however, where evidence of a compromise is offered for some purpose other than as a quasi-admission of wrongdoing or liability.  *See* Rule 408(b), Fed. R. Evid.; *see also Tremont LLC v. Halliburton Energy Servs., Inc.*, ___ F. Supp. 2d ___, ___, n. 42, 2010 936548, n.42 (S.D. Tex. March 11, 2010); *Fireman's Fund Ins. Co. v. City of Lodi, Calif.*, 296 F. Supp. 2d 1197,1208 (E.D. Cal. 2003).  It is clear that the defendants are not offering the Stipulation to prove liability; rather, they rely upon it to show the extent of S/P's obligations under the PCD, in order to establish that S/P's response costs were compelled by it.

20

has not been a "controlling" case from the Supreme Court or the Eleventh Circuit on the primary issue raised by the motions to reconsider: the relationship between CERCLA's cost recovery and contribution causes of action. That relationship is decidedly unsettled, however, as discussed below, since June 2008 there have been a significant number of decisions handed down not only in the district courts but also in circuit courts of appeals that serve as additional persuasive guidance. Accordingly, reconsideration of the court's order denying the defendants' motions for summary judgment on the § 107 claims is both authorized and justified. The court now turns to the substantive issues raised by the motions to reconsider.

### C.    The Scope of CERCLA's "Cost Recovery" and "Contribution" Remedies

When a private party incurs costs associated with the cleanup of a hazardous waste site, CERCLA affords that party two types of claims by which it potentially may seek to recoup all or part of its costs from other parties that are entirely or partially responsible for the contamination. The first type of claim arises under § 107(a) and is commonly known as a "cost recovery" cause of action. 42 U.S.C. § 9607(a). The second type is the "contribution" cause of action arising under § 113(f). The primary argument raised by the defendants, and also by the United States as amicus curiae, in support of the motions to reconsider is that S/P are precluded from bringing claims under § 107(a) on the theory that their exclusive remedy under CERCLA is through § 113(f) contribution. The defendants take the position that S/P has incurred their expenses in question by performing cleanup activities pursuant to the PCD and the administrative agreements it encompasses, *i.e.*, the Removal Order, the NTC Removal Order, and the RI/FS Agreement. The defendants maintain that such "compelled" expenses incurred under judicial and administrative enforcement measures generally are subject to apportionment amongst the Defendants through claims by S/P for contribution under

§ 113(f).  In those circumstances, the Defendants urge, S/P can pursue such contribution claims against them to the extent that they are not precluded by § 113(f)(2) contribution protection arising from the Foundry AOC, but that S/P cannot simply choose to characterize its claims instead as ones seeking cost recovery under § 107(a).

In opposition, S/P take the position that § 107(a) does authorize cost recovery claims in circumstances that might also give rise to a § 113(f) claim, and S/P contend that the court, in its June 2008 summary judgment memorandum, was correct to interpret § 107(a) as permitting cost recovery even if the subject costs stem from cleanup activities that were "compelled" by judicial or administrative enforcement measures.  Alternatively, S/P argue that, assuming § 107(a) is construed not to authorize cost recovery claims based on circumstances that also give rise to § 113(f) contribution, the circumstances underlying S/P's claims here do not authorize contribution under § 113(f) and thus support claims under § 107(a).  In a similar vein, S/P maintain that their § 107(a) claims are viable on the theory that the costs underlying their claims arose from response activities not actually "compelled" by the government's enforcement measures.  To understand fully the parties' respective arguments and positions on these issues, it is necessary to discuss in some detail the framework of CERCLA as it relates to its cost recovery and contribution causes of action, as well as how the federal courts have interpreted those provisions.

### 1.    The CERCLA Framework

"As its name implies, CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994).  The "'two ... main purposes of CERCLA' are 'prompt cleanup of hazardous waste sites and imposition of all cleanup costs on the responsible

22

party.'"  *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996) (quoting *General Electric Co. v.*

*Litton Industrial Automation Systems, Inc.*, 920 F.2d 1415, 1422 (8th Cir. 1990)).  When faced with

the need to clean up a hazardous waste site, CERCLA § 104(a) presents the federal government with

the option of either cleaning up the site itself or requiring the cleanup to be financed and performed

by certain enumerated entities that are subject to liability under CERCLA.  42 U.S.C. § 9604(a).

Those entities, often referred to as "potentially responsible parties" or "PRPs" for short, are set forth

as four categories in § 107(a)(1) through (4).  They include: (1) the owner and operator of a facility

where hazardous substances are located; (2) the owner or operator of a facility at the time when such

hazardous substances were disposed of; (3) those who arranged for disposal, treatment, or transport

of such hazardous substances by some other party; and (4) those who accepted hazardous substances

for transport to disposal or treatment facilities from which there is a release or a threatened release.

42 U.S.C. §§ 9607(a)(1)-(4).  Regardless of whether the government performs the cleanup itself or

compels a PRPs to do it, the government is authorized to recover "all costs of removal or remedial

action"[9] associated  with  the  cleanup  from  such  PRPs,  either  through  a  civil  action  under  §

---

[9]      Under CERCLA, cleanup activities are divided into "removal" and "remedial" actions.  The term "removal"
includes

> the cleanup or removal of released hazardous substances from the environment, ...
> such actions as may be necessary to monitor, assess, and evaluate the release ... of
> hazardous substances, the disposal of removed material, or the taking of such other
> actions as may be necessary to prevent, minimize, or mitigate damage to the public
> health or welfare or to the environment, which may otherwise result from a release
> ... .   The term includes ... action taken under [§ 104(b), which authorizes
> investigations, monitoring, surveys, testing, and planning related to cleaning up
> hazardous substances].

§ 101(23), 42 U.S.C. § 9601(23); *see also* § 104(b), 42 U.S.C. § 9604(b).  The term "remedial action"
refers to

> those actions consistent with permanent remedy taken instead of or in addition to
> removal actions in the event of a release ... of a hazardous substance into the
> environment, to prevent or minimize the release of hazardous substances so that

107(a)(4)(A), or through an administrative settlement under § 122(g) or § 122(h).  42 U.S.C. §§ 9607(a)(4)(A), 9622(g) & (h).  Under CERCLA's strict liability regime, a party that falls within any of the four PRP categories of § 107(a) may be held jointly and severally liable by the government for the entire cost of a cleanup, even if the party is "innocent" in the sense that it did not contribute to the pollution at the site.  *See Canadyne-Georgia Corp. v. NationBank, N.A. (South)*, 183 F.3d 1269, 1275 (11th Cir. 1999); *Atlantic Research*, 551 U.S. at 136 ("[E]ven parties not responsible for contamination may fall within the broad definitions of PRPs in § 107(a)(1)-(4)").

When the federal government determines that a cleanup is due to be performed by another party, CERCLA authorizes the use of a variety of judicial and administrative enforcement mechanisms, set forth in §§ 106 and 122.  Under § 106(a), the President is authorized to direct the Attorney General to file a civil action seeking injunctive relief to abate "an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance." 42 U.S.C. § 9606(a).  The President, or the EPA as his delegated agent under CERCLA,[10] is also authorized under § 106(a) to issue unilateral administrative orders

---

they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. ...

§ 101(24), 42 U.S.C. § 9601(24).  As used in CERCLA, the term "response" encompasses both recovery and remedial actions, as well as "enforcement activities related thereto."  § 101(25), 42 U.S.C. § 9601(25).

[10]/  *See* 42 U.S.C. § 9615; 40 C.F.R. § 300.100; Executive Orders 12,580 and 12,777;

("UAO's") "as may be necessary to protect public health and welfare and the environment," that require a party to perform a cleanup. 42 U.S.C. § 9606(a). Where a party that is subject to a UAO "willfully" and "without sufficient cause" fails to comply with it, the government is authorized to bring an action in district court under § 106(b)(1) to enforce the UAO and seek additional fines and penalties. 42 U.S.C. § 9606(b)(1); *see also id.*, § 9607(c)(3).

The EPA is also generally authorized under § 122(a) to enter into settlements with other parties under which those parties are to perform cleanup activities. 42 U.S.C. § 9622(a). Under § 122(d)(1), the EPA may enter into so-called "cleanup agreements" "with respect to remedial action under [§ 106(a)]." 42 U.S.C. § 9622(d)(1). Section 122(d)(3) likewise authorizes agreements under which another party is to perform "action under [§ 104(b)]," which references more preliminary removal actions, including investigation, monitoring, and planning tasks.[11] 42 U.S.C. §§ 9622(d)(3) and 9604(b). Finally, CERCLA § 122(g) empowers the government to enter into "de minimis settlements" to resolve "an administrative or civil action under [§ 106] or [§ 107]" where the

---

[11/]   Section 104(b) provides in relevant part as follows:

(b) Investigations, monitoring, coordination, etc., by President

    (1) Information; studies and investigations

        Whenever the President is authorized to act pursuant to subsection (a) of this section, or whenever the President has reason to believe that a release has occurred or is about to occur, or that illness, disease, or complaints thereof may be attributable to exposure to a hazardous substance, pollutant, or contaminant and that a release may have occurred or be occurring, he may undertake such investigations, monitoring, surveys, testing, and other information gathering as he may deem necessary or appropriate to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances, pollutants or contaminants involved, and the extent of danger to the public health or welfare or to the environment. In addition, the President may undertake such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations as he may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter.

42 U.S.C. § 9604(b)(1).

"settlement involves only a minor portion of the response costs at the facility concerned" and other conditions are met.  42 U.S.C. § 9622(g).

From CERCLA's enactment in 1980 until amendment by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 100 Stat. 1613, the only express provision that potentially authorized a private party to recoup expenditures made in connection with the cleanup of a site from other private parties or polluters was § 107(a)(4)(B).  Just as PRPs are liable to the government under § 107(a)(4)(A) for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan[12]," CERCLA specified that PRPs are likewise liable under § 107(a)(4)(B) for "any other necessary costs of response incurred by any other person consistent with the national contingency plan."  42 U.S.C. §§ 9607(a)(4)(A)-(B) (footnote added).  From the outset, courts agreed with virtual unanimity that § 107(a)(4)(B) authorized claims by a private party that had itself cleaned up a site against other parties responsible for the contamination.  *See Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 891 (9th Cir. 1986); *Walls v. Waste Resource Corp.*, 761 F.2d 311 317-18 (6th Cir. 1985); *Artesian Water Co. v. New Castle County*, 605 F. Supp. 1348, 1356 (D. Del. 1985).  Courts during that period also generally agreed that such a cost recovery cause of action was available even if the plaintiff was itself a PRP.  *See, e.g., City of Philadelphia v. Stepan Chem. Co.*, 544 F. Supp. 1135, 1143 (E.D. Pa. 1982); *Jones v. Inmont Corp.*, 584 F. Supp. 1425, 1428 (S.D. Ohio 1984); *Pinole Point Properties, Inc. v. Bethlehem Steel Corp.*, 596 F. Supp. 283, 291 (N.D. Cal. 1984); *United States v. Conservation Chem. Co.*, 628 F. Supp. 391, 404 (W.D. Mo. 1985); *but cf. D'Imperio v. United States*, 575 F. Supp.

---

[12]/     "The national contingency plan specifies procedures for preparing and responding to contaminations and was promulgated by the Environmental Protection Agency ... ."  *Cooper Industries Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 161, n. 2 (2004) (citing 40 CFR pt. 300 (2004)).

248, 253 (D.N.J. 1983) (stating without citation or further analysis that "[i]n order to seek recovery under [§ 107(a)(4)(B)] it is necessary for the plaintiff to prove that he himself is not liable for [cleanup] costs."); *Mardan Corp. v. C.G.C. Music, Ltd.*, 600 F. Supp. 1049, 1057 (D. Ariz. 1984) (holding that a § 107(a) action was barred by, among other things, the doctrine of "unclean hands" because the plaintiff had itself contributed to contamination at the site), *aff'd on other grounds*, 804 F.2d 1454 (9th Cir. 1986).

It appears that it was at least initially assumed that private parties were not precluded from pursuing claims under § 107(a)(4)(B) by the fact that their costs had been incurred performing investigation or cleanup tasks under a CERCLA consent decree or an authorized administrative order or agreement with the EPA or a State environmental agency.  Although only a few published cases prior to the 1986 SARA amendments seem to arise under those circumstances, *see, e.g., Mardan Corp.*, 600 F. Supp. at 1054-55; *Marmon Group, Inc. v. Rexnord, Inc.*, 1986 WL 7070  (N.D. Ill. June 16, 1986) (unpublished), no court or litigant at that time seems to have taken the position that § 107(a)(4)(B) provided no remedy where cleanup costs were compelled by prior enforcement measures.  Further, amendments to the NCP regulations in late 1985 made clear that the EPA contemplated that private cleanups compelled by the agency under § 106 could support cost recovery under § 107(a).  *See* 50 Fed. Reg. 47,929 and 47,934 (Nov. 20, 1985); 40 C.F.R. § 300.68(*l*) (1986) (setting forth standards to be used by EPA in "evaluating ... proposed response actions [taken by parties other than the lead agency pursuant to section 106 of CERCLA] for the purpose of determining consistency with [the NCP] for cost recovery under section 107 of CERCLA.").

Ironically, given the nature of the issues in this action, one of the more hotly-debated issues during the first few years after CERCLA's passage was whether government involvement in a

private party's clean up efforts was affirmatively *required* for an action to lie under § 107(a)(4)(B).

*See* Frederic M. Mauhs, *Judicial Limitations on the CERCLA Private Right of Action*, 15 Envtl. L.

471, 483 (Spring 1985) ("The aspect of CERCLA's private recovery provision with which courts

are most uneasy is the possibility that a party might, voluntarily and without government approval

or intervention, clean up any problematic waste site and then sue hundreds of transporters and

generators for recovery of potentially enormous costs .... "); Jeffrey M. Gaba, *Recovering Hazardous*

*Waste Cleanup Costs: The Private Cause of Action Under CERCLA*, 13 Ecology L.Q. 181, 201

(1986) ("Perhaps the single most difficult issue under section 107(a)(4)(B) is the role that the

government should play in approval of private cleanup plans."). District courts initially split sharply

on that question.[13]   However, the 1985 amendments to the NCP also clarified that cleanups

performed without government approval could generate response costs consistent with the NCP and

thus support a cost recovery action under § 107(a)(4)(B). *See* 50 Fed. Reg. 47,934 (revising 40

C.F.R. § 300.71) (1985).  At about that same time, the issue began to reach the federal appellate

courts, which, taking their cue primarily from the amended NCP, uniformly agreed that government

approval or involvement was not required in an action under § 107(a)(4)(B). *See Wickland Oil*, 792

F.2d 891-92; *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1078 n.8 (1st

Cir. 1986); *Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1575 (5th Cir.

---

[13]/     *Compare Bulk Distribution Centers, Inc. v. Monsanto Co.*, 589 F. Supp. 1437, 1445-46 (S.D. Fla. 1984);
*Wickland Oil Terminals v. Arsarco, Inc.*, 590 F. Supp. 72, 77 (N.D. Cal. 1984) *Marmon Group, Inc. v.
Rexnord, Inc.*, 1986 WL 7070, *1 (N.D. Ill. June 16, 1986) (unpublished) (all holding that government approval
of a private plaintiff's cleanup plan was a prerequisite to suit under § 107(a)(4)(B)), *with Pinole Point
Properties*, 596 F. Supp. at 289-90; *City of New York v. Exxon Corp.*, 633 F. Supp. 609, 616 (S.D.N.Y. 1986);
*Fishel v. Westinghouse Elec. Corp.*, 617 F. Supp. 1531, 1534-35 (M.D. Pa. 1985); *Conservation Chem. Co.*,
628 F. Supp. at 405; *State of New York v. Shore Realty Corp.*, 648 F. Supp. 255, 263 (E.D.N.Y. 1986) (all
taking the contrary position); *see also Artesian Water Co.*, 605 F. Supp. at 1357-60 (holding that a private
plaintiff may sue under § 107(a)(4)(B) to recover costs associated with "removal" action without prior
government approval but requiring such approval to recover costs associated with "remedial" action).

1988); *Richland-Lexington Airport Dist., v. Atlas Properties, Inc.*, 901 F.2d 1206, 1208-09 (4th Cir. 1990).

In addition to the foregoing cases concerning the scope of the § 107 remedy,  "[a]fter CERCLA's passage, litigation also ensued over the separate question of whether a private entity that had been sued in a cost recovery action (by the Government or by another PRP) could obtain contribution from other PRPs."  *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 162 (2004).  The Supreme Court further recounted:

> As originally enacted in 1980, CERCLA contained no provision expressly providing for a right of action for contribution.  A number of District Courts nonetheless held that, although CERCLA did not mention the word "contribution," such a right arose either impliedly from provisions of the statute, or as a matter of federal common law. See, *e.g., United States v. New Castle County*, 642 F. Supp. 1258, 1263-1269 (D. Del. 1986) (contribution right arises under federal common law); *Colorado v. ASARCO, Inc.*, 608 F. Supp. 1484, 1486-1493 (D. Colo. 1985) (same); *Wehner v. Syntex Agribusiness, Inc.*, 616 F. Supp. 27, 31 (E.D. Mo. 1985) (contribution right is implied from § 107(e)(2)).  That conclusion was debatable in light of two decisions of this Court that refused to recognize implied or common-law rights to contribution in other federal statutes.  *See Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 638-647 (1981) (refusing to recognize implied or common-law right to contribution in the Sherman Act or the Clayton Act); *Northwest Airlines, Inc. v. Transport Workers*, 451 U.S. 77, 90-99 (1981) (refusing to recognize implied or common-law right to contribution in the Equal Pay Act of 1963 or Title VII of the Civil Rights Act of 1964).

*Id.* at 162.

"Congress subsequently amended CERCLA in the Superfund Amendments and Reauthorization Act of 1986 (SARA), 100 Stat. 1613, to provide an express action for contribution." *Id.*  Specifically, § 113(f) contains two provisions expressly setting forth circumstances in which a party "may seek contribution": (1) "during or following any civil action under [§ 106] or under [§ 107]," § 113(f)(1); and (2) when a party has "resolved its liability to the United States or a State for

some or all of a response action or for some or all of the costs of such action," § 113(f)(3)(B).  42

U.S.C. §§ 9613(f)(1) & (f)(3)(B).  In addition to codifying the contribution cause of action, the

SARA amendments included several other provisions that distinguish such claims from those for

cost recovery under § 107(a).  First, the nature of liability is at least generally different.  Courts

consistently interpret § 107(a) to provide for joint and several liability among all PRPs unless a

defendant can show that a reasonable basis for apportionment of harm exists.  *See Burlington*

*Northern & Sante Fe Ry. Co. v. United States*, ___ U.S. ___, ___, 129 S. Ct. 1870, 1880-1881

(2009).  By contrast, contribution calls for an apportionment of liability, with courts being authorized

under § 113(f)(1) to "allocate response costs among liable parties using such equitable factors as the

court determines are appropriate." 42 U.S.C. § 9613(f)(1).  Second, the statute of limitations is often

longer and may be otherwise more favorable for cost recovery claims than it is for contribution

claims.  Under § 113(g)(3), the limitations period for an "action for contribution for any response

costs or damages" claims is three years, with commencement of the period being tied to the date of

a judgment or certain specified administrative orders or a judicially approved settlement.   The

limitations period for § 107 cost recovery claims under § 113(g)(2) is either three or six years,

depending upon the type of response action performed.  42 U.S.C. § 9613(g)(2).  Further, that

limitations period is triggered by the performance of response work by the plaintiff, which might not

occur until well after the date of a prior judgment, settlement, or order under which the plaintiff

initially was compelled or agreed to perform response work at the site.  *Id.; see also, e.g., RSR Corp.*

*v. Commercial Metals Co.*, 496 F.3d 552 (6th Cir. 2007) (holding that contribution action based on

costs of response action performed pursuant to 1999 consent decree was untimely filed under §

113(g)(3) where it was filed more than three years after entry of the consent decree, notwithstanding

that response work was not completed until 2001). Third, and most importantly for present purposes, § 113(f)(2) provides that a party that "has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2). That "settlement bar does not by its terms protect against cost-recovery liability under § 107(a)." *Atlantic Research*, 551 U.S. at 140.

Notwithstanding the prior caselaw interpreting § 107(a)(4)(B) as authorizing actions by PRPs, after SARA's enactment, the federal appellate courts changed course. Seeking to "direct traffic between" that section and the new § 113(f) cause of action, *Atlantic Research*, 551 U.S. at 132 (quoting case below, 459 F.3d 827, 832 (8th Cir. 2006)), many courts, including the Eleventh Circuit, began to hold that the § 113(f) contribution cause of action was the exclusive remedy by which a private plaintiff PRP might bring suit against others to recoup or apportion expenses associated with a cleanup, at least unless the plaintiff could not show that it was merely an "innocent" party that did not contribute to the site contamination, despite its PRP status. *See Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 & n.7 (11th Cir. 1996); *Rumke of Indiana v. Cummins Engine Co.*, 107 F.3d 1235, 1240-41 (7th Cir. 1997); *see also Cooper Indust.*, 543 U.S. at 169 (collecting cases). "But as courts prevented PRPs from suing under § 107(a), they expanded § 113(f) to allow PRPs to seek 'contribution' even in the absence of a suit under § 106 or § 107(a)." *Atlantic Research*, 551 U.S. at 132 (citing *Aviall Servs., Inc. v. Cooper Industries, Inc.*, 312 F.3d 677, 681 (5th Cir. 2002) (en banc)).

In its decisions in *Cooper Industries* and *Atlantic Research*, however, the Supreme Court established a different template for assessing the relationship between § 107(a) and § 113(f). Each

31

case involved a similar factual situation in which a plaintiff, itself a PRP that had contributed to

contamination at the site, had cleaned it up without having been sued under § 106 or § 107 or

otherwise subject to formal government enforcement and then sued other alleged PRPs under

CERCLA to recoup its cleanup costs. *Cooper Industries*, 543 U.S. at 163-64; *Atlantic Research*, 551

U.S. at 133-34.  In resolving the cases, the Supreme Court made clear that while the remedies of §

107(a) and § 113(f) "are similar at a general level in that they both allow private parties to recoup

expenses from other private parties," *Cooper Industries*, 543 U.S. at 163 n.3, the latter section's

contribution cause of action does not encompass all claims that might implicate "any apportionment

of expenses among PRPs." *Atlantic Research*, 551 U.S. at 138.  Instead, the Court held that "§§

107(a) and 113(f) provide two 'clearly distinct' remedies," *id.* (quoting *Cooper Indust.*, 543 U.S. at

163 n.3), that "complement each other by providing causes of action 'to persons in different

procedural circumstances.'" *Id.* at 139 (quoting *Consolidated Edison Co. of N.Y. v. UGI Utilities,

Inc.*, 423 F.3d 90, 99 (2d Cir. 2005)).

The Court opined that the term "contribution" in § 113(f) is used in its "traditional sense,"

defined as the "'tortfeasor's right to collect from others responsible for the same tort after the

tortfeasor has paid more than his or her proportionate share, the shares being determined as a

percentage of fault.'" *Atlantic Research*, 551 U.S. at 138 (quoting Black's Law Dictionary 353 (8th

ed. 2004)).  As such, a PRP's right to contribution "is contingent upon an inequitable distribution

of common liability among liable parties," *id*. at 139, as where a "PRP ... pays money to satisfy a

settlement agreement or a court judgment" to reimburse another party for costs that it incurred in

performing or overseeing a cleanup.  *Id.* at 139 & n.6.  But such contingency is not satisfied, the

Court held, where a plaintiff seeks to recover or apportion costs of a cleanup it performed

voluntarily, without ever having been sued under § 106 or § 107, settling its liability, or in response to an administrative order.  *See Cooper Industries*, 543 U.S. at 165-68 & n.5; *see also Atlantic Research*, 551 U.S. at 139 n.6.

By contrast, *Atlantic Research* held that a plaintiff that itself has performed a cleanup under those same voluntary conditions is authorized to bring a claim to recoup its response costs under § 107(a)(4)(B), essentially validating earlier federal appellate cases like *Wickland Oil* that had sanctioned cost recovery claims arising from private cleanups undertaken without government involvement. 551 U.S. at 141; *see also id.* at 139 n.6.  The Supreme Court explained that § 107(a)(4)(B) does not create a right to contribution relative to payments a party has made to reimburse others for their cleanup costs; rather, it authorizes a private plaintiff to recover costs that it has incurred by performing or financing its own cleanup.  *Id.* at 139.  At least this is so, the Court held, where the plaintiff has cleaned up a site without having been subject to government enforcement measures, recognizing that the § 107(a) cause of action does not require "any establishment of liability [of that plaintiff] to a third party," including the government.  *Id.* at 139; *see also id.*, at 139 n.6.

### 2.     No Binding Precedent Governs the Viability of § 107 Claims Based on "Compelled" Costs of Response

Insofar as S/P's cleanup costs underlying their would-be § 107(a) claims either (1) might have been "compelled" by the PCD or the EPA's administrative orders encompassed within the PCD or (2) might otherwise support § 113(f) contribution claims, the facts of this case are distinguishable from those of the "voluntary" cleanups in *Cooper Industries* and *Atlantic Research*, which were not preceded by formal judicial or administrative enforcement measures.  The parties do not seriously

dispute this.   Nonetheless, certain Defendants and the United States have argued that *Atlantic Research* itself and two earlier cases decided by the Eleventh Circuit, *Redwing Carriers, supra*, and *OSI, Inc. v. United States*, 525 F.3d 1294 (11th Cir. 2008), sufficiently intimate that a plaintiff cannot bring claims under § 107(a) after itself having been sued under § 106 or § 107 or where it would otherwise be entitled to assert a contribution claim under § 113(f).

In support of their claim that *Atlantic Research* controls, Defendants point to a portion of the opinion in which the Supreme Court, after noting that the district court below had dismissed the plaintiff's § 107(a) claims based on its conclusion that the statute does not allow PRPs to recover costs, stated as follows:

> The Court of Appeals for the Eighth Circuit reversed.  Recognizing that *Cooper Industries* undermined the reasoning of its prior precedent, 459 F.3d, at 830, n. 4, the Court of Appeals joined the Second and Seventh Circuits in holding that § 113(f) does not provide "the exclusive route by which [PRPs] may recover cleanup costs."  *Id.*, at 834 (citing *Consolidated Edison Co.*, supra ).  The court reasoned that § 107(a)(4)(B) authorized suit by any person other than the persons permitted to sue under § 107(a)(4)(A). 459 F.3d, at 835.  Accordingly, it held that § 107(a)(4)(B) provides a cause of action to Atlantic Research.   To prevent perceived conflict between § 107(a)(4)(B) and § 113(f)(1), the Court of Appeals reasoned that PRPs that "have been subject to §§ 106 or 107 enforcement actions are still required to use § 113, thereby ensuring its continued vitality." *Id.*, at 836-837.  We granted certiorari, 549 U.S. 1177 (2007), and now affirm.

*Atlantic Research*, 551 U.S. at 134.  The Defendants interpret the Supreme Court's reference to the Eighth Circuit's statement that PRPs that have been subject to § 106 or § 107 enforcement actions are required to use § 113, coupled with its close proximity to the Court's acknowledgment that it was "now affirm[ing]" the Eighth Circuit's judgment, as proof that the Supreme Court agreed with the Eighth Circuit's statement.

*Atlantic Research* cannot logically be read as supporting the notion that the exclusive remedy of a PRP that has been subject to an enforcement action under § 106 or § 107 is a § 113(f) contribution claim.  In any case, such statement by the Supreme Court in *Atlantic Research* would necessarily be dicta, because the plaintiff there had not been subject to a prior § 106 or § 107 action nor any other formal enforcement action and therefore clearly had no potential contribution claim, per *Cooper Industries*.  While "'dicta from the Supreme Court is not something to be lightly cast aside,'" *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (quoting *Peterson v. BMI Refractories*, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997)), the Court's language at issue here is merely a recitation included in the case's procedural history, rather than something to be taken as legal analysis or as expressing approval of the Eighth Circuit's statement.[14]  Moreover, any potential ambiguity on that score is put to rest by the fact that later, in footnote six of the *Atlantic Research* opinion, the Supreme Court explicitly reserved that very same issue, as follows:

> We do not suggest that §§ 107(a)(4)(B) and 113(f) have no overlap at all.  *Key Tronic Corp. v. United States*, 511 U.S. 809, 816 (1994) (stating the statutes provide "similar and somewhat overlapping remed[ies]").  For instance, we recognize that a PRP may sustain expenses pursuant to a consent decree following a suit under § 106 or § 107(a).  *See, e.g., United Technologies Corp. v. Browning-Ferris Industries, Inc.*, 33 F.3d 96, 97 (1st Cir. 1994).  In such a case, the PRP does not incur costs voluntarily but does not reimburse the costs of another party.  We do not decide whether these compelled costs of response are recoverable under § 113(f), § 107(a), or both.  For our purposes, it suffices to demonstrate that costs incurred voluntarily are recoverable only by way of § 107(a)(4)(B), and costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f).  Thus, at a minimum, neither remedy swallows the other, contrary to the Government's argument.

---

[14]     Indeed, any statement appearing in the Eighth Circuit's opinion in *Atlantic Research* regarding the unavailability of relief under § 107(a) where a claim would be authorized under § 113(f), would itself be dicta because, again, no such issue was presented by the facts of the case.

*Atlantic Research*, 551 U.S. at 139 n.6.  Given that the *Atlantic Research* Court flagged the matter of compelled response as presenting a potentially distinct issue and declined to analyze it further, the inference drawn by the Defendants that the Supreme Court approved of the Eighth Circuit's ostensible resolution of that issue, *i.e.*, that § 113(f) is the exclusive remedy for a PRP once it has been sued under § 106 or § 107, is unwarranted.

The Defendants also urge that the Eleventh Circuit's 1996 decision in *Redwing Carriers* stands for the proposition that a PRP cannot utilize § 107(a) to bring claims against other PRPs based on response costs that the plaintiff PRP incurred pursuant to obligations under an administrative or judicial settlement with the government.  S/P claim that they are innocent parties, not PRPs, with respect to the Anniston Lead Site and that they are thus entitled to proceed under § 107 even if *Redwing Carriers* is read as defendants suggest.  However, even assuming that S/P are polluters with respect to the Anniston Lead Site and that *Redwing Carriers* would have at one time barred S/P's § 107 claims, that case no longer can do so.

In *Redwing Carriers*, the plaintiff Redwing had formerly operated a trucking terminal on the site, resulting in the ground having become "contaminated with hazardous chemicals which have combined to form a black, tar-like toxic substance."  94 F.3d at 1494.  Although Redwing had not been sued under § 106 or § 107(a), it had entered into two administrative orders by consent ("AOCs") with the United States Environmental Protection Agency ("EPA"), pursuant to which Redwing performed certain monitoring, removal work, and an RI/FS at the site, at a cost of approximately $1.9 million.  *Id.* at 1495.  Redwing thereafter sought to recoup those costs by bringing suit against other alleged PRPs under both §§ 107(a) and 113(f).  *Id.*  The Eleventh Circuit

held, however, that Redwing was limited to pursuing its claims for contribution under § 113(f),

stating as follows:

> In its amended complaint, Redwing alleged separate claims against the Appellees under §§ 107(a) and 113(f) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(f). As a matter of law, however, Redwing's CERCLA claims against the Appellees are claims for contribution governed by § 113(f). To bring a cost recovery action based solely on § 107(a), Redwing would have to be an innocent party to the contamination of the Saraland Site. *See United Technologies Corp. v. Browning-Ferris Indus.*, 33 F.3d 96, 99-100 (1st Cir. 1994), cert. denied, 513 U.S. 1183 (1995); *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir. 1994). Redwing cannot claim such innocence. Although Redwing disavowed liability in its consent orders with the EPA, Redwing cannot deny it originally disposed of most, if not all, of the hazardous substances now contaminating the Site. Redwing is a responsible party under CERCLA, and therefore, its claims against other allegedly responsible parties are claims for contribution. *See United States v. Colorado & E.R. Co.*, 50 F.3d 1530, 1535-36 (10th Cir. 1995); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir. 1989).

*Redwing Carriers*, 94 F.3d at 1496 (footnote omitted).

Assuming that S/P contributed to the pollution of the Anniston Lead Site, that status would

have indeed precluded them from bringing cost recovery claims pursuant to § 107(a), based on the

holding of *Redwing Carriers*. However, as the court explained in its June 2008 memorandum

opinion, *Redwing Carriers* has been called into question by *Atlantic Research* to the extent that the

former held that a § 107(a) claim is unavailable except to those parties who are not PRPs or are

otherwise innocent of having contributed to the pollution of a facility or site. While the defendants

do not seem to seriously contend otherwise, they maintain that *Redwing Carriers* further established

that the plaintiff there could not proceed under § 107(a) because its response costs were compelled

by the AOCs, and that this aspect of the Eleventh Circuit's holding survived *Atlantic Research*. The

flaw in that argument is that the *Redwing Carriers* opinion leaves no room for doubt that the

Eleventh Circuit's resolution of the § 107(a) claims turned solely upon that court's interpretation that

such claims are available under the statute only to "innocent" parties.  That is, once the Eleventh Circuit recognized that Redwing could not deny that it was a PRP and a polluter, the § 107(a) claims were foreclosed, and it was not necessary to consider the narrower question of whether the § 107(a) claims might have *also* been barred because the plaintiff had incurred its response costs "involuntarily" under the AOCs.  Nor did the court of appeals make any statement to that effect. Whether Redwing's § 107(a) claims might have been precluded because its cleanup costs were compelled may have been "lurk[ing] in the record." *Cooper Indust.*, 543 U.S. at 170 (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).  However, the *Redwing Carriers* court did not purport to consider, never mind rule upon, that issue, so the case is not binding on the point.  *Id.*; *cf. Texas v. Cobb*, 532 U.S. 162, 169 (2001) ("[R]ights are not defined by inferences from opinions which did not address the question at issue.").  The June, 2008, order does not conflict with the holding of *Redwing Carriers*.

Finally, the United States, as amicus curiae, contends that the Eleventh Circuit's post-*Atlantic Research* decision in *OSI* holds or suggests that compelled response costs are not subject to recovery under § 107(a).  The government wildly overreaches.  In that case, a plaintiff landowner, OSI, sued the federal government under, among other statues, § 107(a) based upon contamination caused by the Air Force when it leased the land from a prior owner years earlier.  There is no indication in the opinion, however, that OSI had previously been subject to a § 106 or § 107 suit or other governmental enforcement. The court disposed of the § 107(a) claims in a footnote that stated in relevant part as follows:

> We also reject OSI's claims for cost recovery under CERCLA. OSI sought recovery of costs from the Government under 42 U.S.C. § 9607(a), which permits recovery of removal and remediation costs voluntarily incurred by parties like OSI.

38

> *See United States v. Atlantic Research Corp.*, 551U.S. 128, 127 S.Ct. 2331, 2335-37, (2007).  OSI has not come forward with even a scintilla of evidence that they have incurred or plan to incur costs to clean up [the contaminated site].  Therefore, the grant of summary judgment on the CERCLA claims is affirmed.

*OSI*, 525 F.3d at 1297 n.1.  To the extent that the government attempts to make something of the Eleventh Circuit's reference to § 107(a) as permitting recovery for response costs "voluntarily" incurred under *Atlantic Research*, it suffices to say that such a characterization does not purport to preclude § 107(a) claims for response costs that are incurred "involuntarily."  *See Atlantic Research*, 551 U.S. at 139 n.6.  The court of appeals merely recognized that OSI, which had not been subject to enforcement measures, would have been authorized under *Atlantic Research*'s reading of § 107(a) to recover its response costs, but the evidence did not support that OSI had, or was sufficiently likely at that point to have, any response costs, voluntary or otherwise.  *OSI* is therefore not controlling of any issue in the present case.

### 4.    Non-Binding Authorities on "Compelled" Response Costs

The defendants also argue that, even absent binding precedent, the weight of authority from other federal courts since *Atlantic Research* and this court's June 2008 summary judgment ruling supports that § 107(a) does not authorize S/P's claims, which, the defendants contend, are based on compelled costs that give rise to contribution rights under § 113(f).   At the outset, the court notes that the cases cited by the defendants and those revealed by the court's own research show that courts generally have not treated all cleanup costs that may have been "compelled" by government enforcement measures alike when assessing whether they support claims under § 107(a).  This is not entirely surprising, as the distinction between "compelled" and "voluntary" cleanups is in some measure artificial; virtually all cleanups are performed by a party who is at least facing the specter

of potential liability under CERCLA. *See Atlantic Research*, 551 U.S. at 136-37; *cf. Cooper Industries*, 543 U.S. at 164 (the plaintiff's cleanup did not give rise to contribution rights under § 113(f) notwithstanding that state environmental agency "directed [the plaintiff] to clean up the site, and threatened to pursue an enforcement action if [the plaintiff] failed to undertake remediation.").

Rather, most courts have drawn a line distinguishing between response costs that give rise to § 113(f) contribution rights and those that do not. That is, courts have held that costs may be recovered under § 107(a) notwithstanding that they may have been "compelled" under an administrative order or settlement with the government where that order or settlement does not give rise to contribution rights under § 113(f)(3)(B). *See, e.g., W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 90-91 (2d Cir. 2009) (holding that the plaintiff could bring § 107(a) claims based upon cleanup costs incurred pursuant to administrative settlement with state environmental agency that did not give rise to contribution rights under § 113(f)(3)(B) because such agreement settled liability only under state law, not under CERCLA); *ITT Indust., Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 459-61 (6th Cir. 2007) (holding that an AOC issued by the EPA pursuant to § 122(a) & (d) did not give rise to contribution rights under § 113(f)(3)(B), but costs incurred pursuant to that AOC were subject to cost recovery under § 107(a)). On the other hand, as the defendants argue, courts have for the most part agreed that where a party incurs "compelled" expenses performing obligations under a judgment, consent decree, or a settlement that is deemed to give rise to contribution rights under § 113(f)(1) or (f)(3), the contribution cause of action is that party's only potential remedy, precluding § 107(a) claims. *See Niagara Mohawk Power Corp. v. Chevron USA, Inc.*, 596 F.3d 112, 124 (2d Cir. 2010) (where an administrative consent order with the State environmental agency settled the plaintiff's CERCLA liability so as to give rise to contribution rights under § 113(f)(3)(B),

40

"only [that subsection]," and not § 107(a), "provide[d] the proper procedural mechanism for [the plaintiff's] claims"); *Agere Systems, Inc. v. Advanced Environ. Tech. Corp.*, 602 F.3d 204, 227-28 (3d Cir. 2010) (holding that § 113(f) contribution claims were plaintiffs exclusive remedy based on costs incurred performing work under consent decrees that settled prior CERCLA actions brought by EPA and afforded plaintiffs protection from contribution counterclaims); *Atlantic Research*, 459 F.3d at 836-37 ("[L]iable parties which have been subject to §§ 106 or 107 enforcement actions are still required to use § 113, thereby ensuring its continued vitality." (dicta)); *Morrison Enter., LLC v. Dravo Corp.*, 2009 WL 4330224, *8 (D. Neb. Nov. 29, 2009) (unpublished) ("[A] a PRP can bring a claim under § 107(a) if it is foreclosed from bringing a claim under § 113(f), but that, conversely, a PRP must proceed under § 113(f) if § 113(f) is available to it."); *ITT Indus., Inc. v. Borgwarner, Inc.*, 615 F. Supp. 2d 640, 646-48 (W.D. Mich. 2009) ("[B]ecause Plaintiff ITT entered into a consent decree with respect to the NBIA Site, and because ITT could have brought a § 113(f) contribution claim, but failed to do so in a timely manner, ITT should not be able to evade the statute of limitations and the allocation scheme of a § 113(f) contribution claim by bringing a contribution claim under the guise of a § 107(a) cost recovery action."); *Appleton Papers, Inc. v. George A. Whiting Paper Co.*, 572 F. Supp. 2d 1034, 1043 (E.D. Wis. 2008) ("[T]he operative principle appears to be that § 107(a) is available to recover payments only in cases where § 113(f) is not."); *cf. Lyondell Chem. Co. v. Occidental Chem. Corp.*, ___ F.3d ___, ___ n.19, 2010 WL 2266812, *13 n.19 (5th Cir. June 8, 2010) (recognizing that the district court below had implicitly held, on an issue that was not appealed, that expenses sustained pursuant to a CERCLA consent decree with EPA supported claims only under § 113(f), not § 107(a)); *but see United States v. Pharmacia Corp.*, ___ F. Supp. 2d ___, ___, 2010 WL 1913105, *4 (S.D. Ill. May 12, 2010) (while noting that "if a PRP

is eligible to seek contribution under § 113(f), 'the PRP cannot simultaneously seek to recover the *same expenses* under § 107(a)'" (quoting *Atlantic Research*, 551 U.S. at 139 (emphasis in *Pharmacia*)[15], the district court held that S/P could assert claims under § 107 notwithstanding that the federal government had § 107 claims pending against them); *New York v. Solvent Chem. Co.*, 685 F. Supp. 2d 357, 425-28 (E.D.N.Y. 2010) (allowing a party that had incurred cleanup costs pursuant to consent decree following a suit brought by the State under § 107(a) and state law to pursue claims against other PRPs to amend its complaint to amend its complaint at trial to invoke § 107(a) as an alternative or additional basis underlying their CERCLA cost apportionment claims, which were already being tried under a § 113(f) contribution theory[16]); *Ford Motor Co. v. Michigan Consol. Gas. Co.*, 2009 WL 3190418, at *6-8 (E.D. Mich. Sept. 29, 2009) (unpublished) (denying Rule 12(b)(6) motion to dismiss § 107(a) claims insofar as they sought to recover the plaintiffs own "direct" response costs, even if incurred pursuant to a state administrative order, but also holding that state administrative order did not give rise to contribution rights under § 113(f)(3)(B).

Upon reconsideration in light of the above authorities and a re-examination of the statutory language of § 113, this court concludes that Congress intended § 113(f) contribution to serve as the exclusive remedy for a party to recoup its own costs incurred in performing a cleanup pursuant to a judgment, consent decree, or settlement that gives rise to contribution rights under § 113(f).  In *Atlantic Research*, the Supreme Court emphasized that the crux of the contribution cause of action

---

[15]    Although it is not entirely clear, the district court's opinion in this "Sauget" *Pharmacia* case seems to suggest that it may interpret *Atlantic Research* itself as holding that compelled response costs, such as under a consent decree following a prior § 106 or § 107 action, that do give rise to a contribution claim cannot also sustain a cost recovery claim under § 107(a). As stated previously in the text, this court does not read *Atlantic Research* that broadly.

[16]    The court would note that it is not clear that the district court's ruling in *Solvent Chemical* will survive in light of the Second Circuit's later-released opinion in *Niagara Mohawk*.

is an "inequitable distribution of common liability among liable parties." 551 U.S. at 139. Amounts that a party expends performing a cleanup pursuant a judgment or a consent decree following an action under § 106 or a settlement under § 122 are reasonably subject to being classified similarly to sums paid to reimburse the government or another remediator for its prior cleanup work, which is the situation addressed in *Atlantic Research*. In both of those contexts, and unlike with a voluntary remediator, the plaintiff's CERCLA liability is sufficiently established to give rise to a § 113(f) claim for contribution against an alleged joint tortfeasor.

One could argue, as S/P do, that a party's own direct cleanup costs should also be subject to a claim for cost recovery, even if incurred carrying out obligations under a consent decree or other government enforcement because, strictly speaking, that party is not reimbursing another for its response costs. *See Atlantic Research*, 551 U.S. at 139 n.6. If one were to read § 107(a)(4)(B) in isolation, such an interpretation is plausible. That section does not explicitly restrict cost recovery actions to non-PRPs or "innocent" parties, *id.* at 135-36, nor to circumstances that do not give rise to contribution rights. Further, as discussed previously, pre-SARA caselaw seemed to assume that response costs incurred in performing cleanup activities compelled by the government were subject to recovery under § 107.

The court also recognizes that, despite the current position taken by the United States here, the EPA'S regulations establishing the NCP clearly assumed that response costs that the agency has forced a private party to incur through actions under § 106 and settlements under § 122 are recoverable by private parties under § 107(a)(4)(B). *See* 55 Fed. Reg. 8,797 (March 8, 1990); 40 C.F.R. § 300.700(c)(3)(ii) (2010) ("For purpose of cost recovery under section 107(a)(4)(B) of CERCLA ... [a]ny response action carried out in compliance with the terms of an order issued by

EPA pursuant to section 106 of CERCLA, or a consent decree entered into pursuant to section 122 of CERCLA, will be considered 'consistent with the NCP.'").  Nonetheless, while Congress charged the executive branch with promulgating regulations establishing the parameters of the NCP, 42 U.S.C. § 9605, Congress did not authorize the executive to determine what parties may sue under § 107(a) or the relationship between the remedy of that section and the § 113 contribution cause of action.  Rather, that task is for the courts, as EPA itself acknowledged in drafting the NCP regulations.  50 Fed. Reg. 47,934 (noting in response to comments questioning EPA's authority to promulgate regulations concerning the right of PRPs to bring cost recovery actions against other PRPs, that "EPA agrees that the courts will make the ultimate determinations of what parties may sue under section 107 of CERCLA").  Further, the regulations do not purport to establish what parties actually may sue under § 107(a) or § 113(f) but rather only state what cleanup actions will be deemed "consistent" with the NCP "for purposes of" an action under § 107(a).  Accordingly, the court does not defer to the NCP regulations when assessing whether S/P are entitled to sue under § 107(a). *See generally Gonzalez v. Oregon*, 546 U.S. 243, 258-59 (2006) (declining to grant *Chevron* deference to administrative rule that was not promulgated pursuant to authority Congress has delegated to executive official).

Reading other provisions of CERCLA in pari materia with § 107(a), it seems unlikely that the Congress that codified the contribution cause of action in the SARA amendments intended that a particular set of costs and underlying circumstances should give rise to both a claim for contribution under § 113(f) and a claim for cost recovery under § 107(a)(4)(B), at least *after* a judgment, consent decree, or settlement that resolves CERCLA liability.  Although aware that § 107(a) liability had been interpreted to be joint and several, Congress expressly provided in §

113(f)(1) for contribution liability based upon the principle of equitable apportionment. In addition, as mentioned above, the statute of limitations is generally more favorable for claims brought under § 107(a) than for contribution claims. Finally, there is the settlement bar of § 113(f)(2), which affords protection from liability "for claims for contribution." 42 U.S.C. § 9613(f)(2). On its face, that provision does not apply to cost recovery actions.[17]

Based on these differences, a plaintiff would certainly always choose to characterize his claim as brought pursuant to § 107(a) rather than § 113(f) if possible. However, it would be particularly anomalous for Congress to grant a settling party protection from liability for "contribution" but then allow a plaintiff to sidestep the bar by doing nothing more than formally restyling the same claim as one seeking "cost recovery" under § 107(a). In this vein, the language of both §§ 113(f)(1) and (f)(3)(B) suggests that Congress contemplated that the contribution cause of action it was codifying would encompass claims seeking reimbursement not only for sums that a PRP has paid to the government or another remediator for its cleanup efforts but also for sums that the PRP has been or will be compelled to pay directly to cleanup a site itself after resolving CERCLA liability by judgment or settlement, as explained below.

First, § 113(f)(1) authorizes contribution claims "during or following a civil action under [§ 106] or under [§ 107(a)]." 42 U.S.C. § 9613(f)(1). An action under § 107(a) is by definition one to recover response costs that the government or a private party has itself has incurred or will incur

---

[17] Some of the defendants here have argued that § 113(f)(2) should be interpreted to preclude not only a settling party's liability for contribution under § 113(f) but also its liability for cost recovery under § 107(a). However, the settlement bar § 113(f)(2) by its terms only protects against the former, not the latter. Given the Supreme Court's emphasis in *Atlantic Research* that CERCLA's cost recovery and contribution remedies are separate and distinct, which included a discussion of the settlement bar, this court declines to ignore or judicially rewrite the plain language of § 113(f)(2) to protect against cost recovery liability. *See Litgo N.J., Inc. v. Bob Martin*, 2010 WL 240038, *27 (D.N.J. June 10, 2010) (unpublished),

in the future.  But actions under § 106 involve only government-compelled cleanups, not the imposition of liability upon a PRP for response costs.  That is, § 106(a) authorizes an action by the federal government to obtain an injunction requiring a defendant to perform a cleanup, while § 106(b)(1) authorizes the federal government to seek enforcement of a UAO that compels a defendant to perform a cleanup.  42 U.S.C. §§ 9606(a) & (b)(1).  Finally, § 106(b)(2) authorizes a party that has performed a cleanup compelled by a UAO to seek reimbursement of all or some of its response costs from the federal government where such party can show it was not a PRP or that the particular response action required by the UAO was arbitrary and capricious or otherwise not in accordance with law.  42 U.S.C. § 9606(b)(2).

Similarly, § 113(f)(3)(B) provides that "a person who has resolved its liability to the United States or a State or some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution" from parties that are not protected by the settlement bar of § 113(f)(2).  42 U.S.C. § 9613(f)(3)(B).  "The simple reading of this subsection is that the initial phrase refers to expenses incurred in the course of a liable party's direction of a site's cleanup while the second phrase refers to reimbursement of cleanup costs incurred under the government's hegemony."  *United Tech. Corp. v. Browning-Ferris Indust., Inc.*, 33 F.3d 96, 102 (1st Cir. 1994), abrogated on other grounds by *Atlantic Research*.  By thus distinguishing between liability for a "response action" itself and liability for "the costs" thereof, the statute suggests that the "contribution" remedy of § 113(f)(3)(B) encompasses claims to apportion costs that the settling party will itself incur as a result of a cleanup following the settlement.  *See id.*

That the contribution remedy of § 113(f) extends to cover a plaintiff's disproportionate payments of first-instance cleanup costs as well as disproportionate payments of reimbursed costs

following establishment of the plaintiff's CERCLA liability by judgment or settlement, is also

consistent with the legislative history.  In particular, a House Report characterized what would

become § 113(f) as follows:

> The section also confirms a Federal right of contribution or indemnification
> for persons alleged or held to be liable under section 106 or 107 of CERCLA and
> prohibits the assertion of such rights against a party who has entered into a judicially
> approved settlement with EPA.  It has been held that, when joint and several liability
> is imposed under section 106 or 107 of the Act, a concomitant right of contribution
> exists under CERCLA, *United States v. Ward*, 8 Chem. & Rad. Waste Litig. Rep.
> 484, 487-88 (D. N.C. May 14, 1984).  Other courts have recognized that a right to
> contribution exists without squarely addressing the issue. *See, e.g., United States v.*
> *South Carolina Recycling and Disposal, Inc.*, 7 Chem. & Rad. Waste Litig. Rep.
> 674,677 (D. S.C. February 23, 1984).  This section clarifies and confirms the right
> of a person held jointly and sevenrally (sic) liable under CERCLA to seek
> contribution from other potentially liable parties, when the person believes that it has
> assumed *a share of the cleanup or cost* that may be greater than its equitable share
> under the circumstances. ...
>
> The section should encourage private party settlements and cleanups.  Parties
> who settle *for all or part of a cleanup or its costs*, or who pay judgments as a result
> of litigation, can attempt to recover some portion of their expenses and obligations
> in contribution litigation from parties who were not sued in the enforcement action
> or who were not parties to the settlement. Private parties may be more willing to
> assume the financial responsibility for some or all of the cleanup if they are assured
> that they can seek contribution from others.

H.R. 99-253 (Part I) at 79-80; 1986 U.S.C.C.A.N. 2861-62 (emphasis added).

It cannot be that Congress intended that a plaintiff could avoid the less favorable aspects of

§ 113(f) claims that are based on compelled direct costs just by seeking those very same costs via

§ 107(a).  The court concludes, therefore, that if the costs S/P seek to recover arise out of a cleanup

they performed pursuant to obligations under a consent decree or administrative settlement that

would give rise to contribution rights under § 113(f), absent the settlement bar of § 113(f)(2),[18] then

---

[18] S/P argue that cases holding that a PRP was precluded from bringing a § 107(a) claim for compelled response
costs based upon the availability of a § 113(f) claim for the same costs are distinguishable on the ground the
PRP was in each case allowed to pursue the § 113(f) claim.  Here, by contrast, S/P argue, if their § 107(a)

they cannot pursue claims for those same costs under § 107(a).  *See Niagara Mohawk*, 596 F.3d at 127-28; *Agere Systems,* 602 F.3d at 227-28; *Morrison Enter.,* 2009 WL 4330224, *8-9; *ITT Indus.,* 615 F. Supp. 2d at 646-48; *Appleton Papers,* 572 F. Supp. 2d at 1043.  However, if S/P could not pursue their instant claims under § 113(f), then they may still pursue them under § 107(a).  *See W.R. Grace,* 559 F.3d at 90-91.

### 5.      Could S/P Pursue Their Claims Under § 113(f)?

Accordingly, the final question becomes whether S/P could have pursued contribution claims under either § 113(f)(1) or (f)(3)(B).  The evidence establishes as a matter of law that S/P do have contribution rights under one or both relevant subsections of § 113(f) with respect to their cleanup costs at issue.  Therefore, S/P's exclusive remedy to apportion or otherwise recoup those costs is a contribution action, precluding their § 107(a) cost recovery claims.

Under § 113(f)(1), a party is entitled to "seek contribution from any other person who is liable or is potentially liable under [§ 107(a)], during or following any civil action under [§ 106] or under [§ 107(a)].  42 U.S.C. § 9613(f)(1).  A party is also entitled under § 113(f)(3)(B) to seek contribution after it "has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement."  42 U.S.C. § 9613(f)(3)(B).  There can be no question that the suit brought by

---

claims are dismissed, their contribution claims are also barred by § 113(f)(2), at least against the Settling Defendants.  That is not actually accurate with respect to at least one of the cases.  In *ITT Industries* after the Sixth Circuit had affirmed the district court's dismissal of the plaintiff's § 113(f) claim relative to the "NBIA Site" as time-barred, *see* 506 F.3d at 459, the district court held on remand that the plaintiff's § 107(a) claim relative to the same site was also subject to dismissal where it could have been brought as a § 113(f) claim.  *See* 615 F. Supp. 2d at 646-48.  Regardless, whether a plaintiff will be without further remedy if a § 107(a) claim is dismissed simply is not the issue.  That § 113(f) claims might be precluded under § 113(f)(2) or because of the statute of limitations has expired is not a basis for inferring that Congress intended liability to attach for what are in substance the same claims when a § 107(a) label is attached to them.  The question here is thus whether S/P could have brought their instant claims as contribution claims, even if those claims happen now to be precluded by the settlement bar.

the United States against S/P in the Enforcement Case constituted a "civil action" under both §§ 106 and 107 for purposes of § 113(f)(1).   Further, the complaint in the Enforcement Case sought relief against S/P for their activities and liability associated with an area broadly including "[S/P]'s plant site, [and] residential and commercial properties located in and around Anniston, Alabama, that are suspected of containing PCB-contaminated soil and sediments." S/P also do not dispute that they have "resolved [their] CERCLA liability to the United States ... for some ... of a response action or for some ... of the costs of such action" within the contemplation of § 113(f)(3)(B), by virtue of the PCD that resolved the Enforcement Case and the administrative orders incorporated within the PCD, namely the Removal Order, the NTC Removal Order, and the RI/FS Agreement.   Nonetheless, S/P assert that they remain eligible to assert § 107(a) claims on the theory that they cannot assert contribution claims under either subsection based on the specific cleanup costs underlying their claims.

S/P's primary argument hinges upon the perceived significance of the manner in which the Anniston Lead Site (hereinafter the "Lead Site") and the Anniston PCB Site (the "PCB Site") are respectively defined in the PCD.  The Decree defines the PCB Site in relevant part as "consist[ing] of the area where hazardous substances, including PCBs associated with releases or discharges as a result of the operations, including waste disposal, of the Anniston plant by Solutia, Inc., Monsanto Company, and their predecessors have come to be located."  By contrast, the PCD defines the Lead Site as "consist[ing] of the area where lead and other commingled hazardous substances, including PCBs, associated with the historical and ongoing industrial operations in and around Anniston, Alabama have come to be located."   As S/P emphasize, and as this court has previously acknowledged, while the terms have a geographical component, they are tied to the *source* of

contaminants.  That is, although they may be polluted with at least some of the same the types of contaminants, including lead and PCBs, the Lead Site is deemed to be the area where contaminants originating from S/P's operations have come to be located, while the PCB Site is the area where contaminants originating from other industrial operations around Anniston have come to be located. Because the site definitions are source-based, S/P claims that they are *necessarily* not responsible for contamination  on the Lead Site or for cleaning it up.  At the very least S/P argue that such is the case to the extent that the Lead Site and the PCB Site do not overlap geographically.    S/P acknowledges that the Sites do so overlap, but they assert that the question of where they actually do so is the fundamental fact issue to be decided in the case.

In its June 2008 summary judgment ruling, the court largely accepted S/P's argument regarding the implications of the source-based nature of the Site definitions in the PCD, leading the court to conclude that, even if S/P were not, in fact, "innocent" with regard to the contamination of the Lead Site, the PCD at least did not impose *obligations* upon S/P with regard to the Lead Site. Thus, the court reasoned that S/P's cleanup costs incurred on the Lead Site were effectively "voluntary" within the meaning of *Atlantic Research* and were capable of supporting claims under § 107(a).  However, upon reconsideration, the court agrees with the defendants that the source-based definitions of the respective Sites in the PCD do not imply that S/P's cleanup costs in question were either voluntary or that they do not give rise to contribution rights under § 113(f).  Regardless of how the Lead Site and the PCB Site are defined in the PCD, that document, the administrative agreements it incorporates, and the Stipulation, in exchange for resolving in part S/P's CERCLA liability to the United States, impose particular testing and removal action obligations within delineated geographic areas in and around Anniston.  Those obligations, as relevant here, principally involve the removal

50

and replacement of soil at residential properties where testing had shown PCB levels in surface soil of at least 10 ppm (as in the Removal Order) or at least 1 ppm (as in the NTC Removal Order). There is no question that the costs S/P are now seeking to recoup or apportion in this action arise out of their fulfillment of their obligations under the PCD and administrative orders in the Enforcement Case, rather than from work performed beyond or outside the scope of those obligations.[19]  In exchange for that performance, S/P partially resolved their CERCLA liability to the United States, which effectively established their common liability so as to create contribution rights for the associated costs under § 113(f).

Finally, S/P contest whether the PCD or its incorporated administrative agreements actually give rise to contribution rights under the language of § 113(f)(1) or (f)(3)(B).  S/P seem to largely discount the former, on the ground that its broad language allows the government to determine unilaterally whether a party is limited to pursuing contribution claims simply by filing suit against the remediator under § 106 or § 107.  Even assuming that the court has some sympathy with S/P on that matter generally, such concerns are not applicable here given that S/P was not merely sued by the government under §§ 106 and 107 but entered into the PCD that partially settled their CERCLA liability to the United States.  As such, S/P do indeed have contribution rights under § 113(f)(1).

---

[19]/  *See* Compl. ¶ 334 ("Solutia, on its own behalf and on behalf of Pharmacia," incurred response costs "in connection with work performed under various state and federal orders" at the Anniston PCB Site and the Anniston Lead Site).  *id.* ¶ 338 (S/P "are entitled to contribution from each the Defendants with respect to all response costs incurred by [S/P], or to be incurred by [S/P], including interest, in performing response activities pursuant to the federal and state orders at the Anniston PCB and Lead Sites.").  Likewise, at summary judgment S/P previously emphasized the *breath* of their obligations under the PCD and its associated agreements, not that they exceeded those obligation.  (*See* Doc. 297, ¶ 30; Doc. 329, ¶ 30).  S/P also admit that they have neither cleaned nor are they required to clean properties contaminated with lead only, absent PCBs.  (See Doc. 297, ¶ 33; Doc. 329, ¶ 31).

But even assuming otherwise, the evidence supports that S/P also have contribution rights under § 113(f)(3)(B).  In particular, S/P rely upon the Sixth Circuit's decision in *ITT Industries*, which held that an AOC issued pursuant to § 122(a) and (d)(3) did not qualify as an "administrative or judicially approved settlement" for purposes of giving rise to contribution rights under § 113(f)(3)(B), on the theory that the statute of limitations provisions in § 113(g)(3)(B) indicates that only de minimis settlements under § 122(g) and cost recovery settlements under § 122(h) so qualify. *See* 506 F.3d at 459-61.  The court would note that there seems to be some tension between the reasoning of *ITT Industries*, authored by Judge Clay, and an earlier Sixth Circuit case in which he was the dissenter, *RSR Corp. v. Commercial Metals*, 496 F.3d 552 (6th Cir. 2007).  In *RSR*, the Sixth Circuit rejected the notion that § 113(g)(3)(B) was intended to apply only to settlements under §§ 122(g) and (h).  *See* 496 F.3d at 556-59.  But more importantly, the Eleventh Circuit has held, in a case decided after *Cooper Industries* but before *Atlantic Research*, that where a plaintiff entered into administrative orders with the EPA imposing obligations to perform investigation and site clean up, the plaintiff could bring an action for contribution under § 113(f)(3)(B).  *Atlanta Gas Light Co. v. UGI Utilities, Inc.*, 463 F.3d 1201, 1203-04 (11th Cir. 2006) (citing *Consolidated Edison*, 423 F.3d at 95)).  S/P urge the court to discount *Atlanta Gas Light* on the grounds that it was decided before *Atlantic Research* and that the Eleventh Circuit's analysis of the issue is allegedly cursory.  However, this court is not authorized to depart from Eleventh Circuit precedent on the basis that this court might think that its ruling was analytically suspect or the question insufficiently considered.  Nor does the court construe *Atlanta Gas Light* as having been abrogated by, or as even being clearly incompatible with, *Atlantic Research*.  Accordingly, the court concludes that *Atlanta Gas Light* supports that the consent decree and the administrative agreements requiring S/P to perform testing

and removal activities do establish S/P's contribution rights pursuant to § 113(f)(3)(B).  And because S/P do have contribution rights under § 113(f)(1) or § 113(f)(3)(B) or both with respect to their cleanup costs, they cannot choose instead to simply bring their claims pursuant to § 107(a).

## III.   CONCLUSION

Based upon the foregoing, the court concludes that the defendants' motions to reconsider (Docs. 542, 544, 546, 547, 548, 549, 550, 551, 554, 557, 558, & 581) are due to be GRANTED and that their motions for summary judgment on S/P's cost recovery claims under § 107(a) are likewise due to be GRANTED.  A separate order will be entered.

As to the foregoing it is SO ORDERED this the 2nd day of July, 2010.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE