**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| SOLUTIA, INC. and PHARMACIA CORPORATION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | 1:03-cv-1345-PWG |
| McWANE, INC., a/k/a Union Foundry, et al., | ) | |
| | ) | |
| Defendants. | **)** | |

**<u>MEMORANDUM OPINION</u>**

In this action, Solutia, Inc. ("Solutia") and Pharmacia Corporation ("Pharmacia") (collectively "Plaintiffs") sued numerous defendants for response costs and contribution pursuant to §§ 107(a) and 113(f), respectively, of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a), 9613(f).  The parties have consented to exercise of plenary jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and LR 73.2.  The cause now comes to be heard on motions for summary judgment by the only two defendants remaining, Southern Tool, LLC ("Southern Tool") (Doc.[1] 616) and Scientific-Atlanta, Inc. ("Scientific-Atlanta") (Doc. 652), respectively.  Both motions are due to be granted.

## I.    BACKGROUND

This case arises in the wake of administrative and judicial action by the United States and its Environmental Protection Agency ("EPA") pursuant to CERCLA, seeking to require Solutia and

---

[1]    Citations herein to "Doc(s). ___" are to the document numbers assigned by the clerk to the pleadings and other materials in the court file, as reflected on the docket sheet.

Pharmacia to perform and pay for the cleanup of polychlorinated biphenyls ("PCBs") and lead contamination in and around Anniston and Oxford, Alabama.  Congress enacted CERCLA in 1980 "in response to the serious environmental and health risks posed by industrial pollution." *Burlington Northern & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009).  "The Act was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Id.* (internal quotation marks and citations omitted).  CERCLA imposes strict liability for environmental contamination upon four categories of entities identified in CERCLA § 107(a)[2], which are often referred to as "potentially responsible parties," or "PRPs" for short.  *See* 42 U.S.C. § 9607(a)(1) - (4); *see also Burlington Northern*, 556 U.S. at 608-09; *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1233 n. 3 (11th Cir. March 6, 2012) (per curiam); *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1497 (11th Cir. 1996).

From 1929 to 1971, Monsanto Company ("Monsanto") and its predecessors produced PCBs at a plant approximately one mile west of downtown Anniston (the "Anniston Plant").  In 1997, Monsanto created Solutia in a spin-off transaction.  The latter now owns and operates the Anniston Plant.  In 2000, Pharmacia was formed by the merger of Monsanto and Pharmacia & Upjohn, Inc. In their amended complaint, Plaintiffs recognize that

> PCBs were widely used in industry for more than five decades because they are resistant to fire and are chemically inert, which means they do not readily react with other substances. These attributes made PCBs especially useful in safety fluids used to insulate and cool heavy duty electrical equipment, including transformers and capacitors.  In the late 1960s, Monsanto learned that the same trait that made PCBs so attractive to industry - the fact that they do not react readily with other substances - also resulted in their persistence in the environment.

---

[2]    All "Section" citations are to the provisions of CERCLA unless otherwise noted.

(Amended Complaint (hereinafter "Complaint" or "Compl."), Doc. 86, ¶¶ 12, 13).  Further, PCBs have been found

> to cause cancer, decreased fertility, still births, and birth defects in test animals. *Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1267, 1270 (D.C. Cir. 1980). ... The EPA has noted the "well-documented human health and environmental hazard of PCB exposure" and the "potential hazard of PCB exposure posed by the transportation of PCBs." 40 C.F.R. § 761.20.  Indeed, PCBs pose such health and environmental dangers that the Toxic Substances Control Act bans the manufacturing of PCBs in this country without a special exemption from the EPA. 15 U.S.C. §§ 2605(e)(3)(A) & (B).

*Dickerson, Inc. v. United States*, 875 F.2d 1577, 1583 (11th Cir. 1989).

Pursuant to its authority under CERCLA, the EPA entered into administrative orders on consent ("AOCs") in 2000 and 2001, under which Solutia agreed to perform certain sampling and cleanup activities in and around Anniston related to both PCB and lead contamination.  *See Solutia v. McWane, Inc.*, 726 F. Supp. 2d 1316, 1319-20 (N.D. Ala. 2010).  In March 2002, the United States filed a CERCLA enforcement action in this court against both Solutia and Pharmacia based upon PCB contamination in the Anniston area.  *See id.*; *United States v. Pharmacia Corp., et al.*, 1:02-cv-749-PWG (N.D. Ala.)).  Contemporaneously with the filing of that enforcement case, the United States submitted a proposed partial consent decree ("PCD") entered into by the parties that would, if approved, settle certain claims identified in the United States's complaint.  *See Solutia*, 726 F. Supp. 2d at 1321.  The court, acting through then-Chief Judge U.W. Clemon, approved and entered the PCD in August 2003.

In June 2003 prior to the entry of the PCD, Solutia and Pharmacia filed this action.  Plaintiffs sought to require other parties to help foot the bill for cleanup and investigation costs they had incurred and would continue to incur in connection with the AOCs and the PCD, as well as for

similar costs that might not have been formally compelled by those CERCLA enforcement measures. When a private party incurs costs associated with the cleanup of a hazardous waste site, CERCLA authorizes two types of claims by which that party may seek to recoup all or part of its expenses from others that are entirely or partially responsible for the contamination. The first arises under § 107(a) and is commonly known as a "cost recovery" cause of action. *See* 42 U.S.C. § 9607(a). Under that section, PRPs are liable for "necessary costs of response incurred by any ... person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). The second type of claim is the "contribution" cause of action arising under § 113(f). *See* 42 U.S.C. § 9613(f)(1) & (3). Such a theory applies when "a person is forced to reimburse a third party for its cleanup efforts, as mandated by a legal judgment or settlement under CERCLA," in which case that person may "seek contribution for those reimbursement costs from other [PRPs] under § 113(f)." *Solutia*, 672 F.3d at 1235 (citing *Cooper Indus., Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 166 (2004)).

In the Complaint, Plaintiffs raised claims for both cost recovery under § 107(a) and contribution under § 113(f) against Southern Tool, Scientific-Atlanta, and numerous other defendants. Plaintiffs acknowledge that they or their corporate predecessor, Monsanto, is responsible for much of the PCB contamination in the Anniston area. Plaintiffs alleged, however, that the defendants named in this action were also responsible for the presence of PCBs, as well as lead, cadmium, and other contaminants found at certain sites known as the "Anniston PCB Site" and the "Anniston Lead Site," which Plaintiffs were undertaking to sample and clean up in connection with the AOCs and the PCD. Those sites included parts of West Anniston, Oxford Lake Park, the Quintard Mall expansion area, the Highway 21 expansion area, Snow Creek, Choccolocco Creek, and Lake Logan Martin. Plaintiffs identified Southern Tool and Scientific-Atlanta as among

fourteen defendant "Foundries" who, Plaintiffs alleged, had in the course of their pipe production and metalworking operations "disposed of" and "transported and arranged for the disposal" of hazardous substances in the Anniston area.  At this point, all of the defendants other than Southern Tool and Scientific-Atlanta have been dismissed.   Thus, it is only necessary to consider the circumstances related to the claims against those defendants.

In December 1964, Scientific-Atlanta purchased all of the stock of Southern Tool and Machine Company, Inc. ("STM"), which is unaffiliated with defendant Southern Tool, LLC.  At that time, STM owned and operated what was primarily a machine shop and metal fabrication business in Oxford, Alabama, which neighbors Anniston.   Following the purchase, Scientific-Atlanta conducted manufacturing operations on two parcels of property in Oxford that are relevant here. One, where Scientific-Atlanta fabricated cable television antennas, was located at 2285 U.S. Highway 78 West and was known as the "CATV Property." The other property, located about two miles east at 112 U.S. Highway 78 West[3], was known as the "Main Plant."  In December 1983, Scientific-Atlanta sold certain assets, including the CATV Property and the Main Plant (collectively the "Oxford Facilities"), to a newly formed corporation, Defendant Southern Tool.  Southern Tool continued operations at the Main Plant but sold the CATV Property to third parties in November 2000.

Both Scientific-Atlanta and Southern Tool (hereinafter collectively "Defendants") operated what are known as investment casting foundries, meaning that they used a production technique known as "investment" or "lost wax" casting to create metal parts and products.  In that process, a

---

[3]     In 2003, the City of Oxford changed the address of the Main Plant property to 508 Hamrick Drive West.

casting wax is injected into a mold or die with a hollow cavity in the shape of the metal part that will be made.  The wax pattern is removed from the pattern die and attached to a wax runner to form a "tree," which is a cluster of wax replicas.  The tree is then repeatedly dipped or "invested" in alternate solutions of non-hazardous silica slurry and dry silica to create a hard ceramic shell around the assembled tree.  Once the final coat of the shell is dry, the wax is melted out of the shell, leaving a hollow cavity  the same size and shape as the desired cast part into which molten metal can be poured.  The shells are pre-heated before casting, which gives them a hard ceramic, pottery-like consistency.  The metal used to form the desired part or product is melted and poured into the preheated shell.  After the metal cools, the shell is removed from the metal cast part, and the individual metal cast parts are removed from the metal tree with a saw.  The parts are then sent to a finishing operation, packaged, and shipped to the customer.

Beginning in the mid-to-late 1960s, Scientific-Atlanta began to employ investment casting at the CATV Property.  Scientific-Atlanta moved those operations to the Main Plant in 1969.  After Scientific-Atlanta sold the CATV Property and the Main Plant to Southern Tool in December 1983, Southern continued investment casting operations at the Main Plant, creating metal products such as valve bodies, door lock housings, and power tool components.

In support of their allegations that the Foundries were responsible for the presence of PCBs, lead, and other heavy metals located on the Anniston Lead and PCB Sites, Plaintiffs' latest complaint articulated three principal sources of potential contamination by those defendants: (1) dielectric equipment allegedly used by the Foundries that were filled with oils and fluids containing PCBs, (2) the Foundries melted down scrap metal, including old dielectric equipment, that was contaminated with PCBs, lead, cadmium, and other heavy metals, and (3) that some Foundries used investment

6

casting waxes containing PCBs.  Plaintiffs also had three general theories by which the contaminants were allegedly transported from the Foundries to areas in which Plaintiffs had performed environmental investigation and cleanup work.  First, Plaintiffs asserted that the Foundries sold, gave away, and otherwise disposed of contaminated spent foundry sand used to make their casting molds. That sand, Plaintiffs contended, was then used as fill material for landscaping and commercial and private construction projects throughout the region, including on the Anniston Lead Site and the Anniston PCB Site.  Plaintiffs maintain that the spent foundry sand was contaminated because the Foundries used it to absorb and otherwise clean up fluids containing PCBs that leaked or spilled from dielectric equipment that Foundries used in production operations and/or as a source of scrap metal.  Plaintiffs further averred that the Foundries' melted down such dielectric equipment and other scrap metal contaminated with lead, cadmium, and other heavy metals, some of which would have been collected as "baghouse dust" and mixed with spent foundry sand prior to disposal. Second, Plaintiffs maintained that a portion of the lead and other heavy metals present in the Foundries' scrap metal was not collected as baghouse dust but was instead emitted into the atmosphere and came to rest on other properties.  Third and finally, Plaintiffs alleged that the Foundries had discharged, or allowed rainwater to wash, their contaminated wastes discussed above into Snow Creek or one of its tributaries within the Anniston PCB and Lead Sites.

Scientific-Atlanta and Southern Tool have each moved for summary judgment pursuant to Rule 56, Fed. R. Civ. P.  (Docs. 616, 652).  The motions have been fully briefed.  (Docs 616-1, 616-2, 626, 627, 630, 630-1, 652-1, 652-2, 655, 655-1, 658).  The parties rely on voluminous evidentiary submissions in support of their respective positions on the motions.  (Docs. 239, 240, 241, 242, 243, 616, 627, 630, 652, 655, 656).

## II.   SUMMARY JUDGMENT STANDARDS

Rule 56(c)(2), Fed. R. Civ. P., provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) ("*Four Parcels*") (quoting *Anderson*, 477 U.S. at 248, 251-52).

> The party moving for summary judgment
>
> bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Where the movant will not bear the burden of proof at trial, it is not always necessary for the movant to support its motion with materials "*negating* the opponent's claim."  *Celotex Corp.*, 477 U.S. at 323 (emphasis original). Rather, it is sufficient for the moving party to point out to the district court materials showing "that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325; *see also Clark*, 929 F.2d at 607 (interpreting *Celotex* as a case in which "neither party could prove either the affirmative or the negative of an essential element of the claim – exposure to Celotex's products,"

and where the moving defendant had carried its initial burden "by showing that [the plaintiff] would not be able to meet its burden of proof at trial.").

Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.  Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Rule 56(c)(1)(A), (B), Fed. R. Civ. P.  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  Accordingly, in its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor.  *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).  But, if after sufficient time for discovery, the nonmoving party's evidence fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof [at trial]," *Celotex*, 477 U.S. at 323, the moving party is entitled to summary judgment.

## III.   DISCUSSION

### A.   Continuance of Summary Judgment

Plaintiffs first argue that summary judgment would be premature because Defendants filed

their motions prior to the close of "expert discovery."  Under Rule 56(d), Fed. R. Civ. P., a court may defer ruling on a motion for summary judgment where the non-movant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition. However, Plaintiffs have filed no affidavit or declaration setting forth with particularity the facts they expect to discover or how those facts would create a genuine issue of fact, as required for a continuance of a summary judgment motion.  *See Harbert Intern., Inc. v. James*, 157 F.3d 1271, 1280 (11th Cir. 1980) (addressing the requirements of former Rule 56(f), Fed. R. Civ. P.)  Rather, Plaintiffs have merely intimated in unverified argument in their briefs that their experts might provide testimony contradicting certain of Defendants' assertions and claims.

Equally to the point, the deadline to complete expert discovery expired on June 13, 2011. (*See* Docs. 571, 580).  Since that date , Plaintiffs have not submitted additional materials, expert-related or otherwise, in opposition to summary judgment, nor have Plaintiffs asked for an opportunity to do so. Neither party is  entitled to a continuance of summary judgment proceedings. The motions for summary judgment are ripe for decision.

## B.    CERCLA Liability

To establish a prima facie case in a CERCLA action for cost recovery under § 107(a), a plaintiff has the burden to prove the following elements at trial: "1) that the site is a CERCLA 'facility'; 2) that there was a release or threatened release of a hazardous substance; 3) which caused the plaintiff to incur response costs consistent with the National Contingency Plan; and 4) the defendant is a statutorily liable person, *i.e.*, a responsible party [as defined in § 107(a)(1) - (4)]." *Blasland, Bouck & Lee, Inc. v. City of North Miami*, 283 F.3d 1286, 1302 (11th Cir. 2002).  To make out a prima facie case for contribution under § 113(f), a plaintiff must establish those same elements,

*id.*, as well as how equitable factors weigh in favor of the defendant's contribution. *See Miami-Dade County, Fla. v. United States*, 179 Fed. App'x 658, 660 (11th Cir. 2006) (citing *Minyard Enterprises, Inc. v. Southeastern Chem. & Solvent Co.*, 184 F.3d 373, 385 (4th Cir. 1999). Defendants argue that they are entitled to summary judgment on all claims because, they say, Plaintiffs cannot show either that Defendants released or even generated wastes contaminated with PCBs, lead, or other heavy metals. Defendants further argue that even assuming such contaminated wastes were generated, Plaintiffs cannot show that they were disposed of upon or migrated to any contaminated site in the Oxford/Anniston area where Plaintiffs have incurred response costs.

### 1. Claims Related to Pollutants Other Than PCBs, to Loose Spent Foundry Sand, and to the CATV Property

Plaintiffs have failed to materially respond to several of the Defendants' arguments related to certain contamination and pollutant transportation theories and to cleanup sites alleged in the Complaint. "[T]here is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Solutia*, 672 F.3d at 1239 (quoting *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 598 (11th Cir.1995)). Notably, Plaintiffs do not dispute Defendants' claims that they did not generate wastes containing lead, cadmium, or other heavy metals that came to rest on any location where Plaintiffs have incurred response costs. Nor do Plaintiffs any longer contend that they can establish that Defendants disposed of loose spent foundry sand that was used as fill material[4] or that Plaintiffs incurred response because of PCBs from dielectric equipment that

---

[4]    Plaintiffs continue to maintain that Defendants disposed of broken investment casting molds which were composed almost entirely of sand. Plaintiffs also assert that such molds

may have been released at the Oxford Facilities.  Finally, although Plaintiffs do maintain that Defendants used PCB-contaminated wax in their investment casting operations at both the CATV Property and the Main Plant and that PCBs migrated from the Main Plant to Choccolocco Creek, Plaintiffs do not argue that the evidence supports a showing of such migration from the CATV Property.  Accordingly, Defendants' respective motions are due to be granted to the extent that they seek summary judgment on all such claims.[5]

### 2.    Plaintiffs' Remaining PCB Contamination Theories

In their remaining claims, Plaintiffs contend that Defendants are liable under CERCLA for PCB contamination in Choccolocco Creek and other particular properties in and around Anniston and Oxford where Plaintiffs have incurred response costs.  At this point, Plaintiffs espouse two principal theories.  First, Plaintiffs assert that PCBs in the soil and on the property of the Main Plant have leached or otherwise migrated from the Main Plant to areas of Choccolocco Creek via "complete surface water pathways."  Second, Plaintiffs contend that Defendants disposed of broken investment casting shell molds, allegedly containing residual amounts of PCB wax, at the City of Oxford Landfill (the "Oxford Landfill") and at certain other locations in the Oxford/Anniston area.

---

contained residual amounts of casting wax that was allegedly contaminated with PCBs. However, Defendants argue, and Plaintiffs do not seriously dispute, that such broken casting molds were not used as fill material because they were in the nature of ceramic pottery, not the loose sand used by non-investment casting foundries to make their molds.  Plaintiffs claims related to the Defendants' disposal of broken investment casting molds are addressed in the text.

[5]    To the extent that Plaintiffs might dispute that they have conceded the viability of any of the claims addressed in this section, the Defendants are nonetheless still entitled to summary judgment on such claims.  Suffice it to say that the court concludes that the Defendants have met their initial burden under Rule 56 with respect to these claims and that Plaintiffs have not pointed to sufficient evidence to sustain them.

Plaintiffs claim that they have incurred response costs both at those dumpsites and at others where the PCBs from the spent shell molds have allegedly migrated.  More specifically, Plaintiffs assert that the evidence is sufficient to prove the following propositions in support of the Defendants' CERCLA liability:

(1)     Scientific-Atlanta purchased and used investment casting wax containing PCBs during the period prior to a January 1, 1978 ban on the sale and use of PCBs imposed by the Toxic Substances Control Act ("TSCA");

(2)     Such PCB wax was reclaimed and recycled in production operations not only by Scientific-Atlanta but also by Southern Tool after it purchased Scientific-Atlanta's facilities in December 1983;

(3)     Defendants' use of PCB wax resulted in releases of PCBs by both Scientific-Atlanta and Southern Tool at the Oxford Facilities;

(4)     PCBs released by the Defendants at the Main Plant migrated from the soil there to Choccolocco Creek via a surface water pathway;

(5)     The use of PCB wax also resulted in the contamination of Defendants' investment casting shell molds;

(6)     Defendants disposed of such PCB-contaminated spent shell molds at the City of Oxford Landfill ("Oxford Landfill") and those PCBs migrated to Choccolocco Creek; and

(7)     Defendants also disposed of PCB-contaminated spent shell molds at other locations around Oxford and Anniston where Plaintiffs have incurred response costs.

Defendants contest Plaintiffs' ability to prove any of the above assertions.

A defendant may be held liable under CERCLA if its hazardous wastes are present in any quantity at a site where the plaintiff has incurred response costs.  *See United States v. Davis*, 261 F.3d 1, 44 (1st Cir. 2001) (citing *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 72, 76-77 (1st Cir. 1999).  Thus, liability may attach even if the defendant's wastes disposed of at a site represent less

than the background level of contamination or are tiny in comparison to the amount dumped by other parties. *Davis*, 261 F.3d at 44; *see also Kalamazoo River Study Group v. Mensasha Corp.*, 228 F.3d 648, 655-56 (6th Cir. 2000). However, the parties agree that in order to prevail on their claims, Plaintiffs will have the burden at trial to prove that the relevant Defendant's conduct contributed to wastes at a site where Plaintiffs have incurred response costs. (*See* Doc. 626 at 4; Doc. 655 at 4). Where the plaintiff seeks to establish that it has incurred response costs at a site where the defendant has directly dumped its hazardous waste, it is enough to show that the defendant's wastes were dumped at the site and that the defendant's wastes contain hazardous materials like those found at the site. *See United States v. Monsanto*, 858 F.2d 160, 169 n. 15 (4th Cir. 1988)); *Chem-Nuclear Syst., Inc. v. Arivec Chem., Inc.*, 978 F. Supp. 1105, 1113 (N.D. Ga. 1997); *United States v. Wade*, 577 F. Supp. 1326, 1333 (E.D. Pa. 1983). Accordingly, a plaintiff in such a case need not present evidence "tracing chemical waste to particular sources in particular amounts, a task that is often technologically infeasible due to the fluctuating quantity and varied nature of the pollution at a site over the course of many years." *Davis*, 261 F.3d at 36 (quoting *Acushnet*, 191 F.3d at 76); *see also United States v. Hercules, Inc.*, 247 F.3d 706, 716 (8th Cir. 2001) (recognizing that a plaintiff "need not trace or 'fingerprint a defendant's wastes in order to recover under CERCLA" (quoting *Monsanto*, 858 F.2d at 169-70).

However, where a plaintiff contends not that the defendant directly dumped or otherwise disposed of its wastes at the site but rather that hazardous materials migrated there from the defendant's facility or from a different dumpsite elsewhere, a somewhat different causation analysis applies. In such a "two-site" case, it may be "much less obvious how [a defendant] could be responsible for contamination of the [site where the plaintiff has incurred response costs.]" *Norfolk*

14

*So. Corp. v. Chevron USA, Inc.*, 279 F. Supp. 2d 1250, 1268 (M.D. Fla. 2003), rev'd on other grounds, 371 F.3d 1285 (11th Cir. 2004). Unlike in direct dumping cases, it is not sufficient in alleged migration cases merely to show that the defendant's wastes contain materials similar to those found at the site; otherwise a defendant might be liable under CERCLA to pay for the cleanup of any dumpsite in the country that happened to contain a substance similar to that in the defendant's wastes. *See Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1382, 1387 (W.D. Mo. 1994)). Rather, the plaintiff has the burden to present evidence that will "provide the necessary causal link between [the defendant's] activities and the contamination which is the subject of [the] suit." *Id.* In cases of actual contamination, there must be sufficient evidence from which a jury might reasonably find that it is "more probable than not" that the defendant's wastes did migrate to the site where the plaintiff incurred response costs, not merely that there was some "possibility" that they reached the site. *Kalamazoo River Study Group v. Rockwell Intern. Corp.*, 171 F.3d 1065, 1072-73 (6th Cir. 1999) ("the plaintiff must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up").

### a.      The Defendants' Use of PCB Casting Wax

Defendants first argue that they are entitled to summary judgment because Plaintiffs cannot prove that either Defendant ever even used a product containing PCBs or released PCBs anywhere. The Plaintiffs' respond by arguing that they can prove that both Scientific-Atlanta and Southern Tool used investment casting wax that contained PCBs as a filler ("PCB wax"). Plaintiffs admit that they have no sales records, direct testimony, or any other direct evidence to support that either Defendant

ever purchased PCB wax from any wax manufacturer.[6]  Further, in 1976, Congress passed the Toxic

Substances Control Act ("TSCA"), which prohibited the manufacture, sale, or use of PCBs with

some limited exceptions, effective January 1, 1978.  15 U.S.C. § 2605(e)(2)(A); *see also* 40 C.F.R.

§§ 761.1 - 761.218; *General Elec. Co. v. Joiner*, 522 U.S. 136, 516 (1997); *Electric Power Bd. of

Chattanooga v. Monsanto Co.*, 879 F.2d 1368, 1372 (6th Cir. 1989).  Southern Tool did not purchase

the Oxford Facilities from Scientific-Atlanta until December 1983, almost six years after the

effective date of the TSCA ban.  Moreover, Edgar Houston, the Plant Chemist for Scientific-Atlanta

and Southern Tool from January 1978 to 1995, testified that no PCBs were used in their operations,

including in the casting waxes, during his tenure.  (Deposition of Edgar Houston ("Houston Depo."),

ST Ex.[7] 6 (Doc. 616-9), ST Ex. 28 (Doc. 630-7), Pl. Ex. PPP to ST[8] (Doc. 627-71), at 44-45, 77-79,

95-100, 113-16).  Plaintiffs nonetheless assert that it is "well documented" that Scientific Atlanta

---

[6]  Plaintiffs with some regularity lament the fact that they were unable in discovery to obtain product orders, invoices, receipts, records, or other documents regarding what casting waxes were purchased and used by the Defendants, especially Scientific-Atlanta.  Plaintiffs also complain at times about their inability to secure other evidence either due to the passage of time, because records were disposed of prior to this litigation, and because of a fire occurring in Southern Tool's Wax Room in 2003.  However, Plaintiffs have not argued, nor attempted to prove, that anyone is guilty of a bad-faith act of spoliation that it might make it appropriate to draw an inference against the offending party.  *See Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1310 n. 28 (11th Cir. 2011); *Mann v. Taser Intern., Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009).

[7]  Citations to "ST Ex. ___" are to exhibits submitted and cited by Southern Tool in support of its motion for summary judgment.  ST Ex. A through G are encompassed within Doc. 239.  ST Ex. H through R are in Doc. 240.  ST Ex. S are in Docs. 240, 241, 242, and 243.  ST Ex. T through Y are also in Doc. 243.  ST Ex. 1 through 23 are in Doc. 616.  ST Ex. 24 through 41 are in Doc. 630.

[8]  Citations to "Pl. Ex. ___ to ST" are to exhibits that Plaintiffs have submitted in opposition to Southern Tool's motion for summary judgment.  Pl. Ex. A though QQQ are encompassed within Doc. 627.

purchased and used PCB wax prior to the TSCA ban.  Moreover, Defendants contend that the evidence is sufficient to indicate that such PCB wax was reclaimed and recycled in production operations not only by Scientific Atlanta but also by Southern Tool after it purchased the Main Plant from Scientific Atlanta.

In support of their claim that Scientific-Atlanta used PCB wax, Plaintiffs first rely on an EPA report from February1976 recognizing that such wax was commercially available and used by 25 of the 135 investment casting foundries then in operation in the United States.  That report identified Yates Manufacturing Company ("Yates") as the only domestic wax manufacturer selling PCB wax. Yates acknowledged that it did sell such wax and that it contained 30% PCBs by volume (*i.e.*, 300,000 ppm).  A later EPA proposed rule notice repeated the 30% figure and added that "some waxes reportedly contained up to 40 percent PCBs (i.e., 400,000 ppm)." *Polychlorinated Biphenyls; Exclusions, Exemptions and Use Authorizations*, 52 Fed. Reg. 25838, 25845 (July 8, 1987)[9].  As a frame of reference, the threshold concentration at which Plaintiffs are required under the PCD to remove topsoil from residential properties is 1.0 ppm.  The 1976 EPA report does not mention Scientific-Atlanta or otherwise indicate that it might have been one of the investment casting foundries then using PCB wax.  However, former employees of Scientific-Atlanta have testified that Yates was a principal supplier of casting wax to Scientific-Atlanta during that same approximate time frame, from the late 1960s until about the mid-'70s.  On the other hand, there is no evidence identifying what particular waxes Yates sold to Scientific-Atlanta or whether they contained PCBs. Nor is there evidence that Yates sold only PCB waxes at that time.

---

[9]     The court is authorized to take judicial notice of the contents of the Federal Register.  44 U.S.C. § 1507; *Powers v. United States*, 996 F.2d 1121, 1125 n. 3 (11th Cir. 1993).

The 1976 EPA report also stated that Yates and the three other "major" domestic investment casting wax manufacturers, Freeman Manufacturing Company ("Freeman"), M. Argueso and Company ("Argueso"), and J. F. McCoughlin Company, were all "believed" also to be making investment casting waxes filled with polychlorinated terphenyls ("PCTs"). PCTs are very similar in chemical structure to PCBs, and they also persist in the environment and at least potentially have similar toxicological properties. *See Chlorinated Terphenyl; Submission of Notice of Manufacture or Importation*, 49 Fed. Reg. 11181 (March 26, 1984). Indeed, it was concerns over the latter that prompted Monsanto, the only domestic manufacturer of PCTs, to discontinue their production in 1972. *Id.* But even after that, as the EPA noted, imported PCTs were used as filler in some investment casting waxes ("PCT wax"). *Id.* Moreover, although PCTs were not directly prohibited by the TSCA, they normally contained some amount of PCBs as an impurity. *Id.*; *Polychlorinated Biphenyls; Exclusions, Exemptions and Use Authorizations*, 52 Fed. Reg. 25838, 25845 (July 8, 1987). According to the EPA, however, PCTs were last imported into the United States in 1979 and by 1984 were not known to be manufactured anywhere. *Id.* Just as there is no direct evidence that either Defendant purchased or used PCB wax, there is also no direct evidence that either Defendant purchased or used PCT wax.

Plaintiffs also assert that the evidence supports that Scientific-Atlanta purchased PCB wax from Argueso in the early 1970s. However, Plaintiffs cannot make that claim stick. The evidence shows that Argueso did sell PCB waxes as of December1973 through a distributor, Remet Corporation ("Remet"). (Pl. Ex. EE to ST) There is also proof that Argueso, Remet, or both sold Argueso waxes at some point to Scientific-Atlanta and later to Southern Tool. Even so, an Argueso company executive testified without dispute that Scientific-Atlanta did not become an Argueso

customer until after he joined the company in 1980, which was also after Argueso had stopped selling PCB wax because of the TSCA ban.  (Pl. Ex. GG to SA[10]; SA Ex. SS[11], Deposition of John P. Argueso at 16, 73).  Likewise, Plant Chemist Houston testified that Scientific-Atlanta did not start using Argueso wax until 1981 or 1982.  (Houston Depo. at 78-79, 100-01).  Scientific-Atlanta is also absent from a list Argueso compiled in September 1976 identifying the eleven firms in the investment casting industry to whom it had sold PCT waxes between the start of 1975 and the middle of 1976. (Pl. Ex. BB to ST).

Plaintiffs attempt to resuscitate their argument on this point by referencing three Material Safety Data Sheets ("MSDSs") obtained from Southern Tool for casting waxes manufactured by Argueso.  (Pl. Exs. L, M, AA to SA).  However, those MSDSs are dated 1985, 1986, and 2002, respectively.  Thus, they were all created at least a year after Scientific-Atlanta had sold the Oxford Facilities to Southern Tool and at least seven years after the effective date of the TSCA ban on the use of PCBs.  None of those MSDSs mention PCBs or PCTs.  The MSDSs dated 1985 and 1986 are for a "Cerita Wax 819-L" manufactured by Argueso.  (Pl. Ex. L, M to SA).  Plaintiffs maintain that Cerita 819-L contained Aroclor, a trade name for PCBs manufactured by Monsanto.  However, the lone piece of evidence Plaintiffs cite in support of that proposition, a December 4, 1973 letter from a representative of Argueso to his counterpart at Remet (Pl. Ex. I to SA), will not bear that weight. The letter opens with a reference to certain "Aroclor-containing orders" which had been or were

---

[10]    Citations to "Pl. Ex. ___ to SA" are to the exhibits filed by Plaintiffs in opposition to Scientific-Atlanta's motion for summary judgment.  Pl. Ex. A through Z to SA are encompassed within Doc. 655.  Pl. Ex. AA through EEE to SA are within Doc. 656.

[11]    Citations to "SA Ex. ___" are to the exhibits filed by Scientific-Atlanta in support of its motion for summary judgment.  SA Ex. A through QQ are encompassed within Doc. 652. SA Ex. RR through UU are in Doc. 658.

scheduled to be shipped from Argueso to Remet.  However, Cerita 819-L was not among those orders.  Instead, those were orders for "Cerita #915-G Pink," "Cerita #418," "Cerita #754-A," and "Orbis Wax."  The remainder of the letter discusses other accounts and shipping schedules for various waxes, one of which is "Cerita #819-L."  But nothing in the letter reasonably suggests whether that or any other wax discussed in that section contained Aroclor or any other PCBs.  Further, even assuming that a wax identified as "Cerita 819-L" might have contained PCBs in 1973, that does not reasonably imply that a wax with that identification still contained PCBs at any time it might have been used by either Defendant.  This is so because of (1) the undisputed evidence that Argueso wax was not sold to either Defendant until at least 1980, (2) the intervening TSCA ban on PCBs in 1978, and (3) the fact that the 1985 and 1986 MSDSs for Cerita 819-L do not reference PCBs, by then a well-known and federally prohibited hazardous substance.

The next piece of evidence Plaintiffs rely on to show that Scientific-Atlanta used PCB wax is a letter dated February 11, 1977, from Southern Research Institute ("SRI") in Birmingham to Scientific-Atlanta.  (Pl. Ex. FF to ST).  In that letter, SRI acknowledges that it had received from Scientific-Atlanta two wax samples to be analyzed for the possible presence of PCBs and PCTs.  SRI advised that testing on one of the waxes, which was orange in color, showed it to contain "less than .005%," *i.e.*, 50 ppm, "of PCBs plus PCTs."  The other sample, a "blue-green wax," was found to have "relatively large concentrations of PCBs or PCTs, estimated to be about 0.5%," or 5,000 ppm.

While the SRI letter does support the inference  that Scientific-Atlanta hired SRI to analyze the two casting wax samples containing PCBs, the letter does not itself prove that Scientific-Atlanta actually used either tested wax.  Plaintiffs attempt to forge a link of identity between the waxes tested by SRI and waxes used by Scientific-Atlanta by relying upon testimony of former Scientific-Atlanta

employees who testified generally to the color of waxes they saw at the Main Plant.   Many employees, for example, testified that a "green" wax was regularly used.  However, to infer that a wax identified only by color, observed to have been used at some unspecified time, was one of the two waxes tested by SRI would amount to speculation.   Thus, a general description of a wax as "green" would not itself allow a jury reasonably to infer that such was the "blue-green" wax tested by SRI.  Plaintiffs also point to the testimony of another employee, Henry Burt, who recalled that Scientific-Atlanta had "tested" an "orange" and a "blue" wax at some unspecified time.  (SA Ex. D, Doc. 652-7, at 120, 134).   However, neither, Burt said, was ever "put in production."  (Id.)  If anything, Burt's testimony undercuts Plaintiffs' theory that the waxes tested by SRI were actually used by Scientific-Atlanta.  Finally, another employee, Mike Simmons, testified that "a very small percentage" of the wax used at the Main Plant was a "blue-green" "soluble wax" used "to form internal cores."  (SA Ex. R, Doc. 652-21, at 105-06).  Again, the probative value of such a color identification alone is limited.  Further, Simmons's description of the wax as "soluble" belies that it was the "blue-green" wax tested by SRI noted to contain "relatively large concentrations of PCBs or PCTs."  Specifically, Houston testified without dispute that soluble waxes used to make internal cores are designed specifically to dissolve in water and that for that reason they do not contain PCBs, which are highly insoluble in water.  (Houston Depo. at 99-100, 114); *see also Persistent Bioaccumulative Toxic (PBT) Chemicals*, 64 Fed. Reg. 58666, 58694 (Oct. 29, 1999) ("PCBs have ....very, very low water solubility.") Accordingly, Simmons's testimony does not support that the blue-green soluble wax was the blue-green wax tested by SRI.[12]

---

[12]     Plaintiffs also cite the deposition of a former employee at the Main Plant, Bettye Ashley, who testified that she saw a blue-green was used and that it was not a soluble wax.  (Pl. Ex. HH to SA at 114).  However, it is undisputed that Ashley did not begin working at the Main Plant

The next type of evidence that Plaintiffs rely upon in support of their theory that Scientific-Atlanta used PCB wax is soil sample test results from 1989 and 2006 confirming the presence of PCBs at both the CATV Property and the Main Plant.  The 1989 testing by Southern Tool showed PCB concentrations of 2.7 ppm at one location on the CATV Property and concentrations of 0.1 ppm and 1.0 ppm, respectively, at two locations on the Main Plant property.  In April and May 2006, consultants hired by Plaintiffs in connection with this litigation took 32 samples from locations at the Main Plant.  The highest PCB level yielded in that testing was 1.1 ppm in one sample; the Defendants seem to acknowledge that some number of other samples were also positive for PCBs but at concentrations less than 1.0 ppm, the threshold at which Plaintiffs are required to remove and replace topsoil from residential properties under the PCD.  Defendants downplay this evidence as insignificant because the low PCB concentration levels are far below the 50 to 500 ppm range that EPA regulations define as "contaminated" in the context of industrial properties.  *See* 40 C.F.R. § 761.3.  Nonetheless, although the concentration levels were low, the question is not whether either of the Oxford Facilities is "contaminated" such that a clean-up of the property would be required under EPA standards.  The significance of the evidence, rather, lies in the detection of PCBs in the soil at any material level because that circumstance tends to support that PCBs were used and released on the premises at some point, particularly in the absence of some alternative explanation for their presence.  Defendants reply that the PCBs in the soil might have originated from somewhere other than from their investment casting operations on the premises, including from the Anniston

---

until 1984, after it had been sold to, and was being operated by, Southern Tool.  (Doc. 652-2 at 14, ¶ 48; Doc. 655-1 at 14, ¶ 48).  Thus, her employment began at least six years after the February 1977 SRI letter.  Ashley's testimony cannot establish what waxes were used by Scientific-Atlanta, never mind that the "blue green" wax she observed might have been the "blue green" wax that SRI tested for Scientific-Atlanta.

Plant where PCBs were manufactured and disposed of by Plaintiffs' predecessor, Monsanto. Defendants further highlight that Plaintiffs have represented to the EPA that "normal levels of PCBs in properties in Anniston ... [are] approximately 1 ppm to 10 ppm." Even so, Defendants do not otherwise articulate the particulars of any theory by which PCBs might have been released by some prior owner or operator of the Oxford Facilities or how PCBs might have migrated to that location from elsewhere.

The final pieces of evidence Plaintiffs rely upon to support that Scientific-Atlanta used PCB wax relate to "wax molds" taken home by a former employee of both Scientific-Atlanta and Southern Tool, Chester Beason. In a declaration made pursuant to 28 U.S.C. § 1746, Beason states that he worked as a mold maker at the Main Plant from approximately 1972 until he retired in 1992. (Pl. Ex. JJ to SA; Pl. Ex. X to ST ("Beason Decl.")). In that capacity, Beason participated in the creation of metal mold patterns used to cast various metal items to customer specifications. Beason explains that after he created a metal mold, melted investment casting wax was injected into the pattern. Once the wax cooled, he would separate the metal mold from the solidified "wax mold" that was in the shape of the part to be cast. Beason indicates that during the time that he worked at the Main Plant, the casting wax used to create the wax molds "appeared to be white in color," although he also recalls a "pale green" wax being used "near the time [he] retired." Beason states that, "between 1977 and 1992," he took home various of these wax molds he made, keeping them in a cardboard box in his basement except when he occasionally took them out to show family and friends.

Beason does not purport to know whether his wax molds contained PCBs. Plaintiffs assert in their summary judgment briefs, however, that those molds were analyzed and found to contain PCBs at high levels. Beason states in his declaration that, on November 23, 2005, he turned over

"several" of the wax molds he had brought home, including "wax casting pieces for a gas pump nozzle, valve body housing and lock mechanism housing," to Jerry Hopper, an employee of a consulting firm hired by Plaintiffs.  Plaintiffs allege that one or more of Beason's wax samples given to Hopper were, in turn, the subject of an "Analytical Report" prepared by Severn Trent Laboratories, Inc. ("STL"), dated December 6, 2005.  (Pl. Ex. JJ to SA; Pl. Ex. V to ST ("STL Report")).  The cover of the STL Report cites the "Job Description" as "PCB Investment Casting Wax," indicating that the report was prepared for Solutia as the client, "Attention: Jerry Hopper." The final page of the STL Report is a pre-printed form captioned, "Analysis Request and Chain of Custody Record."  That form identifies the subject sample simply as "ICW-200-1 (Investment Casting Wax)," describing it as a "composite" rather than a "grab" sample[13], and indicating that it is "sold or semisolid" and was submitted in a single 16 ounce glass container.  It further indicates that the sample was "relinquished" by Hopper to Federal Express on December 1, 2005, and then received by STL the following day.  The STL Report advises that its analysis of the sample revealed it to contain PCBs at a concentration of up to 12,000 ppm.

Defendants do not dispute the positive PCB findings regarding the sample in the STL Report. They argue, however, that the STL Report is irrelevant because there is insufficient evidence to support that the tested sample is, in fact, from one or more of the wax molds that Beason brought home and later gave to Hopper.  The Defendants may be correct in their argument.  Evidence other than live testimony must be authenticated as a condition precedent to a finding of relevance.  *See*

---

[13]     A "grab" sample is a single test sample drawn from a single location, while a "composite" sample consists of various samples drawn from different locations or at different times so as to yield a representative level for the waste. *See Chemical Waste Management v. EPA*, 976 F.2d 2, 33-34 (D.C. Cir. 1992) (citing RCRA Sampling Procedures Handbook 75 (1989)),

Fed. R. Evid. 901, 902; *see also* Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* § 9:1 (2008) (hereinafter "*Federal Evidence*" ). "[W]hen an object is taken from the defendant for the purpose of testing its nature or content, it is essential to the admissibility in evidence of the results of the testing that the identification of the object or substance tested with the object or substance taken from the defendant be established." *Rothaus v. United States*, 319 F.2d 528, 529 (5th Cir. 1963)[14] (per curiam).  "[G]aps in the chain of custody normally go to the weight of the evidence rather than its admissibility." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 2532 n. 1 (2009) (citation omitted).  However, the existence of "[s]erious gaps in the chain or suspicious discrepancies in the records, descriptions, or quantum or nature of the material, may raise enough doubt to require exclusion." *Federal Evidence* § 9:10; *see, e.g.*, *United States v. Ladd*, 885 F.2d 954, 957 (1st Cir.1989) (lab results excluded when government failed to explain discrepancy in numbering of specimen samples); *United States v. Bonds*, 78 Fed. R. Evid. Serv. 1117, 2009 WL 416445, *1-2, 5 (N.D. Cal. 2009), aff'd and remanded, 608 F.3d 495 (9th Cir. 2010) (lab results, logs, and other documents purporting to show that the defendant used anabolic steroids would be excluded if the individual who allegedly collected the underlying blood and urine samples refused to testify, thus leaving insufficient evidence to indicate that the defendant was the source of the samples).

The court concludes, however, that it need not rule on the admissibility of the STL Report. Rather, the court will assume that it is admissible and consider it for whatever evidentiary value it has at summary judgment.  Moreover, the court will further assume that a jury could reasonably infer

---

[14]     The decisions of the former Fifth Circuit handed down before October 1, 1981 are binding in the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

that Scientific-Atlanta used PCB wax in its production operations for at least some period of time, which resulted in the release of PCBs into the soil at the Main Plant. But even with all of those assumption, the record evidence does not support a reasonable inference that *Southern Tool* ever used PCB wax or otherwise caused PCBs to be released. Again, Southern Tool has presented evidence supporting that it did not ever use wax filled with PCBs or PCTs, which might be expected to contain some small amount of PCBs. In the face of that, Plaintiffs have offered no evidence that any wax manufacturer sold Southern Tool wax filled with either PCBs or PCTs. Nor is there any direct testimony acknowledging that Southern Tool ever used PCB wax or PCT wax. Rather, the only argument that Plaintiffs continue to assert in support of Southern Tool's CERCLA liability is that a jury could infer that *Scientific-Atlanta* purchased PCB wax while it was still commercially available prior to the January 1978 TSCA ban and that such wax was reclaimed, recycled, and thus reused by *Southern Tool* after it purchased the Main Plant in December 1983. Plaintiffs further claim that "[t]his recycling further concentrated the PCBs in the wax." (Doc. 627 at p. 8, ¶ 28). The record, however, does not reasonably support Plaintiffs' theories.

To be sure, Plaintiffs have cited deposition testimony from various former Scientific-Atlanta and Southern Tool employees confirming the utilization of equipment and procedures by both companies to reclaim and recycle casting wax. (*See id.*) However, none of those employees stated that Southern Tool recycled or used any wax that had been purchased or used previously by Scientific-Atlanta, never mind that Southern Tool used recycled wax from Scientific-Atlanta that contained PCBs. Nor does any testimony cited by Plaintiffs purport to provide details that would likely be needed to draw such an inference, including how often or for how long a given unit of new wax might have been recycled in the system, or the specifics of how PCBs might be affected by the

26

recycling process.  Further, Houston testified that sometime between 1981 and 1983, before Southern Tool bought the Main Plant, Scientific-Atlanta installed a new wax reclamation system, with brand new tanks (Houston Depo. at 69-70, 109-110), tending to undercut the possibility that PCB residue that might have existed in the equipment from the reclamation of wax purchased prior to the TSCA ban made its way into Southern Tool's wax supply.  Plaintiffs have also pointed to no expert testimony on any of these issues.

Even assuming that Scientific-Atlanta used PCB wax, and further assuming that it could be ascertained how long it might have been recycled and remained in the Main Plant's system, drawing any conclusions about exactly when or how long Scientific-Atlanta continued to use PCB wax or at what volume or frequency is a speculative exercise.  If the STL Report is admissible, it plus Beason's declaration would indicate that PCB wax was still being used sometime "between 1977 and 1992," when Beason says he was bringing home his wax molds.  Plaintiffs contend that such evidence supports that Scientific-Atlanta and Southern Tool were using reclaimed PCB wax "through the 1970s, 1980s and 1990s."  (Doc. 627 at 10, ¶ 31).  That, however, is an impermissible stretch.  Plaintiffs have failed to support their assertion that the recycling process "further concentrated" PCB levels in casting wax over time.  Likewise, even assuming that the sample from the STL Report was wax from one or more of Beason's molds, nothing that report, Beason's declaration, nor anything else in the record would allow a jury to ascertain with reasonable certainty whether the subject sample was from any particular wax mold(s) Beason collected, when such molds(s) might have been created, or who was running the Main Plant at the time.  To support that at least some of Beason's wax molds were created when Southern Tool was operating the Main Plant, Plaintiffs rely on deposition testimony from two former Southern Tool employees, Bettye Ashley and David

27

McLaughlin.  (Doc. 627 at p. 10, ¶ 31).  Both Ashley, employed by Southern Tool from 1984 to 2000, and McLaughlin, employed from May 1983 to October 1993, were asked about items depicted in a photograph (Pl. Ex. U to ST), which Plaintiffs assert are of wax molds collected by Beason. Although Defendants contest whether the record sufficiently establishes that the photo actually depicts any those molds, the court assumes here that it does.  Ashley was asked if the items "look like parts that might have been made at Southern Tool," to which she answered, "Oh, yes, sir."  (Pl. Ex. P to ST; ST. Ex. 9; Doc. 630-13 ("Ashley Depo.") at p. 88).  Ashley further explained that she recognized the items by shape and that she had made one of the parts at her station while she was employed at the Main Plant.  (Id. at 130-31).  McLaughlin similarly indicated that he saw wax molds "in the wax room," and, when asked about the items in the photo, he said he had "seen it in the wax room, and I seen (sic) them after pouring and I cleaned them."  (Pl. Ex. C to ST at 47-48).  It is questionable whether such testimony is sufficient to show that any of the depicted wax molds were created when Southern Tool operated the Main Plant.  Ashley admitted that the items could have been made at some time she did not work there.  (Ashley Depo. 130-31).  For his part, McLaughlin recalled green wax being used at the plant and he suggested that the photo he was shown depicted green wax molds.  (ST Ex. 26 at 100).  However, Beason's molds were white or off-white.  But even if one or more of the items in the photo were made on Southern Tool's watch and the STL Report is admissible, there still remains insufficient proof connecting any particular wax mold collected by Beason, in the photo or otherwise, to the sample that was the subject of the STL Report, which is identified generically as "investment casting wax."  Finally, while Plaintiffs highlight the PCBs detected in the soil at the Oxford Facilities in 1989 and 2006, even if such resulted from investment casting operations on the premises, there is simply no way to determine when those PCBs might have

been released or who was then running the Main Plant.[15]  Therefore, the court concludes that the evidence is insufficient to allow a jury reasonably to find that Southern Tool used PCB wax or was the source of any PCB release.  *Cf. Anthony v. Chevron USA, Inc.*, 284 F.3d 578, 589 (5th Cir. 2002) (expert testimony was insufficient to establish that defendant oil company's activities caused site contamination where expert offered no specific time frame for when contamination occurred and could not exclude possibility that other oil companies with nearby operations could have caused contamination).  As Plaintiffs acknowledge that Southern Tool cannot be liable under CERCLA unless its conduct caused Plaintiffs to incur response costs, Southern Tool is entitled to summary judgment.

### b.   Migration or Disposal of Defendants' PCB Wastes Where Plaintiffs Have Incurred Response Costs

Scientific Atlanta contends that it is entitled to summary judgment on the ground that Plaintiffs cannot prove that any PCBs that might have been used in its operations were disposed of or have migrated to any location where Plaintiffs have incurred response costs.  Southern Tool makes the same argument as an alternative basis for summary judgment in its favor, assuming that the evidence is sufficient to find that it used or released PCBs at the Oxford Facilities.  Plaintiffs maintain that they can make that showing necessary to establish CERCLA liability.  These claims fall into three categories.  The first is that PCBs from the Defendants' operations at the Main Plant

---

[15]    Plaintiffs also cite several other pieces of evidence to support that Southern Tool used PCB waxes "well after the TSCA ban on the distribution and sale of PCB materials." (Doc. 627 at 9-11, ¶ 31).  None of it is sufficiently probative.  For instance, as discussed previously, Plaintiffs obtained two MSDSs from Southern Tool for Argueso's Cerita 819-L wax. However, those MSDSs, dated 1985 and 1986, do not suggest that such wax contained PCBs. Similarly, Plaintiffs highlight that ten drums of spent pink wax were found near the rear of the Main Plant in 1997, but again, no evidence supports that such pink wax contained PCBs either.

have migrated from there to areas of Choccolocco Creek.  Second, Plaintiffs similarly contend that Defendants disposed of PCB-contaminated spent shell molds at the Oxford Landfill and that those PCBs migrated to areas of Choccolocco Creek.  Third and finally, Plaintiffs claim that Defendants disposed of  PCB-contaminated spent shell molds directly on other locations around Oxford and Anniston where Plaintiffs have incurred response costs.  These claims are addressed in turn below.

### i.     Migration from the Main Plant to Choccolocco Creek

Defendants first contend that Plaintiffs cannot prove their theory that PCBs released at the Main Plant migrated to various tributaries and downstream areas of Choccolocco Creek. Specifically, Defendants argue that Plaintiffs cannot show that there is even a hydraulic pathway to those areas from the Main Plant. But even assuming that such a hydraulic pathway exists, Defendants continue, Plaintiffs have failed to demonstrate that PCBs in the soil at the Main Plant or otherwise released there have made their way to contaminated areas of Choccolocco Creek where Plaintiffs have incurred response costs.

Although the court has ruled that there is insufficient evidence that Southern Tool used or released PCBs, it is assumed for present purposes that both Defendants are responsible for releasing at least some PCBs at the Main Plant.  Plaintiffs theorize that those PCBs migrated from that soil via some surface water pathway(s) to areas of Choccolocco Creek.  However, there is no proof that there is a continuous or even semi-permanent flow of surface water running from the Main Plant property to Choccolocco Creek or a tributary thereof.  It is undisputed that the southern section of the Main Plant property is wooded acreage, and a site inspection report presented to the Alabama Department of Environmental Management ("ADEM") in 1984 states that "[s]urface drainage [at

the Main Plant site] is from north to south with no ditches or tributaries developed to a significant degree." (Doc. 652-36, SA Ex. GG at ADEM 017771). The Main Plant is also outside the 500-year floodplain of Choccolocco Creek. (Id. at ADEM 017751, 017775). Rather, to the extent that a surface water pathway to Choccolocco Creek exists, it would seem to arise only seasonally or otherwise intermittently as course of drainage avenues, as outlined a 1995 site inspection report presented to the EPA, which states as follows:

> Surface water run-off from the [Main Plant] site flows overland approximately 400 feet south to the [Interstate] Highway 20 drainage swale. Flow continues in the highway swale approximately 400 feet west, then 300 feet south to intersect with the Anniston Calhoun County Airport's drainage channel. The drainage channel extends west and south around the airport runway approximately 1.5 miles to the discharge into Choccolocco Creek.

(Doc. 652-36, SA Ex. GG at ADEM 017751).

Nonetheless, Plaintiffs emphasize that Scientific-Atlanta and Southern Tool each applied for and obtained National Pollution Discharge Elimination System ("NPDES") permits under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq.,[16] recognizing that the Defendants would discharge stormwater and wastewater into "Choccolocco Creek," an "Occasional Tributary to Choccolocco Creek," an "unnamed tributary to Choccolocco Creek," or to "Choccolocco Creek via [a] Drainage Ditch." (Pl. Ex. W to SA at ST.A 003937, 003940, 003943, 004008, 004053, Pl. Ex. B to ST at ST.A 007270; Pl. Ex. NNN to ST at ST.A 003958, 003974, 004022, 004085, 004512, Pl. Ex. OOO at ADEM 32640). Plaintiffs urge that the Defendants' NPDES permits are "proof positive of a surface water connection between the [Main Plant] and Choccolocco Creek." (Doc. 655-1 at 22, ¶

---

[16]   Under the Clean Water Act, 33 U.S.C. § 1251 et seq., a party is generally required to obtain an NPDES permit in order to discharge pollutants into the navigable waters of the United States. *See* 33 U.S.C. §§ 1311, 1342; *South Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004).

79).  Even assuming that is true, however, Plaintiffs have cited no evidence that PCBs have actually migrated by that connection to any area of Choccolocco Creek.  Plaintiffs at times quibble with the precise distance between the Main Plant and Choccolocco Creek or its tributaries.  However, there is no serious dispute both that the distance, as the drainage course is described above, is over one mile and includes material segments, including an interstate highway, that often, if not typically, stand as dry land,  While soil testing at the Main Plant has detected PCBs, those concentration levels are low.  Plaintiffs have produced no sample testing results demonstrating that PCBs are present in the soil of any drainage pathway between the Main Plant and Choccolocco Creek, including at the point where wastewaters from the former would supposedly discharge into the latter.  Finally, Plaintiffs repeatedly assert that, when the time came, they would offer expert testimony detailing the particulars of the alleged hydraulic pathway to Choccolocco Creek, soil weathering at the Main Plant, and the mechanics of migration along the route.  However, the deadline to provide expert testimony passed long ago, and Plaintiffs have not sought to supplement their summary judgment opposition with any such testimony.  The court concludes that both Defendants are entitled to summary judgment on Plaintiffs' claims based on the theory that PCBs (or any other pollutants, for that matter) have migrated from the Main Plant to areas of Choccolocco Creek where Plaintiffs have incurred response costs.  *See Rockwell Intern. Corp.*, 171 F.3d at 1072-73 (affirming summary judgment for defendant where the plaintiff's evidence and expert testimony failed to reasonably show that there was sufficient waterflow to carry PCBs through the entire length of a drainage ditch to a lake where the plaintiff had incurred clean-up costs).

        **ii.**    **Migration from the Oxford Landfill to Choccolocco Creek**

Defendants argue that they are also entitled to summary judgment on Plaintiffs' claims alleging that Defendants disposed of ceramic shell wastes contaminated with PCBs at the Oxford Landfill and that those PCBs migrated from there to areas of Choccolocco Creek where Plaintiffs have incurred response costs. It is undisputed that Defendants disposed of spent, sand-based ceramic shell mold wastes at the Oxford Landfill. And, as above, although the court has ruled that the evidence is insufficient to establish that Southern Tool used PCB wax, it is assumed here that both Defendants used PCB wax at some point. Even so, the court concludes that the evidence is insufficient to sustain a reasonable inference that PCBs from such use resulted in PCB contamination at the Oxford Landfill which, in turn, migrated to areas of Choccolocco Creek where Plaintiffs have incurred response costs.

Even if both Defendants used PCB wax, the extent and time period of such use are unclear. Further, Plaintiffs have not tested any of Defendants' shell wastes, from the Oxford Landfill or otherwise, for PCBs, and Plaintiffs have not referenced any testimony about whether or to what extent any use of PCB wax might have resulted in detectable PCB contamination of spent ceramic shell molds. Plaintiffs also have not shown that the Oxford Landfill is contaminated with PCBs. But even assuming that shell wastes disposed of by the Defendants at the Oxford Landfill at some point contained some PCBs, Plaintiffs have not pointed to admissible evidence indicating that they incurred CERCLA response costs at the Oxford Landfill as a result of Defendants' activities.[17] Nor

---

[17]   Plaintiffs do not claim in the argument section of either of their briefs that they incurred CERCLA response costs at the Oxford Landfill itself. However, Plaintiffs do bury such a claim in the final sentence to their response to one of the fact statements made by Scientific-Atlanta in support of its motion for summary judgment. (*See* Doc. 655-1 at 18, ¶ 59). Nonetheless, the two pieces of evidence that Plaintiffs rely upon in support of the claim, Pl. Ex. O and X to SA, are photographs without any accompanying testimony to explain what they purport to depict. They are not admissible. *See* Rule 901, Fed. R. Evid. Even if they

have Plaintiffs pointed to sufficient evidence that there is a complete hydraulic pathway between the Oxford Landfill and areas of Choccolocco Creek where Plaintiffs have incurred response costs. Finally, as with their migration-from-the-Main-Plant theory Plaintiffs have presented no evidence that PCBs are present anywhere in any purported hydraulic pathway between the Oxford Landfill and Choccolocco Creek or its tributaries, including Polecat Creek. Plaintiffs have suggested that they would supply expert testimony regarding the supposed hydraulic pathway from the Oxford Landfill and how PCBs have migrated along it to Choccolocco Creek.  Again, however, expert discovery is now closed, and Plaintiffs have not supplemented their summary judgment opposition with any such materials.  Defendants are entitled to summary judgment on these claims as well.  *See Rockwell Intern. Corp.*, 171 F.3d at 1072-73.

### iii.    Disposal of Defendants' Wastes at Locations Where Plaintiffs Have Incurred Response Costs

Finally, both Defendants argue that they are entitled to summary judgment on Plaintiffs' remaining claims, based on allegations that Defendants' dumped spent ceramic shell molds contaminated with PCBs at certain other locations around Anniston and Oxford where Plaintiffs have incurred response costs.  Specifically, Plaintiffs have attempted to link the disposal of wastes of the Defendants, allegedly contaminated with PCBs, with Plaintiffs' remediation efforts at: (1) identified residential properties in the Hobson City section of Anniston, (2) the Quintard Mall, (3) areas near U.S. Interstate 20, and (4) the Choccolocco Wastewater Treatment Plant.  Claims related to those areas are addressed in turn.

In support of their claim that Defendants' wastes were dumped on residential properties,

_____

were, they fail to establish that Plaintiffs have incurred response costs at the Oxford Landfill as a result of a release or a threatened release of hazardous waste by Defendants.

34

Plaintiffs rely on the testimony of three witnesses: David McLaughlin, Bettye Ashley, and Mary Horne.  McLaughlin was employed by Southern Tool from the May 1983 until October 1993.  In the final year and a half of his employment, McLaughlin's duties included driving a Southern Tool truck to haul ceramic shell mold wastes to Oxford Landfill for disposal.  However, McLaughlin admits that he took ceramic shell wastes from Southern Tool and dumped them without authorization instead on an alley behind his own residence on Lincoln Street in Hobson City to smooth it out.  McLaughlin further admits that after doing so, he also dumped such shell waste material on the driveways of about five or six other residences in the area at the request of the respective property owners.  Southern Tool records indicate that a company investigation confirmed that McLaughlin had dumped shell wastes on the driveways of five identified residences on Martin Luther King Drive in Hobson City.  (ST Ex. 20).  Ashley and Horn each also testified that she saw a several driveways in Hobson City covered with white ceramic shell material recognizable as Southern Tool waste.  Both women further stated that McLaughlin was known in the neighborhood to be the source of such material.

Plaintiffs seem to recognize that McLaughlin's testimony related to his actions occurring almost a decade after Southern Tool purchased the Main Plant does not support that wastes from *Scientific-Atlanta* were dumped on residential properties, in Hobson City or anywhere else.  Nonetheless, Plaintiffs cite Ashley and Horne's testimony to support that proposition. Thre cited evidence cannot sustain the burden assigned to it.  Both Ashley and Horne referenced McLaughlin and Hobson City specifically, so it is unmistakable that the women were talking about the same white shell material from Southern Tool that McLaughlin admitted to dumping.  The record simply fails to show that wastes from Scientific-Atlanta were dumped on residential properties, so

Scientific-Atlanta is entitled to summary judgment on such claims.

As far as Southern Tool goes, Plaintiffs cannot establish that the McLaughlin's isolated instances of dumping constituted a release or threatened release of any hazardous substance that caused Plaintiffs to incur response costs. Even assuming for the sake of argument that Southern Tool may have used PCB wax at some point, there is no evidence that the shell wastes that McLaughlin dumped on driveways in Hobson City the early '90s, about fifteen years after the effective date of the TSCA ban, contained PCBs or any other hazardous wastes. There is also no evidence that any of those residences has required remediation under the PCD or under any EPA standard. Nor have Plaintiffs claimed that they incurred response costs at any of those residences.[18] Rather, Plaintiffs assert only that they "have incurred costs investigating the release or threatened release of PCBs at residential yards *on the same block*" where the McLaughlin disposals occurred. (Doc. 627 at 21-22, ¶ 61 (emphasis added)). The general evidence that Plaintiffs cites fails to establish even that proposition. Even so, the record fails to show that McLaughlin's actions resulted in any PCB contamination. Nor does it show that Plaintiffs' alleged response costs in the same area were caused by the release or threatened release of wastes by McLaughlin or even that Plaintiffs were aware of the presence of those wastes when they undertook investigative measures. Accordingly, Southern Tool is also entitled to summary judgment on these claims.

Plaintiffs next contend that Defendants' "ceramic shell material has been observed at

---

[18]/    Plaintiffs suggest that McLaughlin's testimony supports that there may have been additional residential properties upon which he might have dumped Southern Tool shell wastes, beyond the "five or six" he clearly acknowledged. However, in the absence of other evidence, the fact that McLaughlin's testimony might be somewhat vague or uncertain so as to leave open the possibility that there may have been other residence where disposals occurred would not be sufficient to allow a jury to find that such disposals actually occurred, never mind that they coincided with any location where Plaintiffs incurred response costs.

Quintard Mall," a location where Plaintiffs claim they "have incurred response costs ... due to the placement of materials generated by Defendants." (Doc. 627 at p. 20-21, ¶ 61).  In support, Plaintiffs cite a page of a letter dated October 1, 1999, from Robert Kaley, Solutia's Director of Environmental Affairs, to ADEM, which states in pertinent part as follows:

> Substantial information supports the hypothesis that found sand generated in the Anniston area has contributed PCBs into the environment. ... [T]he detailed sampling investigation at the Quintard Mall revealed the presence of fill containing foundry bricks and other debris associated with foundry operations.  A deposit of fill characteristic of foundry sand was also discovered during the excavation activities at the mall.  When analyzed, this sand showed concentrations of PCBs in excess of 1 part per million.  The characteristic dark color, the presence of brick and ceramic fragments, and the location outside of the flood plain established that this material was not the result of natural deposition.  Additional anecdotal information indicated that this debris was found sand used to fill a low-lying area on what later became Quintard Mall.

(Pl. Ex. SS to ST at ANREM0092141).

That letter, however, is hearsay and is not admissible at summary judgment.  *See Macuba v. Deboer*, 193 F.3d 1316, 1323-25 (11th Cir. 1999).  Even if the letter is admissible, it fails to connect either Defendant to the referenced waste material.  There is no other evidence that either Defendant's wastes were disposed of at or near Quintard Mall.  If anything, the letter seem to be describing loose spent foundry sand generated by other foundries that did not use investment casting.  Ultimately, Plaintiffs hang their hat on the letter's mention of "ceramic fragments" to link the wastes to these Defendants.  That is not enough.  Defendants are entitled to summary judgment on these claims.

Plaintiffs also claim that Defendants are liable to share in the costs of response around the Interstate 20 area.  To establish that this area is "disturbed with foundry ceramic material," Plaintiffs rely solely on the "sworn statement" given by one Leon Stovall to Plaintiffs' counsel in March 2006. (Pl. Ex. N to ST).  However, Stovall has since died.   Because his statement taken was *ex parte*,

Defendants had no opportunity to cross-examine him.  Defendants therefore argue that Stovall's statement is hearsay due to be excluded at summary judgment.  The court agrees.  *See* Rule 804(b)(1), Fed. R. Evid.; *Macuba*, 193 F.3d at 1323-25; *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1253-54 (11th Cir. 1999); *Bortell v. Eli Lilly & Co.*, 406 F. Supp. 2d 1, 9 (D.D.C. 2005).  Even if Stovall's statement is considered, however, it is insufficient to establish that those wastes were contaminated with PCBs, that they were generated by either Defendant, or that their disposal of in the I-20 area actually promoted Plaintiffs to incur response costs.  Defendants are entitled to summary judgment on these claims.

Finally, Plaintiffs maintain that Plaintiffs are liable under CERCLA to share in the costs of response incurred by Plaintiffs at the Choccolocco Wastewater Treatment Plant ("CWWTP").  Plaintiffs rely on the deposition of Hopper, their consultant in this litigation, who indicated that he observed "white ceramic material" at some "excavations" at the CWWTP that looked "very similar" to wastes generated by the Defendants' investment casting operations.  (Pl. Ex. TT to ST at p. 415-16).  Again, however, Plaintiffs have offered nothing more to establish that those wastes at the CWWTP were contaminated with PCBs or other hazardous substance, that they were actually generated by either Defendant and when, how the wastes came to be there, or that their presence caused Plaintiffs to incur response costs.  Accordingly, Defendants are entitled to summary judgment on these claims as well.

## IV.    CONCLUSION

Based on the foregoing, the respective motions for summary judgment filed by Southern Tool

(Doc. 616) and Scientific-Atlanta (Doc. 652) are both due to be GRANTED.  A separate final order will be entered.

DONE this 1st  day of June, 2012.

_____

PAUL W. GREENE

CHIEF, U.S. MAGISTRATE JUDGE